# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TERRY LANGSTON,

     Plaintiff,                     Case No. 22-cv-11883

v.                                  Hon. Terence G. Berg

CENTER FOR FAMILY HEALTH,

     Defendant.

---

## Sara Benedetto Deposition Testimony Index

| Summary of Testimony | Transcript Citations |
|---|---|
| • According to Ms. Benedetto, when Molly Kaser approached her to become the interim CEO, Ms. Kaser "shared that both Terry and Rebecca had put their hats in the ring… I just remember her saying that she thought Rebecca had the skillset to do it." | • 33:10-34:3 |
| • In April 2022, while both Ms. Snow and Plaintiff were still candidates, Ms. Benedetto invited Mr. Treacher to one of her "regular meetings" with Mr. Hogwood. | • 44:14-21 |
| • Mr. Treacher was invited because he and Ms. Benedetto "had concerns." | • 44:14-21. |
| • Ms. Benedetto's "concerns" included that she "didn't have any communication to know the status" of the Search Committee" and Campbell & Company; she wanted to "inquire what the process was, where we were in the process, things of the nature." | • 44:24-45:8 |

| | |
|---|---|
| • According to Ms. Benedetto, Mr. Treacher expressed concern that the Search Committee had "very strong opinions being shared, and that it was not seeming to be a fair process in terms of evaluating the candidates." | • 45:18-46:15. |
| • In the same meeting, Ms. Benedetto and Mr. Treacher told Mr. Hogwood Ms. Snow had the "skill set" to be the next CEO, but not Plaintiff. | • 43:2-44:5;<br>• 48:12-49:3 |
| • Specifically, Ms. Benedetto claimed that Plaintiff lacks "leadership and management skills" because he is "unorganized and dishonest." | • 49:4-18 |
| • According to Ms. Benedetto, Mr. Hogwood advised her "not to be concerned [and] that he had confidence in the Search Committee." | • 54:15-20 |
| • Ms. Benedetto says that Mr. Treacher is the only Search Committee member she spoke to about the CEO search. | • 55:15-56:4 |
| • Leadership Team members acquired the resumés of the final three candidates ahead of their interviews. | • 83:16-84:4. |
| • Ms. Benedetto says that she and the Leaderhsip Team had concerns regarding the three resumés, so she contacted Mr. Hogwood and "talked to him, in particular, about [Plaintiff's] resumé. | • 85:24-87:18 |
| • Ms. Benedetto claims that Mr. Hogwood advised her to "debunk" the discrepancies during the interview process. | • 86:21-87:2 |
| • Plaintiff was not afforded the opportunity to defend his resumé because the Leadership Team felt "awkward and "uncomfortable" confronting him. | • 87:9-18. |
| • Ms. Benedetto was the only deponent to testify that she was advised to preserve evidence. | • 58:19-59:17 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TERRY LANGSTON,

      Plaintiff,

                              Case No. 22-cv-11883

v

                              Hon. Terence G. Berg

CENTER FOR FAMILY HEALTH,

      Defendant.

_____/


VIDEO CONFERENCE DEPOSITION OF SARA BENEDETTO

Taken by the Plaintiff on Wednesday, May 10, 2023,

commencing at 9:59 a.m., via Zoom, pursuant to Notice.


APPEARANCES:

For the Plaintiff:     Mr. Grant M. Vlahopoulos (P85633)
                       Mr. Noah S. Hurwitz (P74063)
                       HURWITZ LAW, P.L.L.C.
                       340 Beakes Street, Suite 125
                       Ann Arbor, Michigan 48104
                       (844) 487-9489
                       grant@hurwitzlaw.com
                       noah@hurwitzlaw.com

For the Defendant:     Ms. Karen B. Berkery (P38698)
                       KITCH, DRUTCHAS, WAGNER, VALITUTTI &
                       SHERBROOK
                       One Woodward Avenue, Suite 2400
                       Detroit, Michigan 48226
                       (313) 965-7448
                       karen.berkery@kitch.com


(Appearances continued)



Page 2

```
 1    APPEARANCES continued:
 2
 3    Also Present:        Plaintiff Terry Langston
 4
      REPORTED BY:         Christine Hagle, CSR-5748
 5                         Certified Shorthand Reporter
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                TABLE OF CONTENTS
 2
 3    WITNESS:                              PAGE:
 4    SARA BENEDETTO
 5      Examination by Mr. Vlahopoulos          4
 6
 7
 8
 9
10
11
12    EXHIBITS:
13      None marked.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1  Via Zoom Video Conference
2  Wednesday, May 10, 2023 - 9:59 a.m.
3      * * *
4      (Mr. Hurwitz has not joined at this time.)
5      THE REPORTER:  Ma'am, could I ask you to raise
6  your right hand, please?
7      (Ms. Benedetto complied.)
8      THE REPORTER:  Do you solemnly swear or affirm
9  that the testimony you are about to give will be the truth,
10  the whole truth, and nothing but the truth?
11      MS. BENEDETTO:  Yes.
12      THE REPORTER:  Thank you.
13          SARA BENEDETTO,
14      having been called by the Plaintiff and sworn:
15          EXAMINATION
16 BY MR. VLAHOPOULOS:
17 Q   Good morning.  Would you please state and spell your full
18   name, for the record?
19 A   **Sara Benedetto.  The first name is s-a-r-a, last name is b,**
20   **as in boy, e-n-e-d-e-t-t-o.**
21 Q   It's nice to meet you, Sara.  My name is Grant Vlahopoulos,
22   and I'm one of the attorneys for Mr. Terry Langston.  Have
23   you ever been deposed before?
24 A   **Yes.**
25 Q   When were you deposed?

Page 5

1 A   **Several years ago, like seven, eight, nine years ago,**
2   **somewhere around there.**
3 Q   Okay.  And what was that about?
4 A   **It was in regards to an employee lawsuit.**
5 Q   Was that with the Center for Family Health?
6 A   **Yes.**
7 Q   And what was the nature of that lawsuit, if you know?
8 A   **An employee was terminated and filed a Complaint of -- that**
9   **she didn't feel like it was fair or something.**
10 Q   Was it a discrimination lawsuit, if you know?
11 A   **Not that I recall.**
12 Q   And you said this was several years ago, ballpark?
13 A   **Yes.**
14 Q   Do you have a number?
15 A   **I want to say like eight years ago maybe, seven, eight,**
16   **somewhere in there.**
17 Q   Were you COO at the time?
18 A   **Yes.**
19 Q   Is that why you were deposed?
20 A   **Yes.**
21 Q   All right.  Well, because it has been a few years, I'm just
22   going to go over some of the ground rules for how this will
23   work today.  This is a question and answer process.  I ask
24   the questions and you give me the answers.  Those answers
25   need to be verbal for the court reporter.  Do you

Page 6

1    understand that?

**2 A    Yes.**

3         (Mr. Hurwitz joined the deposition at 10:01 a.m.)

4 BY MR. VLAHOPOULOS:

5 Q    And we can take a break whenever you want, but we need to

6    make sure that you finish the answer to a question that is

7    pending before we break.  Do you understand?

**8 A    Yes.**

9 Q    If for some reason you don't understand a question that I

10    ask, tell me you don't understand.  Ask me to repeat it,

11    clarify it, whatever you need in order to understand the

12    question, okay?

**13 A    Yep.**

14 Q    Now, lastly, please let me finish the question before you

15    start answering, and I will let you finish your answer

16    before asking another question.  Do you understand?

**17 A    Yes.**

18 Q    And you understand your testimony today is under oath,

19    correct?

**20 A    Correct.  I understand.**

21 Q    Is there anything you can think of today that would impact

22    your ability to give truthful testimony?

**23 A    No.**

24 Q    Okay.  Now, I don't want to know what was said, but did you

25    prepare with your attorney ahead of today's deposition?

Page 7

**1 A    Yes.**

2 Q    When?

**3 A    Last Friday.  I don't remember the date, but it was Friday,**

**4    last week.**

5 Q    How long did you meet for?

**6 A    Two, three hours.**

7 Q    Did you speak with anyone else, other than your attorneys,

8    about today's deposition?

**9 A    No.  Well, my husband knows I have a deposition, but that's**

**10    it.**

11 Q    Did you look at any documents in preparation for today's

12    deposition?

**13 A    Yes.**

14 Q    What documents did you look at?

**15 A    I looked at the report that the reviewer -- just kind of**

**16    like my notes that were in the packets, and I reviewed the**

**17    videos that were submitted.  I looked at the Bloomerang, a**

**18    couple reports in the Bloomerang.**

19 Q    I'm sorry, did you say Boomerang?

**20 A    Bloomerang, like the flower bloom.  It's a database that**

**21    was used for fundraising.**

22 Q    Okay.  Could you spell that for me, please?

**23 A    Yes.  I believe it's b-l-o-o-m-e-r-a-n-g.**

24 Q    Thank you.  And can you tell me again what that is?

**25 A    It's a web-based allocation for tracking fundraising and**

Page 8

**1    constituent support kind of things, fund development.**

2 Q    Did you look at any emails or text messages in preparation

3    for today's deposition?

**4 A    No.  I only looked at the ones that were already printed**

**5    that were part of the interrogatory process I guess is what**

**6    you would call it.**

7 Q    Okay.  So any -- any emails, communications that might have

8    been produced in discovery then, right?

**9 A    Yes.**

10 Q    Okay.  Did you do anything else to prepare for today's

11    deposition?

**12 A    No, I don't believe so.**

13 Q    What is your current address?

**14 A    900 Brighton Road, Jackson, Michigan 49203.**

15 Q    And what is your highest level of education, Sara?

**16 A    I have a bachelor's degree.**

17 Q    What's your bachelor's degree in?

**18 A    It's in nursing.**

19 Q    Do you have any other degrees or certificates?

**20 A    No.**

21 Q    Okay.  And how long have you worked for CFH?

**22 A    I started in 1991, but we weren't officially incorporated**

**23    as the Center for Family Health until '95.  I'm never sure**

**24    of which date.  So I have been here since 1995 when we**

**25    became the Center for Family Health.**

Page 9

1 Q    Understood.  And what was your position in '95?

**2 A    I believe my title was support services manager.**

3 Q    Was this a nursing position?

**4 A    Yes.  It didn't require a nursing degree, but I oversaw the**

**5    services of community health nurses, social workers and**

**6    dieticians.**

7 Q    And how long did you hold the position of support services

8    manager?

**9 A    A couple of years, maybe three or four.**

10 Q    Okay.  And what did your position change to?

**11 A    It changed to -- I believe it was called operations manager**

**12    or clinic operations manager.  And at that time, it**

**13    basically merged two positions, and so I kept the support**

**14    services manager duties and then added oversight of our**

**15    clinics, but I think it was operations manager.**

16 Q    Okay.  And do you know the years that you held that

17    position?

**18 A    Not off the top of my head, but it was contiguous, you**

**19    know, right from the support services manager to that role.**

**20    For a --**

21 Q    Okay.  And -- oh, I'm sorry, go ahead.

**22 A    For a few years, it was that title.**

23 Q    Okay.  And when did that title change?

**24 A    Probably around 2000, I think.  It became operations**

**25    director.  So at that point, all of the positions that were**

Page 10

1  like -- not all, but like our finance manager became
2  finance director and the operations manager became
3  operations director.
4 Q  Did your responsibilities change at all, or was it just a
5  title change?
6 A  I think over time different departments as we -- as we grew
7  and got more different departments; for example, we added a
8  referrals department, so that then fell under me.  I can't
9  think of the exact ones, but yes, over time there were
10  other departments added.
11 Q  Okay.  And how long were you the operations director for?
12 A  Probably a couple years again, and it changed to chief
13  operating director.  Again, the finance director changed to
14  the finance officer, and the medical director changed to
15  medical officer.
16 Q  So when did you become the chief operating officer for CFH?
17 A  I think like the early 2000s was the title change.
18 Q  Do you have an exact date?
19 A  I don't, off the top of my head, remember.
20 Q  That's okay.  Now, was the -- the chief operating officer
21  is an executive position, right?
22 A  Yes.
23 Q  Okay.  Was the operations director an executive position?
24 A  Yes.
25 Q  So you've held executive positions, give or take, from the

Page 11

1  early 2000s then, is that fair?
2 A  That's fair.
3 Q  So as chief operating officer, can you tell me some of your
4  duties and responsibilities?
5 A  Yes.  I -- I oversee some -- several departments, which
6  included -- includes clinic operations, support services
7  operations, health information, which is like medical
8  records.
9      We're getting a little feedback on our end.  I'm
10  not sure if you're hearing it, but that's like a sound.
11  You guys aren't hearing that?
12 Q  I am not hearing that.
13 A  Okay.  It stopped.  Let me think, over the years it has
14  included IT, facilities, front office and human resources,
15  but that was more -- that was several years back.  It
16  included a variety of those things.
17 Q  So I want to break this down, if that's okay, Sara.  You
18  said several departments, one of them being the clinical
19  operations?
20 A  Yes.
21 Q  Okay.  Tell me what you do --
22 A  Not -- go ahead.
23 Q  I was going to -- you go ahead.
24 A  I was going to say clinical operations, meaning the
25  clinical support staff, not providers.

Page 12

1 Q  Thank you for the clarification.  So what did you -- what
2  are your responsibilities for the clinical support staff?
3 A  So the managers and supervisors that directly oversee the
4  medical assistants and the registered nursing staff all
5  fall under that.  So the day-to-day operations of taking
6  care of patients, prepping them for their visit with the
7  provider and all the follow-up work that happens.
8 Q  And what is your role in the day-to-day operations of that?
9 A  My role is general oversight and making sure that I am
10  providing leadership to that staff, so they know the
11  organizational goals and vision and helping them to
12  identify and troubleshoot anything that comes up, issues
13  and things.
14 Q  And then you also said support services, I think, right?
15 A  Yes.  So that's our dieticians, our community health
16  workers and our behavioral health staff.
17 Q  And what is your role there?
18 A  There is a manager that oversees all that staff directly
19  that -- and he reports directly to me, and it's similar to
20  oversight of the clinic operations.  My role is to make
21  sure that they understand the mission and the
22  organizational goals and strategies that we have in place
23  to care for our patients.
24 Q  Okay.  You also mentioned IT, facilities, I believe, right?
25 A  Yeah.  I -- I don't currently.  I don't currently have IT,

Page 13

1  but in the past I have had an IT staff.  That has been a
2  few years back.
3 Q  Okay.  What is your knowledge of IT, in general?
4 A  My knowledge is pretty limited.  I use our IT manager when
5  I have questions.  I mean, I have a basic understanding to
6  do what I need to do for my daily job, but I rely on their
7  expertise.
8 Q  Okay.  So when you were working with IT, facilities, what
9  exactly was your role?
10 A  So when I was -- and I should clarify, those are two
11  different roles.  I think I just -- so facilities
12  management is one and then IT.
13      When I worked with -- same with IT in the past.
14  It would have been five or six years since they reported to
15  me, but it was the same thing, just making sure that the IT
16  manager had the tools that they needed to effectively
17  manage, to let us know if there were issues that were
18  coming up, troubleshoot, strategize for how to support an
19  organization.
20 Q  So you were a point of contact, really, for the IT
21  department if they ever needed anything, right?
22 A  Yeah, I guess you could say that.
23 Q  Okay.  And you weren't hands-on with IT at all then,
24  correct?
25 A  No, correct.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
14..17

Page 14

1 Q   Is that the same for the clinical support staff and the
2   support services, were you hands-on there?
3 A   What do you mean by hands-on?
4 Q   For instance, like did you have any direct responsibilities
5   or were you just a point of contact?
6 A   I was directly responsible for the day-to-day operations
7   and whether they met the goals; for example, if there was
8   something that needed to be implemented, but I did not
9   actually do the work.  I didn't do any patient care or I
10   didn't go in and do any management of any IT functions.  I
11   would not have had access nor the knowledge of that.
12 Q   Understood.  You also mentioned human resources, I believe,
13   correct?
14 A   Yes.  That was several years ago as well, probably seven or
15   eight years ago.
16 Q   What was your involvement with human resources seven, eight
17   years ago?
18 A   The HR manager reported directly to me.  And again, when
19   I -- as a general broad oversight, but she did the daily
20   operations and the daily work in the HR department.
21 Q   And who was the HR manager at the time?
22 A   It was Cheryl Melville.
23 Q   I'm sorry, could you say the last name again?
24 A   Yeah, Melville.
25 Q   Could you spell that for me, please, if you know?

Page 15

1 A   I believe it's m-e-l-v-i-l-l-e.
2 Q   Thank you.  Was she the only human resources manager that
3   reported directly to you?
4 A   Yes.  We only had one manager.
5 Q   Do you have any involvement in grant writing for the
6   center?
7 A   Some, yes.
8 Q   Tell me about that involvement?
9 A   So I would -- depending on the grant, I would participate
10   in, you know, strategizing around how we would utilize the
11   funds, implement the funding requirements, sometimes
12   reporting, tracking what -- what was required of the grant
13   and making sure that we completed the reports on time and
14   that we met the outcomes.
15 Q   Off the top of your head, do you know how many grants you
16   participated in?
17 A   It has been a long time, so I do not.  I could tell you
18   there were at least three from United Way that I directly
19   oversaw several years ago.  Our schoolhouse center grants,
20   we had two, if I recall correctly, several through the
21   Michigan Primary Care Association, and then our federal
22   grant, which is the standing grant that we receive every
23   year since 2000.
24 Q   So you said it has been a long time since you were
25   involved, right?  What is -- what exactly does that mean?

Page 16

1 A   I don't mean a long time since.  I mean I've been involved
2   since 2000 at some level with grants, so it was hard for me
3   to say a number.  That's what I meant.
4 Q   Understood.  So when was the last time you were involved
5   with a grant directly?
6 A   Currently.
7 Q   Currently?  So even today, as COO, you're still involved in
8   the grant process?
9 A   Yes, yes.
10 Q   Are there levels of grants?  So what I mean by that is
11   there local level, state level and then federal level?  Can
12   you break that down for me?
13 A   Yes, that is correct.  There are federal levels, which is
14   our 330 Grant through the Health Resources and Services
15   Administration, and then there are some grants that we
16   received over the years through the state and then there
17   are some local grants as well.
18 Q   So we have three categories then; federal, state and local,
19   is that -- is that right?
20 A   Yes, yep.  Local could be anything.  It doesn't necessarily
21   mean it's associated with the government.  It could be an
22   individual donor or funder.
23 Q   Understood.  Who is involved from the center with federal
24   grants, and I want their names and positions, please?
25 A   Okay.  So it would be myself currently.  Prior to that, it

Page 17

1   would have been our CEO, Molly Kaser.  She was the prime
2   person, and then Rebecca Snow, the CFO; Kim Hinkle, the
3   quality improvement director.  Those three -- Molly, Kim
4   and Rebecca -- based on their roles would have been the
5   primary folks that would work in the grant system, in
6   the -- in the grant handbook and manage all of the reports
7   that were due.
8 Q   And we're speaking just for federal grants now, right?
9 A   Correct, that's federal, yeah.
10 Q   Tell me Molly Kaser's involvement in federal grants?
11 A   As the CEO, she would be the one that would be responsible
12   to get board approval, which is required for participation
13   in a federal grant.  The Community Health Center cannot
14   submit a request for a federal grant without board
15   approval.  So that was her largest responsibility or the
16   base of all of it.
17       And then she would either decide if she was going
18   to hire a consultant, which in the most recent years, most
19   of the time she did use a consultant that had expertise in
20   federal grant writing.  And then she -- Rebecca -- oh, you
21   asked about Molly.
22       And then Molly would ultimately have to sign off
23   on the grant and submit it once she had approval from the
24   board.  And once she was assured that everyone that had a
25   piece of the grant completed their portion and she was

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
18..21

Page 18

1  satisfied with it, she's the primary authority to sign off
2  on that.
3 Q  So you kind of anticipated my next question.  What was
4  Rebecca Snow's involvement?
5 A  So as the finance -- the chief finance officer, HRSA
6  requires that you have a -- the finance officer is
7  typically the person that would manage all the finances and
8  do the financial reporting, the budgeting.  It would
9  include the staffing, and there are regular reports that
10  would have to be filed once you approve -- the grant was
11  approved.  There also might be conditions on the grant that
12  she might have to respond to where they might ask you to
13  supply another document or something of that nature, and
14  Rebecca would be responsible for that.
15 Q  You mentioned earlier that Molly would hire consultants to
16  write these grants, right?
17 A  Yes.
18 Q  Was anyone -- let me backtrack.  Was Molly involved at all
19  in the writing of these grants?
20 A  Yes.
21 Q  Okay.  Now, what about --
22 A  As I --
23 Q  Go ahead.
24 A  As I understand it, she would -- she would meet with them
25  and talk with them about what we were proposing.  They

Page 19

1  would write some pieces, send it back to her for review.
2  That's how she was involved.
3 Q  Okay.  Did Molly get any help from any employees when she
4  reviewed these grants?
5 A  She would -- definitely would work very closely with
6  Rebecca, because what you wrote in the operational piece
7  had to match what your budget was.  And then, on occasion,
8  she would submit it -- she would send it to the rest of the
9  director team to say here's what we're submitting, but not
10  always.
11 Q  Did Rebecca ever directly write any grants, federal grants?
12 A  I don't know that she wrote them.  So there is -- the way
13  that the federal grants work is you have narrative pieces
14  that you write and then you also have the financial.
15      Some of the financial requires a narrative, so
16  she did not write the operational narrative, to my
17  knowledge.  But the finance person is very heavily involved
18  in the financial writing of the grant; the budget, the
19  narrative, the staffing plan, so very much entwined with
20  what the consultant was writing.  She was very much a part
21  of that.
22 Q  You also mentioned Kim Hinkle was involved in this with the
23  federal grants?
24 A  Yes.
25 Q  Can you tell me her role?

Page 20

1 A  As the QI director, she would be responsible or is
2  responsible for any of the outcomes that we would report on
3  that we had to meet.  So she often would be -- is part of
4  federal grant reporting and submitting our status.  And if
5  it's related to quality, there are -- there are pieces
6  related to quality that are part of our federal grant
7  process, and she is very heavily involved in that.
8 Q  Does she ever directly write any of the grants?
9 A  I don't think she directly wrote any of the federal grants,
10  that I'm aware of.  She may have written a piece of it or
11  reviewed a piece of it with Molly and the consultant as
12  relates to quality.
13 Q  Do you know if Mr. Langston ever reviewed federal grants?
14 A  No.  I actually confirmed with Molly, and she said that he
15  did not.
16 Q  All right.  So when did you confirm this with Molly?
17 A  When Terry submitted his resume or when I received the
18  resumes from Campbell and Company to review the candidates
19  for the CEO position, and I know that I was not the CEO at
20  the time.  So I wanted to make sure that maybe there was
21  something that I wasn't aware of.  But to my knowledge, he
22  had not participated in it.  So that's why I reached out to
23  her, and she confirmed it.
24 Q  What exactly did she say, Sara?
25 A  What exactly did she say?

Page 21

1 Q  Correct, yes.
2 A  She said that he did not participate in the federal grant
3  writing components and that she worked with Rebecca and Kim
4  on those, and the only involvement would have been if she
5  had sent it out to all the directors.  At which point, I
6  would have seen it as well and said here's the grant that
7  we are submitting.  She said he was not involved in any of
8  the information gathering or any pieces of the federal
9  grants.
10 Q  When did this conversation take place, the month exactly?
11 A  May, 2022.
12 Q  Do you know when in May?
13 A  Around the 8th or 10th or something like that, earlier in
14  the month.
15 Q  Was this communication over the phone or via email, text?
16 A  Over the phone.
17 Q  Did you take any notes of this conversation?
18 A  Yes.
19 Q  And where are those notes?  Where did you keep those notes?
20 A  I kept them on my own -- in my computer, and then I
21  submitted them to my attorney.
22 Q  Do you know if those notes have been produced in the course
23  of discovery?
24 A  Yes, I believe they have.
25 Q  I want to go back to state grants real quick.  Are those

Page 22

1    three individuals also involved in state grant writing?  So
2    that includes Molly Kaser, Rebecca Snow and Kim Hinkle,
3    right?
4  A   Rebecca for sure, Molly for sure.  Kim Hinkle, yes, she is
5      involved in some of them.
6  Q   Is anyone else involved in state grant writing?
7  A   I have to think a minute.  The current ones that we have
8      through the Michigan Primary Care Association, I believe it
9      would just be those three that I mentioned and myself.
10 Q   Was Terry involved -- or was Mr. Langston involved in state
11     grant writing?
12 A   He may have been.  I don't know for sure.
13 Q   Is it in his job description that he's involved in
14     non-federal grant writing?
15 A   I believe there is a statement in there about grant
16     writing.
17 Q   Did Mr. Langston ever help a consultant with a federal
18     grant for Hillsdale?
19 A   I don't know off the top of my head.
20 Q   How many consultants does the center work for -- work with
21     when writing federal grants?
22 A   I know of one that Molly was working with in the last
23     couple of years, and then I know of another one that we
24     worked with prior to that.  Two women, and I can't remember
25     their names, but they also work with us.  Other than that,

Page 23

1      over the years, I couldn't say if there were any other
2      ones.  So I would guess two -- I would say two or three
3      different consulting firms.
4  Q   Do you know what the names of those firms are?
5  A   I do not.  I know the names of two people.  I can't think
6      of the name of the firm, but Mary Lieber (phonetic) was one
7      person, and I'm trying to think of the other person's name
8      that worked with her.  They worked together.  And the other
9      person, it's a gentleman.  I don't know his name off the
10     top of my head.  I never met him.
11 Q   Who would have that information, if you know?
12 A   I -- I would have it.  I have access to it.  I just don't
13     know it off the top of my head.
14 Q   Okay.  Who else from the center would have that
15     information?
16 A   About -- can you clarify, the information about --
17 Q   Sure.  About the consultants that the center works with?
18 A   Typically, our finance -- or our interim CFO would know if
19     we had any invoices, but we're not working with anyone
20     actively.  He would be able to see the name of the
21     consultant in our federal electronic database, because
22     that's where the consultant's name is listed.  So he would
23     be -- our interim CFO would be able to see that.
24 Q   Who is your interim CFO?
25 A   Dave Fiero.

Page 24

1  Q   Can you spell the last name for me, please?
2  A   F-i-e-r-o.
3  Q   Thank you.  With regard to federal grant writing, is there
4      anyone else who would have information on that process?
5  A   Not that I can think of.
6  Q   Would members of the board have information on federal
7      grant writing?
8  A   They would have information when Molly would ask for their
9      approval to pursue or to move forward with submitting an
10     application.  They would have information on general
11     knowledge, that I asked for their approval to submit a
12     federal grant this past winter.
13 Q   So the board approves of these grants.  Do they review
14     thoroughly each and every grant that is presented?
15 A   They do not.
16 Q   Okay.  What exactly -- what's the process for board
17     approval with federal grants?
18 A   The process is that the CEO would present the grant
19     opportunity, the general review of the requirements of the
20     grant, the financial amount that we would receive and a
21     recommendation from the CEO as to whether to move forward
22     with that.
23 Q   Was the board ever told who wrote the grant?
24 A   Not to my knowledge.
25 Q   Were they -- were they told if an outside consultant was

Page 25

1      hired to write the grant?
2  A   I believe they would have.  Molly would typically share
3      that information, because the federal grant is such a
4      significant part of who we are and what we do.  So I
5      believe she would tell them that she's working with a
6      consultant.
7  Q   When federal grants were presented, did Molly tell you who
8      wrote the grant?
9  A   I would generally have an idea of who was writing or who
10     was working on it.  The last grant -- there is a
11     significant competitive process every three years called a
12     SAC, s-a-c.  And the last one that was done, Molly, I
13     believe, talked to the -- the director came and said I'm
14     considering getting a consultant; what does everyone think
15     about that?  And we said we agreed, and she -- so that was
16     my knowledge of it.  After that, I was not involved with
17     securing the consultant or anything.
18 Q   So you said you have a general idea.  Did Molly ever
19     directly tell you who was involved with the grant when it
20     was presented?
21 A   She told me that she was going to work with a consultant,
22     but I didn't know who the consultant was at the time.
23 Q   Did she tell you if an employee reviewed the grant and gave
24     her feedback?
25 A   She told me not at the time, she didn't.  But when I asked

Page 26

1    her in that first week in May of 2022, she said she did not
2    give that to anyone to look at until after the fact.  She
3    did not reach out to Terry.  I know she didn't reach out to
4    me.  She worked with Kim primarily and Rebecca and the
5    consultant.
6 Q    So prior to May, 2022, had you spoken directly with Molly
7    as to who writes these grants?
8 A    Yes.  I would have had conversations, that she was working
9    with a consultant to write the grant, and that she -- and I
10    would know that she was working with Rebecca.  It would be
11    talked about at meetings.
12 Q    Prior to May, 2022, did Rebecca ever tell you if any other
13    employees, excluding Rebecca and consultants, employees of
14    the center, did she ever tell you that they revised or
15    reviewed grants with her?
16 A    I don't recall.
17 Q    Do you have a role in drafting any employee policies?
18 A    Not drafting it, no, but reviewing them, yes.
19 Q    What employee policies do you review?
20 A    Each year the employee policy manual is typically updated
21    and revisions are discussed at the director meeting and
22    then shared with the board.
23 Q    Can you explain to me the process of how an employee -- how
24    policies are approved or revised?
25 A    In general, I can say that depending on the department, a

Page 27

1    policy would be -- it would be that director's role to
2    either draft it themselves or assign it to one of their
3    management staff, and then it would be brought back to the
4    directors for review and input.  And then if the -- once
5    the directors approved it, it would go to the board.  If
6    it's a finance policy, it would go to a committee first, a
7    finance committee, and then the finance committee would
8    carry it forward to the board -- the full board.
9 Q    Is there a policy with respect to grant writing at any
10    level?
11 A    I can't think of one off the top of my head.
12 Q    What are some of the policies that you've reviewed?
13 A    Recently, the ones that stand out is a procurement policy,
14    then there's a conduct policy, a finance policy manual, new
15    risk clinical policies.  That's what I -- that's what comes
16    to my mind recently.
17 Q    Are there any guidelines that the center keeps for grant
18    writing?
19 A    Not to my knowledge, not that I've seen.
20 Q    Are there any anti-discrimination policies at the center?
21 A    Yes.
22 Q    Do you have knowledge of them?
23 A    Yes.
24 Q    Tell me about those policies?
25 A    Well, the knowledge that I have is that they are policies

Page 28

1    that state that we do not discriminate.  They are
2    consistent with federal language, and they are part of our
3    human resources policies.
4 Q    Do you review them before they're approved?
5 A    Yes, I would have.
6 Q    To your knowledge, has anyone at the center ever violated a
7    discrimination policy?
8 A    Not to my knowledge.
9 Q    In your entire tenure of working there?
10 A    Nothing is coming to my mind at the moment, that anyone has
11    ever violated a policy -- a discrimination policy.  I can't
12    think of a time right now.
13 Q    Are there any policies or rules that specifically apply to
14    the board of directors?
15 A    Yes.
16 Q    What kinds of policies would that include?
17 A    The standards of conduct is the overarching policy which
18    describes the expectations of board and staff around
19    confidentiality, anti-discrimination.  It's a -- it's a
20    broad policy that overarches all of those things.
21 Q    Are board members ever trained on these policies?
22 A    Yes, they are.
23 Q    When are they trained?
24 A    Well, they just had a training -- they had a training last
25    summer.  They had a training just last month, and then also

Page 29

1    several of our board members have attended board member
2    training both at the state and federal level for community
3    health centers specifically, and that includes things like
4    board member rules and responsibilities and expectations
5    around the standards and conduct and behavior.
6 Q    Prior to May, 2022, when was the -- when was the latest
7    training on these policies prior to May, 2022?
8 A    I wouldn't know that, because I was -- that would have been
9    under Molly, our CEO's purview.  She would have managed
10    that, so I couldn't speak to that.
11 Q    Well, when did Molly retire?
12 A    In May of -- no, in March of 2022, March 25 or something.
13 Q    So as soon as you became the interim CEO, there were no
14    trainings or any policies reviewed with respect to the
15    standards of conduct?
16 A    Not right away, no.
17 Q    Okay.
18 A    The board --
19 Q    Were you ever -- sorry, go ahead?
20 A    The board did get training.  I was not present, but they
21    were working with a board consult- -- a consultant.  And my
22    understanding from our board development chair is that they
23    all reviewed the standards of conduct, and I have signed
24    statements stating such that we have.  Those were done last
25    July, I believe.

Page 30

1 Q    Was the board ever trained on the process for grant
2    writing?
3        MS. BERKERY:  Grant?
4        THE WITNESS:  Not to my knowledge.
5        MS. BERKERY:  Grant, just a minute.  There's
6    someone vacuuming right outside the door, and I would like
7    to ask them to stop.
8        MR. VLAHOPOULOS:  Certainly.  We can go off the
9    record real quick.
10        (Off the record at 10:40 to 10:41 a.m.)
11        MR. VLAHOPOULOS:  Let's go back on the record.
12 BY MR. VLAHOPOULOS:
13 Q    So we got disrupted by some vacuuming.  But, Sara, I just
14    want to be clear, there are no policies on grant writing,
15    correct?
16 A    Not to my knowledge, that I can think of offhand.
17 Q    Is there a formal procedure, though, on grant writing?
18 A    I'm not thinking of one offhand.  There might be, but I'm
19    not thinking of it.
20 Q    Okay.  Were you ever debriefed on -- strike that.  When you
21    became the interim CEO, did you receive any special
22    training?
23 A    No special training, no.
24 Q    Okay.  Were you updated on any policies, procedures or
25    responsibilities as CEO?

Page 31

1 A    Yes.
2 Q    Okay.  Tell me about that?
3 A    So I met with Molly, and she just shared the status of
4    several items at the time, and I think that was the extent
5    of it.
6 Q    When did you meet with Molly?
7 A    It probably would have been in the month of March, maybe
8    the latter part of February.
9 Q    You said status on several items.  What does that mean?
10 A    So I couldn't recall the specifics at the time, but it
11    would have been things like here's the status of where we
12    are with a building project.  Our strategic plan, we
13    reviewed that, which would have outlined -- outlined the
14    current organizational goals.  She would have -- she talked
15    to me, I do recall, about who our federal project officers
16    were, because those are the folks that I would need to be
17    in touch with, things of that nature.
18 Q    Did she ever talk to you about the search process for
19    finding her permanent replacement?
20 A    Not in those meetings.
21 Q    Okay.  When did she talk to you about it then?
22 A    She would -- she talked about it when -- well, she talked
23    about it as part of the full board.  I was present when the
24    board made decisions about how they were going to move
25    forward with the search.  And other than that, the only

Page 32

1    other conversation I recall specifically was when she came
2    and asked me, on behalf of the board, if I would have
3    interest in being the interim CEO.
4        At that time, she just explained that they were
5    hopeful they would have a CEO named by the time she
6    retired.  But if they did not, would I be interested in
7    doing that position, because I was not applying for it.  So
8    it made sense for me to be one of the candidates that they
9    would consider for interim CEO.
10 Q    So when exactly did you take the -- assume the position of
11    interim CEO?
12 A    I believe it was March 25 or 28 of 2022.  One of those
13    dates sticks in my head.
14 Q    At that point, between March 25 and March 28, was it
15    already known that there would be a search process that
16    takes place?
17 A    The search process was already in -- the search was already
18    in process.  It had been that entire winter.
19 Q    So when did -- perhaps I've already asked this, but when
20    did Molly announce her retirement?
21 A    I believe it was October of 2021, October or maybe
22    November.
23 Q    And then when did the search process kick off?
24 A    I can't tell you exactly other than it would have been
25    around December or January, but I was not part of the

Page 33

1    specifics of that.  So it was just shared by Molly that the
2    search committee was being formed and they were -- we got
3    updates at the board meeting.
4 Q    Did Molly ever tell you who she wanted as a replacement for
5    her?
6 A    No, not who she wanted, no.
7 Q    Was she aware that internal candidates might be applying?
8 A    At some point, she was aware.  I don't know when she became
9    aware, but she was aware.
10 Q    Okay.  Do you know if Rebecca Snow ever told her directly
11    that she wanted to be the new CEO?
12 A    I believe when Molly came to me and asked me about being
13    the interim is when she shared that both Terry and Rebecca
14    had put their hats in the ring or had -- or were saying
15    that they were applying or had applied.  I can't remember
16    at what stage it was in, but that's my direct knowledge of
17    that.
18 Q    And what did she say about either Terry or Rebecca applying
19    for the position?
20 A    Just that they both had applied, which is why the board
21    thought it made sense to have someone that was not
22    interested in applying be the interim CEO.
23 Q    Did she ever express an opinion as to who she preferred
24    between Terry and Rebecca?
25 A    I don't remember her expressing an opinion.  I just

Page 34

1    remember her saying that she thought Rebecca had the skill
2    set to do it.  I don't remember her ever saying anything
3    other than that.
4 Q   Okay.  What about Rebecca's skill set did Molly think was
5    suitable?
6 A   That she had been the CFO for several years at the center,
7    that her skills included leadership and management.  She
8    didn't get into any real particular things.
9 Q   So I want to break this down, I'm sorry.  You said it was
10   her management skills and what else?
11 A   Her experience being the CFO and also having some
12   experience over health center operations, because she was
13   involved with the front desk oversight, but she really
14   didn't talk to me specifically.  It was not a detailed
15   conversation.
16 Q   Who does Rebecca -- is Rebecca still with the center?
17 A   No, she's not.
18 Q   Okay.  When did she leave?
19 A   She resigned at the end of September, and her last day was
20   somewhere around the first week of October.  I don't
21   remember the exact day.
22 Q   Why did she resign?
23       MS. BERKERY:  Foundation, but go ahead.
24       THE WITNESS:  What she shared with me is that she
25   was commuting a long way.  And she was ready to stop having

Page 35

1    to commute so long, and she needed to find something
2    different for her family.
3 BY MR. VLAHOPOULOS:
4 Q   So the only reason she gave you is a long commute?
5 A   A long commute, yes.
6 Q   How long had she worked for the center?
7 A   I think seven years, seven and a half, or something like
8    that.
9 Q   So for seven years, she has a long commute, and she doesn't
10   get picked as CEO and then she says, okay, this commute is
11   too long, is that right?
12 A   Yes.  And also, I think at one point they were deciding on
13   whether they were going to move to Jackson.  I think if she
14   had gotten the CEO position, maybe that would have
15   happened.  I don't know, but she didn't feel like she
16   wanted to continue her employment at the center and they
17   weren't going to move here, so it was time to find a job
18   closer to her home.
19 Q   How long of a commute did she have?
20 A   If I recall -- I know it was well over an hour, at least an
21   hour and 15 minutes or something like that.
22 Q   Was she required to be in the office every day?
23 A   Yes.
24 Q   Even during the pandemic?
25 A   During the pandemic, Molly implemented a strategy -- not

Page 36

1    the entire pandemic, but a portion of this time, where the
2    CEO -- excuse me, the C-suite staff and managers were
3    required to go -- do one day remote per week for safety
4    purposes.
5 Q   So earlier you said Molly was impressed with Rebecca's
6    management and experience with health center operations, is
7    that right?
8 A   I don't know if -- I didn't use the word impressed, but I
9    said, yeah, that Molly thought that she had the skills and
10   abilities to do that, yes.
11 Q   Fair enough.  What experience did she have with health
12   center operations?  You mentioned the staff desk earlier.
13   Can you tell me more about that?
14 A   Yes.  Her responsibilities included oversight of the front
15   desk, so all the receptionists that check patients in and
16   out, oversight of the phone room, which is the call center
17   as patients call in.
18       She also had oversight of the dental manager and
19   worked closely with the dental director on the overall
20   operations of the dental clinic.  She was over human
21   resources.  And then the other piece of what I would call
22   operations would be the referrals department.  She was over
23   all of the staff and all of the processes of that
24   department.
25 Q   Does Mr. Langston have any experience with health center

Page 37

1    operations?
2 A   No, not to my -- no, not at the Center for Family Health.
3 Q   Okay.  What about with management at the Center for Family
4    Health, does Mr. Langston have any experience with that?
5 A   He had one direct report for a period of time.
6 Q   When you say direct report, is that an employee who he
7    supervised?
8 A   Yes.
9 Q   Okay.  What about consultants, did he ever supervise any
10   consultants?
11 A   He worked with consultants.
12 Q   How did he work with consultants?
13 A   He would give them the assignment of writing the newsletter
14   or creating an ad.
15 Q   Did he have the final approval over those newsletters or
16   ads?
17 A   I believe it would have been him or Molly, but I believe it
18   was him.
19 Q   Okay.  So he had some oversight there, right?
20 A   Yes.  He would have had oversight with that.
21 Q   Do you know how many -- how many consultants Terry had
22   oversight with?
23 A   I learned that he had over- -- that he worked with R. J.
24   Michaels, someone by the name of Jennifer Cochran
25   (phonetic), who was the sister or sister-in-law to two

Page 38

1    other people that worked at Wild Design. And those are the
2    only ones I'm aware of, but I believe over the years he
3    worked with others.
4  Q    And how did you come to learn of those consultants?
5  A    Wild Design I just knew of. I don't know -- just because I
6    knew of them. R. J. Michaels I knew, because we were doing
7    a women's health promotional campaign. So as a member of
8    the director team, I was aware of that. Jennifer Cochran I
9    became aware of after Terry left and she -- I was connected
10    with her through the folks at Wild Design.
11 Q    So I want to go back to this conversation that you had with
12    Molly about the two internal applicants, Rebecca Snow and
13    Terry Langston. You told me that she mentioned Rebecca
14    might be a good fit, right?
15 A    Yes.
16 Q    Did she ever say anything about Terry?
17 A    Not that I recall.
18 Q    Did she encourage Rebecca to apply for the position?
19 A    I -- I don't know if she did or not.
20 Q    Do you know if they had any conversations about applying
21    for the position?
22 A    I learned -- I recall Rebecca telling me that she told
23    Molly that she was interested.
24 Q    Do you know if she told Molly over the phone, in written
25    communication? How did she tell her?

Page 39

1  A    I don't know.
2  Q    When did Rebecca tell you this?
3  A    Rebecca shared it when she told me that she had applied,
4    that she said --
5  Q    When was that?
6  A    It would have been last winter sometime. I -- I don't
7    recall specifically, but after the search process.
8  Q    And did she tell you before she applied or after she
9    applied?
10 A    She might have told me that she was going to apply. I
11    don't recall specifically, but I know that she did tell me
12    that she had applied at some point.
13 Q    So just to summarize, she might have told you before she
14    applied, that she was thinking about it, but she for sure
15    told you afterwards, is that right?
16 A    Yes.
17 Q    Okay. Did anyone else at the center know Rebecca was going
18    to apply?
19    MS. BERKERY: Foundation. Go ahead.
20    THE WITNESS: I do not know.
21 BY MR. VLAHOPOULOS:
22 Q    You don't know if any board members were aware that Rebecca
23    was going to apply?
24    MS. BERKERY: Foundation. Go ahead.
25    THE WITNESS: For clarification, I don't know if

Page 40

1    they knew she was going to, but I know that they knew that
2    she did because the search committee would know.
3  BY MR. VLAHOPOULOS:
4  Q    Of course.
5  A    Also, for clarification, I know that she shared with
6    directors that she had applied. I don't know if she shared
7    with people that she was going to.
8  Q    Which directors did she share that with?
9  A    I believe all of them, but I -- I couldn't say for sure. I
10    know Kim Hinkle knew and Dr. Johnson knew. I don't know if
11    Dr. Thornton or if Terry knew from her. I don't know who
12    she talked to specifically, but I know that there was
13    general awareness that she had applied.
14 Q    Did you have conversations with anyone about Rebecca's
15    application?
16 A    No.
17 Q    Okay. Did you have any conversations with anyone about the
18    prospect of Rebecca becoming the CEO?
19 A    No, not that I recall.
20 Q    So you didn't -- you didn't talk -- I want to be clear.
21    Sorry, Sara, but I want to be clear, you didn't talk to
22    anyone about Rebecca becoming the CEO; is that your
23    testimony today?
24 A    What I talked to people about -- what I would have talked
25    about is that Rebecca had applied for the position and that

Page 41

1    she also, if I was asked -- I believe I talked to Steven
2    Hogwood. He asked if -- what I thought. I thought that
3    Rebecca had skills, but I never talked to anybody about her
4    specific application or her -- or the process of her being
5    the CEO. I just would have shared that I knew that she had
6    applied and that she had what I thought was the experience
7    for it.
8  Q    Why did you share that information?
9  A    Because I was talking to my board chair directly, and he
10    was asking me what I thought about the search and I shared
11    that -- that's when I shared it.
12 Q    So to be clear, did you share that you thought Rebecca was
13    qualified?
14 A    I shared that I thought she was qualified, but I did not
15    share that I thought she should get the job or have any
16    conversation about who -- with any board members of who
17    should or should not get the job.
18 Q    So you supported her, but you didn't expressly say that
19    she's the one who should get the job?
20    MS. BERKERY: Form of the question.
21    THE WITNESS: Yeah, I don't know what you mean by
22    supported her.
23 BY MR. VLAHOPOULOS:
24 Q    Well, you -- you said that she's a good fit for the
25    position, right?

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
42..45

---

Page 42

```
 1 A   I said I thought she had the skills to do the position, to
 2     fill that position.  I did not say I think that she should
 3     get it or that I thought she would be a good -- the best
 4     fit or anything of that nature.
 5 Q   So you endorsed her candidacy then, right?
 6         MS. BERKERY:  Form of the question.
 7         THE WITNESS:  I -- I never said to someone I
 8     endorse Rebecca.  I said I think Rebecca has the skills and
 9     experience to do the position.
10 BY MR. VLAHOPOULOS:
11 Q   Were you the interim CEO at the time you said this?
12 A   Yes.
13 Q   Do you think that carries some influence?
14 A   It could.
15 Q   Okay.  So is it possible that others considered you
16     endorsing Rebecca for the position?
17 A   No.
18         MS. BERKERY:  Foundation.
19         THE WITNESS:  Do I answer?
20         MS. BERKERY:  You can if you know what other
21     people thought.
22         THE WITNESS:  I don't know what other people
23     thought.  The only person I specifically talked to about
24     that was Steven, and I believe Randy was present at that
25     same meeting.
```

---

Page 43

```
 1 BY MR. VLAHOPOULOS:
 2 Q   Randy Treacher that is, right?
 3 A   Yes.
 4 Q   Okay.  Why didn't you mention his name earlier?
 5 A   Because I didn't think of it until just now.
 6 Q   Until just now?  Okay.  What did you talk about with
 7     Mr. Treacher?
 8 A   The same thing.  It was the same conversation.
 9 Q   So you went to the board director, Mr. Hogwood, and
10     Mr. Treacher and you said Rebecca Snow might be a good fit
11     for this position, is that right?
12 A   No, that was not the nature.  I think it's not the nature
13     of the meeting.  I would meet with Steven, the board chair,
14     on a regular basis.  As my board chair and as my role as
15     interim CEO, I shared with him that I felt that Rebecca had
16     the skills and experience to do the position.  And Randy
17     was also present, and I shared that with the two of them.
18     That was it.  I did not talk to any other board members
19     about Rebecca or any of the process.
20 Q   So Mr. Treacher was in the room when you had this
21     conversation with Mr. Hogwood?
22 A   Yes.
23 Q   Okay.  What did -- what did Randy say, if anything?
24 A   I don't recall the specifics other than that he felt that
25     Rebecca had the skills as well.  He specifically did say
```

---

Page 44

```
 1     that he did not -- was not suggesting that Rebecca be the
 2     CEO, that they had lots of other candidates they were
 3     interviewing, and he felt there were some really good
 4     candidates.  He felt there was one candidate in particular
 5     that had better qualifications than Rebecca.
 6 Q   And who was that?
 7 A   I have no idea.
 8 Q   Do you know if that person was ever a finalist?
 9 A   I don't know.
10 Q   How long was this conversation between you, Mr. Treacher
11     and Mr. Hogwood?
12 A   I don't know, maybe a half hour, but it was part of my
13     regular meeting with the board chair, so...
14 Q   So if this was part of your regular meeting with the board
15     chair, why was Randy Treacher present?  He's not the board
16     chair, right?
17 A   Correct.
18 Q   So why was he present?
19 A   Randy was present because I had some concerns, and I asked
20     him if he would join me in the conversation with Steven.
21     And he had concerns as well.
22 Q   Some concerns about -- let's break this down.  You said you
23     had some concerns.  What were your concerns?
24 A   My concerns were about how the search process was going.  I
25     didn't have any communication to know -- I didn't know what
```

---

Page 45

```
 1     the status was from the search committee.  I didn't know
 2     what the status was from the search firm itself.
 3         I was wanting to inquire what the process was,
 4     where were we in the process, things of that nature.  And I
 5     also shared with Steven and Randy at that time that I felt
 6     Rebecca had the skill set.  I think Steven said do you
 7     think she should get the job, and I said, no, I'm not
 8     saying that she should get the job.
 9 Q   But you were suggesting it, though, right?
10 A   No, I was not suggesting it.  I was answering a question
11     about whether or not Rebecca was skilled and qualified to
12     do the job, and I said I thought she was.
13 Q   So you -- let me be clear here, you didn't initiate this
14     conversation about Rebecca?  Steven asked you about
15     Rebecca's opinion -- or your opinion about Rebecca?
16 A   Yes.
17 Q   Okay.  What was -- you said you had some concerns and Randy
18     had some concerns.  What were Randy's concerns?
19 A   He was concerned about the search process itself.
20 Q   What about it?
21 A   Just that there were strong feelings -- that's not --
22     strong opinions being shared about who should move forward
23     and who shouldn't move forward in the process, things of
24     that nature, and he was concerned that it wasn't a fair
25     process.
```

---

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
46..49

Page 46

1 Q   Okay.  I'm going to ask you some questions on that, but
2     real quick, for the record, when did this conversation take
3     place between you, Steven and Randy?  Do you have the month
4     and date?
5 A   I don't have the date, but it probably was sometime at the
6     end of April, I'm thinking.
7 Q   April of 2022, right?
8 A   Correct.
9 Q   All right.  So you said Randy was concerned about strong
10    opinions, is that correct?
11 A  Yeah, that's how I recall it.  I'm not using those exact
12    words.  I'm not saying those were his exact words, but it
13    was something of that nature, that it was -- there were
14    very strong opinions being shared, that it was not seeming
15    to be a fair process in terms of evaluating the candidates.
16 Q  So you're speaking generally, and I understand that, but
17    what are these opinions that you're discussing?
18 A  Specifically, there was concern -- or I shouldn't -- I'm
19    not going to say concerns, because I don't want to put that
20    word in his mouth because it has been so long since we had
21    this conversation.  But there were concerns or there was
22    comments made about what they -- the search committee, what
23    skills and experience they were considering as they were
24    moving candidates forward.
25 Q  You said the search committee, not Campbell and Company,

Page 47

1     right?
2 A   Yeah, the search committee.
3 Q   Okay.  And then you also mentioned that it wasn't a fair
4     process, correct?
5 A   Yes.  That's my -- that's my assessment of the conversation
6     and the things that Randy brought to that conversation.
7 Q   Okay.  What about the process was not fair according to
8     Mr. Treacher?
9 A   That the way the candidates were being vetted and who was
10    being moved forward, it did not seem to be that the search
11    committee was being objective when comparing skill sets and
12    experience.
13 Q   So this conversation took place in April of 2022.  Was
14    Rebecca still in the search or had she been rejected at
15    this point?
16 A   If I recall, she was still in the search, yes.
17 Q   Okay.
18 A   She and Terry were both in the search.
19 Q   What was Steve Hogwood's response to Randy during your
20    meeting?
21 A   He said just to continue.  He said I hope you will just
22    continue with the process and keep, you know, sharing your
23    concerns or your opinions or something of that nature.
24 Q   Anything else Mr. Hogwood said?
25 A   It's really difficult for me to recall.  It was a long time

Page 48

1     ago, but I think that's -- I think that's what I can
2     recall.
3 Q   What did Mr. Hogwood say about your concerns that you
4     raised?
5 A   He just said to continue to -- he wanted to continue to
6     support me in my role as the interim CEO, and that they
7     would try to keep me informed of what was appropriate to
8     keep me informed of, in terms of timelines, and just
9     assured me that they were doing the best they could to fill
10    the position as quickly as possible with the strongest
11    candidate, something of that nature.
12 Q   Understood.  Was Terry brought up at all during this
13    conversation?
14 A   Yes.
15 Q   What was said about Terry?
16 A   What was said about Terry?  Steven asked me about Terry,
17    and what was -- what I shared with him is that I didn't
18    think that he had the skills and experience.  I didn't
19    think he was as -- had as strong of skills and experience,
20    and I think that was the nature of it.
21 Q   Did Randy trip into this at all?  Did he say anything?
22 A   Yes.
23 Q   What did Randy say?
24 A   Something along the same lines.  He did not feel that he
25    had the skills and experience and that he had been the

Page 49

1     CFO -- he was the interim CFO for a period of time and
2     worked directly with Terry, but I don't know the -- he
3     didn't get into the specifics of that.
4 Q   So strong skills, what strong skills do you believe -- you,
5     not Mr. Treacher -- you believe that Terry was lacking?
6 A   I think he was lacking in leadership and management skills.
7     In particular, he was not very well organized.  He often
8     would misrepresent information about the health center or
9     twist things.  I guess I would summarize that as he
10    didn't -- he wasn't very trustworthy, and then he also did
11    not have the operational understanding of how the health
12    center worked or any experience in health care management.
13 Q   So you thought he was unorganized and dishonest, is that
14    it?
15 A   Yes.  And I don't feel that he had the skills or the
16    experience to manage -- yeah, he didn't have the skills or
17    experience in overseeing the health center or health care
18    operations.
19 Q   Okay.  What about -- what about Mr. Langston's organization
20    did you take issue with?
21 A   It was not uncommon for him to start a project, and then
22    there would be gaps or delays in it being finished.
23 Q   Can you give me an example?
24 A   Yes.  An example would be, during Covid, we were working
25    with folks in the community to offer vaccines in various

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
50..53

Page 50

1 churches or community venues, and the manager that reported
2 to me would come to me on occasion and say I'm still
3 waiting for Terry to connect us with this person or I'm
4 still waiting for Terry to tell me what this event is
5 about.
6         I would then follow up with Terry or I would just
7 eventually -- a couple times, I told her just to reach out
8 directly to the person herself. When she did that, the
9 person said, oh, I'm glad you reached out, because I was
10 wondering if you guys were still going to come, because I
11 hadn't heard back from Terry, things of that nature. That
12 was pretty common.
13 Q   Okay. This project that you're discussing, didn't Terry
14 get a pastor to do like a -- and correct me if I'm wrong
15 here -- but didn't he get a pastor to basically do a
16 promotional video for the vaccine?
17 A   Yes, yes, he did.
18 Q   Okay. When did that take place?
19 A   Oh, I -- I can't recall.
20 Q   This project that you're discussing, what was the lifespan
21 of it? When did it start; when did it end?
22 A   Which project, the video?
23 Q   Just -- is this video related to the project you're
24 discussing that Mr. Langston was unorganized with?
25 A   Yes. It would have been one component of us trying to get

Page 51

1 Covid vaccine awareness and actual administration out into
2 the community.
3 Q   Okay. How long of a project was that?
4 A   Probably a year or more. It went on as soon as the Covid
5 vaccine was available.
6 Q   Are you talking about which Covid vaccine, the first one
7 that the FDA approved?
8 A   The very first one.
9 Q   Was it the Pfizer vaccine?
10 A   Right, the very first one when we got it -- when we first
11 got it in the door at the center and were able to start
12 using it. I had wanted to connect with the community so
13 that we could get folks vaccinated, and we were working to
14 go to community events to do that.
15 Q   So you're saying in the span of that year, Mr. Langston
16 was -- he didn't communicate as promptly as you would have
17 liked him to, is that fair?
18 A   Correct, and did not close gaps. So, yes, he did not close
19 the loop on projects and finish.
20 Q   What exactly do you mean by that, close the gaps?
21 A   So an example would be when we're trying to get
22 communication from someone who wanted us to come to their
23 church and he was the one connecting with that church, and
24 the manager that reported to me that oversees our vaccine
25 program was waiting to hear back so that she could work

Page 52

1 with that church and work out the particulars. What would
2 happen or what did happen a couple of times was that he --
3 he didn't get back with her, so she would ask him again.
4 And then she would come back to me and say he said he's
5 still working on it, and I would say, okay, just be
6 patient.
7         And then eventually, I just told her to go ahead
8 and reach out directly to this person, and the person said,
9 oh, I'm glad you connected, because I wasn't sure if you
10 guys were still interested in doing the event. Then we
11 would move forward from there.
12 Q   What are the -- what are the names of these individuals
13 you're referring to?
14 A   One of them I'm referring to was Chelsea Poole, and I don't
15 recall the other names.
16 Q   Chelsea Poole, that's a -- that's a familiar name. Is she
17 affiliated with the center?
18 A   Yes, she's on our board.
19 Q   That's what I thought. Okay. Was this communication in
20 writing?
21 A   I don't think so. I think that was a conversation that
22 Tracy had with her.
23 Q   That Tracy had with Chelsea?
24 A   Chelsea. It's hard to know which person, because we did
25 several events. So I don't know if that's the exact -- if

Page 53

1 Tracy had a verbal conversation with her or not, but she
2 had verbal conversations with others. I don't know their
3 names off the top of my head.
4 Q   Was this with one church specifically?
5 A   No. There were a couple different churches.
6 Q   Okay. Did any of the churches provide any written feedback
7 as to Terry's involvement?
8 A   No, not that I'm aware of.
9 Q   So there was never a -- any sort of formal survey that was
10 issued to these churches about how the center is doing,
11 what it can do to improve, anything like that?
12 A   Not that I'm aware of.
13 Q   Were there any written complaints about Terry's performance
14 at any of these churches in the community?
15 A   No, not that I'm aware of. The churches would not be aware
16 of what happened on the -- on the inside of the process.
17 They would not be aware that we were waiting for them to
18 make the connection.
19 Q   Who would be aware?
20 A   Me and the manager who was trying to facilitate getting
21 vaccines out into the community.
22 Q   And that manager, was that Chelsea or who was that?
23 A   I believe it's Tracy Van Buskirk.
24 Q   Are there any written communications between you and Tracy
25 about Terry's performance?

Page 54

1 A   There may be.  I'm not -- well, strike that.  There would
2     not be about his performance, but there might have been a
3     communication or an email where she might have said she was
4     still waiting, but I'm not -- I don't recall if it was an
5     email or if it was conversations.
6 Q   So you don't know if it was written or verbal, is that
7     fair?
8 A   Correct.  I don't recall.
9 Q   When would that conversation have taken place, if you know?
10 A   I don't recall.  Somewhere in the time we were giving
11     vaccines at the height of the vaccine campaign, maybe in
12     '21, somewhere in 2021.
13 Q   Okay.  What was the -- I'm going to go back to this
14     conversation between you and Mr. Treacher and Mr. Hogwood.
15     What did Steve say about your concerns regarding Terry?
16 A   He told me not to be concerned, that the board -- that he
17     had confidence in the search committee that they would find
18     the candidate that would best suit the center and make sure
19     that the organization remained strong, something to that
20     effect.
21 Q   Did you invite Randy to this meeting?
22 A   Yes.
23 Q   Okay.  What is your -- how long have you worked with Randy?
24 A   For as long as he has been on the board and then some
25     interactions when he was the interim CFO, and I don't

Page 55

1     recall when that was.
2 Q   Was he the interim CFO before he joined the board or was
3     he --
4 A   Yes, because you can't be on the board and be an employee.
5 Q   Okay.  When -- if you know, what was -- how many years was
6     Randy the interim CFO?
7 A   I want to say it was about a year, but I'm not one hundred
8     percent sure.
9 Q   Was this before you got the CFO position -- I'm sorry, the
10     COO position?
11 A   No, it was after.
12 Q   Okay.  And when did Randy join the board, if you know?
13 A   I don't know off the top of my head.  He has been on the
14     board for many years, seven, eight, something like that.
15 Q   So why invite Randy specifically?
16 A   I invited Randy specifically because he was on the search
17     committee and he is also the vice -- excuse me, not the
18     vice chair.  He is the treasurer, and he had expressed
19     concerns to me about the search process, not things in
20     specific, but just in general.
21        So I felt that it was my responsibility as the
22     interim CEO to do what's in the best interest of the
23     center, and I wanted two people there, not just Steven.  So
24     that's why I invited him and because he had knowledge of
25     the search process.

Page 56

1 Q   Why didn't you invite Jennifer White?  She was on the
2     search committee, too, right?
3 A   Jennifer White?  I hadn't had any conversations with anyone
4     on the search committee except Randy.
5 Q   Okay.  So let's -- for the record, let's just break down
6     who is on the search committee, okay?  Can you tell me
7     their names?
8 A   I can tell you that the search committee consisted of
9     everyone that was on the Board Development Committee as
10     well, plus Randy.  So it's Randy Treacher, Chelsea, I
11     believe, Jennifer; Jessica was the chair, Dale, Ted, and a
12     committee member who was also on board development as a
13     committee member, Mindy Bradish-Orta.  I believe that I
14     covered everybody.
15 Q   You said that Jessica Embury was the search committee
16     chair?
17 A   Yes.
18 Q   Why wouldn't you invite the chair of the committee to this
19     meeting with the board of directors chair?
20 A   Because I think part of the issue or part of the concern
21     was how the meetings were being led, and I didn't feel
22     comfortable talking with Jessica.
23 Q   Were you involved in these meetings at all?
24 A   Nope.
25 Q   How would you know how they're led then?

Page 57

1 A   Because that was part of Randy's concern is how the -- the
2     search process.
3 Q   So Randy came to you and said I'm concerned.  Therefore,
4     you called a meeting between yourself, Randy Treacher and
5     Steven Hogwood, is that correct?
6 A   Yes.  And I believe Randy had already talked to Steven, but
7     I don't know for sure.
8 Q   How did he -- do you know how he communicated with Steven?
9     Was this over the phone, email, text?
10 A   I wouldn't know.
11 Q   Okay.
12 A   I don't know.
13 Q   Do you know if Randy and Molly Kaser had any communications
14     with respect to the overall CEO search process?
15 A   I don't know.  I would not know.
16 Q   Okay.  Do you know if Molly and Randy had any
17     communications about Rebecca Snow specifically?
18 A   I do not know that either.
19 Q   Do you know if Randy and Molly Kaser had any communications
20     about Terry Langston?
21 A   No.
22 Q   Okay.  Do you know who Randy spoke to about his concerns
23     regarding Terry?
24 A   No.  It's just -- just that conversation with Steven and
25     Randy and I is the only thing I would know.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
58..61

---

Page 58

1  Q   Okay.  So you don't know if Randy sent emails or text
2    messages to any other board members; is that your testimony
3    today?
4  A   That is my testimony.
5  Q   Okay.  Were you involved in collecting documents to produce
6    for this case?
7  A   Yes.
8  Q   Okay.  What documents did you collect?
9  A   I collected my notes that I had taken and maintained during
10    that time.
11  Q   Did you help collect any emails that had been sent between
12    board members?
13  A   No, no.
14  Q   Okay.
15  A   There was one email that I had sent that I received through
16    the normal course of business of checking Terry's email.
17    So I did send that, but I was not part of searching any
18    emails or any other things of that nature.
19  Q   Okay.  Were you aware that you had an obligation to save
20    all communications about Mr. Langston's termination and the
21    CEO hiring process?
22  A   Yes.
23  Q   When were you told that?
24  A   I don't recall, probably as soon as I knew there was a
25    lawsuit, as soon as my attorney told us.

Page 59

1  Q   Do you know when that lawsuit was filed?
2  A   Sometime in the summer of 2022.
3  Q   And that was -- so the summer of 2022 was the first time
4    that you were told to preserve documents, is that correct?
5  A   I don't recall specifically.  I would assume, yes, but it
6    is our practice not to just -- I don't just -- I don't
7    delete emails, so...
8  Q   So if others may have deleted emails, do you know why that
9    could be?
10    MS. BERKERY:  I'm sorry, I didn't hear you.
11  BY MR. VLAHOPOULOS:
12  Q   If others have deleted emails and text messages and
13    documents, do you know why that could be?
14  A   Do I know why?  No, I don't.
15  Q   Do you know if members of the board were instructed to not
16    delete any documents?
17  A   I don't know what they were instructed to do.
18  Q   Okay.  When did your attorney, Ms. Berkery, get involved in
19    this case specifically with Mr. Langston?
20  A   I believe it was May of 2022.
21  Q   Around the time he was terminated, right?
22  A   Yes.
23  Q   What was Ms. Berkery's involvement with the center, if any,
24    prior to the CEO search process?
25  A   She has been our attorney -- the attorney for the center

Page 60

1    for employment matters.
2  Q   And how -- I'm just asking time range, how long has that
3    been?
4  A   Several years, 15 -- I don't know when it started.
5  Q   Okay.  In January of 2022, was Ms. Berkery still -- I don't
6    want to know what was said -- was she still consulting the
7    center on legal matters?
8  A   I don't know that -- in January of 2022, I don't know if
9    there were legal matters.  Off the top of my head, I don't
10    recall, but I would not have been privy to all of that
11    anyway.
12  Q   Fair enough.  Do you know if board members were asked to
13    turn over emails?
14  A   I believe recently they were.
15  Q   Recently, when is that?
16  A   As part of the process of collecting information, they were
17    asked to do a search.
18  Q   I understand that.  What month did that take place?
19  A   What is today?  It was either early May or April.  I don't
20    remember.
21  Q   Of 2023?
22  A   Yes.
23  Q   I'm going to show you a document real quick, and then we
24    can take a break.  I know it has been over an hour, but I
25    just want to go through this line of questioning?

Page 61

1  A   Okay.
2    (Mr. Vlahopoulos screen shared a document via video.)
3  BY MR. VLAHOPOULOS:
4  Q   Sara, let me know if you see my screen, okay?  It should be
5    popping up in just a moment.
6  A   Okay.
7  Q   Can you see it?
8  A   Yes, I can see it.
9  Q   Do you want me to zoom in?  Is it large enough?  Let me
10    know.
11  A   If you could zoom in a little bit, that would be helpful.
12  Q   Okay.
13  A   That's good right there.
14  Q   Right here?
15  A   Yes.
16  Q   Okay.  It's only two pages -- strike that.  It's three
17    pages.
18  A   Okay.
19  Q   I'm going to scroll real quick just so you can take a look
20    at it, and let me know when you're ready to discuss it,
21    okay?
22  A   Okay.  You can -- I'm ready.
23  Q   You're ready?
24  A   Yep.
25  Q   Have you seen this document before?

---

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
62..65

Page 62

1 A  Yes.

2       MR. VLAHOPOULOS:  And for the record, this is

3  Bates stamped Defendant 001330 through 001332 from

4  Defendant's document production.

5 BY MR. VLAHOPOULOS:

6 Q  What is this document, Sara?

7 A  It's essentially a roster of our board and committee

8  members.

9 Q  Okay.  So by way of example, the first entry here is for

10  Mr. Hogwood, correct?

11 A  Yes.

12 Q  And it presents his phone number, mailing address and email

13  address, correct?

14 A  Correct.

15 Q  What is this user status column, if you know?

16 A  That means -- that means whether they are a patient of the

17  Center for Family Health or not.

18 Q  Understood.  Okay.  This -- these -- this contact

19  information that is preserved on this record for each board

20  member, is this -- are these -- let's start with the phone

21  number.  Is this an official phone number that is used for

22  their business with the center?

23 A  Yes.

24 Q  Okay.  And what about this mailing address, is this their

25  formal -- or is this email address listed their formal

Page 63

1  address for the center?

2 A  Yes.

3 Q  Does the company have any policies with regard to emails

4  that are used or cell phones that are used for business

5  purposes?

6 A  Can you restate that?

7 Q  Sure.  Let's -- let's break it down.  Does the center have

8  any policies with regard to phone usage, an employee or a

9  board of director's usage of a cell phone?

10       MS. BERKERY:  I'm going to place an objection

11  because you're now saying employees with board members.

12  There might be policies that apply to employees.

13       MR. VLAHOPOULOS:  I'm talking about board

14  members.  I misspoke.  I apologize.

15       MS. BERKERY:  Okay.

16 BY MR. VLAHOPOULOS:

17 Q  Let's talk about just board members, okay?  And forgive me,

18  but I'm going to ask you if you could scoot forward or

19  maybe get a little closer to the camera?  I can't hear you

20  too well.

21 A  Okay.

22 Q  Thank you.  So for the phone numbers, is there a policy

23  with respect to board members' usage of cell phones?

24 A  Not that I'm aware of.

25 Q  What about with email addresses, is there a policy for

Page 64

1  board members with respect to their use of email?

2 A  Not that I'm aware of.

3       MS. BERKERY:  I think the email --

4       THE WITNESS:  I think this is the speaker --

5       MS. BERKERY:  No.  The speaker is over here.

6       THE WITNESS:  Can you hear me okay now?

7       MR. VLAHOPOULOS:  Yes.  Let's go off the record

8  real quick.

9       MS. BERKERY:  Okay.

10       THE WITNESS:  Okay.

11       MR. VLAHOPOULOS:  Sorry, just so we can figure

12  this out.

13       (Off the record at 11:28 to 11:29 a.m.)

14       MR. VLAHOPOULOS:  If we're ready, let's get back

15  on the record.  Thank you.

16 BY MR. VLAHOPOULOS:

17 Q  So my question is, Sara, when a board member uses the email

18  address that is listed here in this document, are they --

19  is there an expectation that they preserve business-related

20  emails?

21 A  I cannot speak to that.  I do not know.  I have not had

22  that conversation with them.  I don't know what they have

23  been told in the past.

24 Q  Who would have told them any policies with respect to

25  keeping company emails?

Page 65

1 A  I guess it would have been discussed in previous --

2  previously at board meetings or with Molly.  It's not

3  something I'm aware of.

4 Q  Who's the human resources director?

5 A  We don't have a director, but our human resources manager

6  is Michelle Lutz.

7 Q  Michelle Lutz?  Thank you.  Would Michelle have told the

8  board members anything with respect to --

9 A  No.

10 Q  Okay.  Have you ever emailed Mr. Hogwood at his email

11  address listed here?

12 A  Yes, I have.

13 Q  Have you ever emailed Zoe Lyons --

14 A  Yes.

15 Q  -- on this email address listed here?

16 A  Yes.

17 Q  What about for Mr. Treacher, have you emailed him at this

18  address?

19 A  Yes.

20 Q  And for Lori Heiler, have you emailed her at the address

21  listed here?

22 A  Yes, I believe so.

23 Q  And what about for Ted Hilleary?

24 A  Yes.

25 Q  And for Jennifer White?

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
66..69

Page 66

1 A   Yes.

2 Q   Dale Moretz?

3 A   Yes.

4 Q   Lee Hampton?

5 A   Yes.

6 Q   Karen Barrett?

7 A   Yes.

8 Q   Is it safe to say that all of these individuals on this
9     sheet, you have emailed them at the addresses that are
10    presented?

11 A   It's safe to say the committee members. I don't know if I
12     ever emailed Mindy. She's no longer on our committee --
13     our board committee, but I have everyone else. It is safe
14     to say that I have, yes.

15 Q   Okay. And do you know if Mindy used the email address that
16     is listed here -- and I've highlighted it for you -- do you
17     know if she used that for center business?

18 A   I don't know. I didn't have any interactions with her as
19     the interim CEO, other than when she stated that she was no
20     longer going to be on the committee.

21 Q   Okay. When we say committee, which committee are we
22     referring to here?

23 A   She was on the Board Development and PR Committee -- or
24     Advocacy, excuse me, not Board Development, Advocacy.

25 Q   You told me earlier that the search committee comprised --

Page 67

1     the CEO search committee -- it comprised of the Board
2     Development Committee as well as Randy, is that right?

3 A   That was incorrect. I meant to say Board Advocacy and PR
4     Committee.

5 Q   Okay. So break this down for me real quick. So the
6     members of the Board Advocacy Committee, if you know, who
7     does that include?

8 A   The board members that are on the Advocacy and PR Committee
9     are Jessica, Jennifer, Lori, Ted, Theo, and Mindy was. If
10    you could -- I would have to look. I'm not sure if I'm
11    missing anybody.

12 Q   Are all members of the Advocacy and PR Committee, they were
13    transferred -- not transferred, but they also took part in
14    the CEO search committee, right?

15 A   Yes.

16 Q   Okay.

17 A   I believe.

18 Q   And the only outlier was Randy Treacher, is that correct?

19 A   That is my understanding, yes.

20 Q   Okay. If you know, how did Randy end up on the search
21    committee?

22 A   I don't know. I do recall that the board -- at a board
23    meeting, I believe, Steven asked the people that were
24    interested. That's all I recall, and I don't know the
25    details behind that. That's all I recall.

Page 68

1 Q   So did Mr. Hogwood ask Randy to join the committee?

2       MS. BERKERY: Foundation.

3       THE WITNESS: I don't -- I don't know. What I
4     recall was that folks were asked if they were interested.
5     I believe that's how it happened, but I don't recall the
6     specifics.

7 BY MR. VLAHOPOULOS:

8 Q   If you know, do you know how the search committee was
9     formed? Was it just a volunteer basis or was there
10    requirements?

11 A   I believe it was a volunteer basis, but I was not involved.

12 Q   Was there any vetting -- was anyone rejected -- strike
13    that. Was anyone rejected to join the search committee?

14 A   I don't know that.

15       MR. VLAHOPOULOS: Let's go off the record.

16       (Off the record at 11:34 to 11:52 a.m.)

17       (Mr. Hurwitz exited the deposition at 11:34 a.m.)

18       MR. VLAHOPOULOS: All right. Let's go back on
19    the record.

20 BY MR. VLAHOPOULOS:

21 Q   So I understand that Molly retired at the end of 2021,
22    correct?

23 A   The end of 200- --

24       MS. BERKERY: 2022.

25       THE WITNESS: Sorry -- 2022, not the end, but

Page 69

1     March.

2 BY MR. VLAHOPOULOS:

3 Q   Okay. Sorry, so clarify for me, she retired in what month?

4 A   March of 2022.

5 Q   March of 2022? Now, I just want to establish a time. So
6     Molly retires in March of 2022. What is the next thing to
7     happen pertaining to the CEO search?

8 A   I don't recall the specifics. They were just continuing
9     the search.

10 Q   Okay. When was --

11 A   I was not involved in any of that, with the search firm. I
12    don't know their timelines.

13 Q   Okay. Do you know when a search firm was selected?

14 A   I think early in 2022, maybe January maybe. I don't know
15    for sure.

16 Q   So a search firm was selected potentially in January of
17    2022, correct?

18 A   Yes.

19 Q   Okay. Do you know what the search firm was, what the name
20    of the company was?

21 A   I know that it's Campbell.

22 Q   Campbell and Company, right?

23 A   Campbell and Company.

24 Q   Is that a yes?

25 A   Yes.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH

Job 23438

BENEDETTO, SARA 05/10/2023

70..73

Page 70

1 Q   Do you know if any other search firms were contemplated for
2     the CEO search?
3 A   I didn't know at the time, but I know after the fact that,
4     yes, there was one other one.
5 Q   What was the name of the other one?
6 A   Pacifica, I think, Pacifica.
7 Q   If you don't mind, could you spell that for me, please?
8 A   P-a-c-i-f-i-c-a, I believe.
9 Q   Okay.  And do you know why Pacifica was not selected?
10 A   No.
11 Q   Do you know why Campbell and Company was selected?
12 A   No.
13 Q   Okay.  Were you involved in any communications with regard
14     to selecting a search firm?
15 A   I was not.
16 Q   Do you know anything about Campbell and Company's search
17     process?
18 A   I learned -- I know now -- I don't know if I knew then, but
19     I know now that they put out a letter, you know, the
20     typical process.  They passed out that to try to get
21     candidates in.  Then the candidates applied, and then they
22     screened them.  They were going to take some to the search
23     committee, and then the search committee was interviewing
24     from there.
25 Q   Okay.  So let's break that down.  If you know, do you know

Page 71

1     when Campbell and Company announced that a search would be
2     taking place?
3 A   I don't recall the date, but it was in the winter, I think,
4     of 2022.
5 Q   Do you know how many people applied in general?
6 A   I did not know at the time, but I know now.  I believe 150
7     some.
8 Q   Okay.  And only two internal candidates, right?
9 A   As far as I know, there were only two internals, yes.
10 Q   Do you know how Campbell and Company communicated with the
11     board of directors?
12 A   No.
13 Q   Do you know if they communicated only with the search
14     committee, or did they communicate with the entire board as
15     a whole?
16 A   I don't know with a hundred percent certainty about that,
17     but I believe it was just the search committee itself.
18 Q   Understood.  Okay.  Do you know what qualities -- strike
19     that.  What kind of qualifications was Campbell and Company
20     directed to look for in a new CEO, do you know?
21 A   There was a document that they produced, and that would be
22     how I know.  I can't recall the particulars of that
23     document right now, but someone with leadership experience.
24     I don't recall.  I don't know the specifics of what they
25     were looking for off the top of my head.

Page 72

1 Q   So the only thing you know is that Campbell and Company was
2     looking for someone with leadership experience, is that
3     correct?
4 A   Without looking at it, anything else I would say would be a
5     guess.
6 Q   I understand, I understand.  Did you have any say in
7     telling the search committee what kind of qualifications
8     would be needed for the new CEO?
9 A   Yes.
10 Q   Okay.  What did -- what did you say would be those
11     qualifications?
12 A   Campbell and Company interviewed us as a whole on Zoom.  So
13     all of the directors, which included both Terry and
14     Rebecca, were present.  My input would have been around
15     someone preferably that had FQHC experience, someone that
16     understood the operations, both at a high level, the
17     clinical and financial operations, someone that was trusted
18     by staff and the community, someone that had experience
19     supervising or overseeing senior leadership.  I recall that
20     was talked about.
21 Q   You said Campbell and Company had a meeting with the
22     directors and the board of direct- -- when you say
23     directors, I want to -- I want to distinguish this -- who
24     are you talking about?
25 A   I'm talking about the senior leadership.  So it was

Page 73

1     Rebecca, Terry, me, Kim Hinkle, Dr. Thornton, Dr. Johnson,
2     on a Zoom call with Campbell and Company.  I don't remember
3     which people from there, but I think there were two.
4 Q   I don't think we've discussed Dr. Thornton yet.  What is --
5     what is her full name?
6 A   Dr. Kathryn Thornton.
7 Q   And what is her position?
8 A   She's the dental director.
9 Q   And then you also mentioned Dr. Johnson?
10 A   Yes.
11 Q   What is their position?
12 A   She is the CMO, chief medical officer.
13 Q   Is her first name Rose?
14 A   Yes.
15 Q   Is there anyone else you might have excluded?
16 A   I don't think so.  I said Kim Hinkle, right?
17 Q   Yep.
18 A   I think that's it.
19 Q   Okay.  Thank you.  Were the -- for sake of consistency, is
20     it okay if I call them the leadership team collectively?
21     Will you understand who I'm speaking of?
22 A   Yes, maybe senior leadership team.
23 Q   Senior leadership team?  Okay.  So we're on the same page?
24 A   Yes, because we also have managers and supervisors, so...
25 Q   Understood.  So we'll just -- we'll refer to them

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
74..77

Page 74

1    collectively as the senior leadership team, okay?
2 A    That works.
3 Q    Was anyone -- did anyone on the senior leadership team, if
4    you know, were they aware that Rebecca Snow was going to
5    apply for the position?
6 A    Yes.
7 Q    Okay.
8 A    I don't know when, but I know that they know -- that they
9    knew she was applying.
10 Q    Okay.  Who would have known from the senior leadership
11    team?
12 A    Dr. Thornton, Dr. Johnson, Kim Hinkle, and I believe
13    Terry --
14 Q    So all of them?
15 A    I believe Terry knew, yes.
16 Q    Okay.  Did anyone vocalize their opinion to you about
17    Rebecca Snow applying for the CEO position?
18 A    Applying for it, you said?
19 Q    Correct.
20 A    I have to think.  I don't recall.  I know I never talked to
21    Dr. Thornton about it or Dr. Johnson.  I don't believe I
22    talked to Kim either.  I know I didn't talk to Terry.  I
23    don't recall anything specific about -- other than just
24    that we knew Rebecca applied.
25 Q    Okay.  So you didn't communicate with Terry?  Prior to him

Page 75

1    applying for the CEO position, did you communicate with him
2    frequently?
3 A    Yes.
4 Q    Okay.  And is this because of the job or just in personal
5    matters as well?
6 A    Because of the job.
7 Q    Okay.  So you weren't -- there wasn't a personal
8    relationship outside of work, is that fair?
9 A    Yes.
10 Q    Okay.
11 A    There was not a personal relationship.
12 Q    Understood.  How long had you worked with Terry?
13 A    For as long as he worked here.  I don't recall if it was
14    ten years.  I'm not sure.
15 Q    Do you know when Terry first joined the center?
16 A    I don't know the date off the top of my head, but I know he
17    started as a consultant first for at least a year or two,
18    and then he became an employee.
19 Q    Okay.  And when he was -- when he became an employee, do
20    you know what his position was?
21 A    I don't know what his title was, but I know that he
22    generally oversaw PR and marketing kinds of things, and
23    then at some point advo- -- advocacy with legislative
24    groups.
25 Q    So he oversaw PR and advocacy, is that correct?

Page 76

1 A    Yes.
2 Q    In his oversight, did he manage anyone?
3 A    He had one employee that he managed for a period of time.
4 Q    I think you referred to that a little earlier, so let's
5    talk about that.  Who was the employee that Terry, you say,
6    managed?
7 A    I don't know her name off the top of my head.
8 Q    Okay.
9 A    It was a woman, I know that, that reported directly to
10    Terry.
11 Q    Do you know what her position was at least?
12 A    I don't know her title.  She might have been like an
13    assistant or a PR specialist or something like that, and he
14    assigned her work.
15 Q    Okay.  Did she ever give any feedback as to how Terry was
16    as a manager?
17 A    Not to me.
18 Q    Did she give it to anyone, that you know of?
19 A    Not that -- I'm not aware.  I didn't really have any
20    interactions with her.
21 Q    Understood.  So after ten years of working with Terry, you
22    never developed a personal relationship with him?
23 A    No.  The only thing that we would do outside of work would
24    be going to an event, like a work-related event.  I mean,
25    on occasion we might have talked about our kids or

Page 77

1    something, but we did not socially hang out, no.
2 Q    Sure.  But you were put into positions where you could
3    socially hang out, as you put it, right?
4 A    Yes.  Like we would go to an event, like a community event
5    where the center would purchase a table, or we would have a
6    table at an event and sometimes I would be at that table
7    along with Terry.
8 Q    How many other people would be at that table?
9 A    It would vary from event to event.
10 Q    On average, is it -- people sitting at this table -- at
11    these tables rather, are they directors of CFH?
12 A    It could be directors; it could be a board member, spouses
13    sometimes.
14 Q    Do you know what Terry's overall reputation was within the
15    center?
16        MS. BERKERY:  Foundation.
17        THE WITNESS:  His overall reputation in the
18    center?
19 BY MR. VLAHOPOULOS:
20 Q    Yes.
21 A    I can't really speak for others.  I think Terry -- I can
22    tell you that I think he was seen as a nice person.  What I
23    do have direct knowledge of, and I shared this earlier, is
24    on occasion a manager would share that they were waiting
25    for him to follow through on something.  My impression was

Page 78

1   that he sometimes thought that he wasn't following through,
2   but they were always respectful and appropriate, but
3   those -- that kind of thing would be said to me on
4   occasion.
5 Q   Did you sit in on any interviews for the search process?
6 A   No.  Well, can you clarify which search process?  With
7   Campbell and Company?
8 Q   I apologize.  No, that's a good clarification question.
9   Any interviews of candidates for the CEO position, so not
10   with Campbell and Company, just with candidates in general,
11   did you sit in on any interviews?
12 A   I sat in on what they called a meet and greet with the two
13   candidates with the second company.
14 Q   But maybe just to clarify, I'm talking about potential
15   candidates for the CEO position, so anyone who was applying
16   for the job.  Did you sit in on interviews when they were
17   applying for this job?
18 A   No, not with Campbell and Company, but yes, with the second
19   search firm.
20 Q   Gotcha.  And this was after the Campbell and Company
21   contract was terminated, right?
22 A   Yes.
23 Q   So was Campbell --
24 A   So clarify -- oh, I do need to clarify.  They were not
25   interviews.  They were called meet and greet.  It was an

Page 79

1   opportunity to meet the final two candidates.
2 Q   Fair enough.  So when Campbell and Company was conducting
3   the search, you never sat in on any interviews with them?
4 A   Correct.
5 Q   Okay.  Did you ever sit in on an interview with Terry for
6   the position?
7 A   No.
8 Q   Do you know of any records that would indicate that you did
9   sit in on an interview with Terry?
10 A   No.
11 Q   Okay.  Would you have reason to doubt those documents if
12   they exist?
13 A   Yes.  You're talking about an interview with Terry for the
14   CEO position?
15 Q   Correct.
16 A   I would highly doubt those documents exist.  I did not sit
17   in on any interview.
18 Q   Okay.  And what about with any other candidates, did you
19   sit in on any interviews with them?
20 A   No.
21 Q   How long was the search process -- strike that.  How long
22   was Campbell and Company contracted to conduct the search
23   process, do you know?
24 A   I don't know how long the contract was for other than I do
25   recall that the process was supposed to hopefully take only

Page 80

1   about six months or so, but I don't know the specifics of
2   the contract offhand.
3 Q   In March of 2022, do you know what Campbell and Company
4   was -- what step in the search process they were in?
5 A   No, I don't recall.
6 Q   Okay.  In April of 2022, do you know what step of the
7   search process Campbell and Company was in?
8 A   I believe in April, at some point, is when they were
9   narrowing the candidates down to the final ones that were
10   going to be brought forward to the search committee for an
11   interview.
12 Q   And how many final candidates did that include?
13 A   I believe there were three final candidates that were going
14   to be interviewed.  But when Campbell -- yeah, there were
15   three final candidates and then -- that were going to be
16   interviewed.
17 Q   When was Rebecca Snow rejected for the position, if you
18   know?
19 A   I don't know, the end of April or early May.  I don't know.
20 Q   Do you know if Rebecca was afforded a second chance to
21   interview?
22 A   I believe she was.
23 Q   Why is that?
24 A   Because she made it through the second phase of the
25   interview process.  I know that she had a screening

Page 81

1   interview and a second interview, I believe was how it was
2   stated to me.
3 Q   I'm sorry, you said it was a screen interview and then what
4   was the second one called?
5 A   I think just a second interview.  I -- I don't know that I
6   was ever -- I don't know what the name is.  I just know she
7   was interviewed two times by Campbell, I believe.
8 Q   Did Randy express any concerns to you once Rebecca was
9   rejected?
10 A   He expressed that he was surprised that both candidates --
11   both internal candidates did not move forward.
12 Q   But Terry did move forward, right?  He was one of the three
13   finalists, correct?
14 A   Correct.
15 Q   So he expressed his surprise with regard to Rebecca, not
16   him?
17 A   Correct.
18 Q   Okay.  Why was Rebecca -- excuse me.  Why was he surprised
19   Rebecca did not move forward?
20        MS. BERKERY:  Foundation.
21 BY MR. VLAHOPOULOS:
22 Q   If you know?
23 A   Pardon me?
24        MS. BERKERY:  If you know.
25        THE WITNESS:  If I know?  I don't believe I could

Page 82

1 say exactly other than that she had worked here and she had
2 the skills and the experience.
3 BY MR. VLAHOPOULOS:
4 Q So you sat in on a meeting with Randy and Steven Hogwood,
5 but you -- you say you don't know why Mr. Treacher was
6 surprised Rebecca did not move forward, correct?
7 A Well, I'm -- I'm saying I can't put words in his mouth to
8 say exactly. But I can assume, based on that conversation
9 and if my memory serves, that it would have to do with that
10 he felt her experience and her skills reflected that she
11 should have been or could have been moved forward for an
12 interview.
13 Q Did Randy say it's because no woman has been included in
14 the final candidates?
15 A Not to me, that I recall.
16 Q But he might have said it to someone else then, right?
17 A I don't know.
18 Q Have you ever heard that before?
19 A Have I ever -- can you repeat that?
20 Q Yes. Have you heard through your employment at CFH that
21 Randy might have said a woman should have been the
22 finalist?
23 A I only would have -- I don't think I heard that statement.
24 Only through reading the documents that I learned about
25 after the fact in these proceedings have I learned that he

Page 83

1 may have -- that he allegedly made comments about having a
2 woman or something to that effect.
3 Q Do you believe that he would have said that?
4 A No, I do not. I do recall that there's reference that --
5 now that it's in writing somewhere that he said I do not --
6 I think that a white woman should have gotten it. I am
7 really doubtful that he would make a comment like that. He
8 knows Rebecca. I imagine he would have said her name if
9 that's what he was talking about, but I don't know.
10 Q So if there's -- if there's emails between board
11 directors -- board of directors who say Randy said that
12 Rebecca was -- should have gone forward because she was a
13 woman, would you have any reason to doubt that?
14 A If it was in writing, I guess I wouldn't, but it would
15 still surprise me that he would talk like that.
16 Q So let's talk about May of 2022. What happened in May of
17 2022 with respect to the CEO search?
18 A At some point, we were sent three resumes to review, and
19 "we" means the senior leadership team. And we were
20 scheduled for a date to interview the three finalists,
21 and --
22 Q I'm sorry, can I pause you for a moment?
23 A Yes.
24 Q Who were the three finalists?
25 A Terry Langston, Mouhanad -- I don't know his last name --

Page 84

1 and George -- I think it was George Olson, actually. Those
2 were the three finalists.
3 Q So you were sent Terry, Mouhanad and George's resumes,
4 correct?
5 A Correct.
6 Q Okay. And when you were sent the resumes -- after you were
7 sent the resumes, what happened?
8 A What happened is that I reviewed them, each of the senior
9 leadership team reviewed them. The senior leadership staff
10 each came to me, either called or came to my office, and
11 expressed concerns. I then decided that we should meet and
12 talk about those concerns.
13 Q What concerns did they express?
14 A Concerns about -- the concern was about overlapping
15 timelines on the resumes that didn't seem to make sense.
16 It looked like people were holding two high level
17 positions, for example, at the same time, and then concerns
18 about things that seemed false on Terry's resume.
19 Q So I just want to clarify, was the only issue that the
20 leadership team had, was it just with Terry's resume, or
21 was it all three final -- or all three final candidates?
22 A It was all three.
23 Q I know Terry was -- the concerns of Terry's resume was
24 addressed. What about the other two, did anyone ever
25 contact them, George and Mouhanad to --

Page 85

1 A We didn't --
2 Q Go ahead.
3 A Sorry, you can finish your question, sorry.
4 Q That's okay. Was Mouhanad ever contacted to clarify his
5 resume?
6 A I don't know if any of them were contacted to clarify.
7 Q Okay. Was Terry Langston contacted to clarify his resume?
8 A I don't know.
9 Q But you emailed him about it, right?
10 A No, I did not email Terry about it.
11 Q So you didn't email Terry asking for him to prove the
12 grants that he wrote?
13 A No, I did not. I did not talk to Terry about his resume at
14 all.
15 Q So you never asked Terry about the amounts that he received
16 from each grant that he wrote?
17 A No.
18 Q And this would have taken place in May of 2022?
19 MS. BERKERY: Objection -- objection to the form.
20 I mean she said no, and then you're saying it would have
21 taken place.
22 MR. VLAHOPOULOS: That's fine.
23 BY MR. VLAHOPOULOS:
24 Q Okay. So the senior leadership team expresses concerns
25 about these resumes. Then what happens?

Page 86

1  A    I talked to Steven.  Well, let's see, we had a conversation
2     and talked about them as a group.  We then tried to reach
3     Steven and could not reach him.  The interviews were
4     scheduled either for the following day or two days.
5          So I reached out to our vice chair, which was Zoe
6     Lyons, and we spoke to her over the phone.  And then we
7     asked her if we could have a meeting together to talk about
8     it and Steven wasn't available.  So later we spoke to
9     Steven on the phone.  I believe it might have just been me.
10    I can't recall, but he called back later that day.  And
11    actually, prior to that, I had a conversation with Steven
12    separately.  So let me back up.
13          After we reviewed the resumes and people came to
14    me -- the senior leadership staff came to me individually
15    and expressed concerns, I called Steven and I said that I
16    was concerned about moving forward with the interviews and
17    I shared the concerns of the team.  I talked to him, in
18    particular, about Terry's resume and that there were things
19    that I felt were incorrect and really highly embellished
20    and not true.
21          He asked if I had talked to Molly to confirm any
22    of that.  I can't remember if I had talked to her before
23    that or if I called her after that.  But he said I would
24    like you guys to still interview, and he used the words go
25    ahead and debunk Terry's resume during the interview

Page 87

1     process.  I said okay.  I will move forward and we'll do
2     the best we can.
3          That's when I then convened the meeting with all
4     of the senior leadership at that time and shared what I --
5     my conversation with Steven, and so we tried to move
6     forward.  The search committee had sent us some questions
7     that we might ask, and we were trying to divide up those
8     questions.
9          During that process, it became very apparent that
10    it was going to be very awkward and everyone felt
11    uncomfortable and said that they did not want to move
12    forward with the interviews.  It was uncomfortable for
13    folks.  We did not feel like it was our space to debunk
14    anyone's resume, particularly as there were going to be
15    search committee members there.  That's when I called --
16    tried to reach Steven and then called and talked to Zoe,
17    and then I went through that part already.  Those are the
18    events that led up to that.
19 Q    Okay.  Thank you.  So you said the senior leadership
20    expressed concerns.  Who from senior -- senior leadership
21    specifically expressed concerns?
22 A    Dr. Thornton, Dr. Johnson, Kim Hinkle --
23 Q    Okay.  What did Dr. Thornton say?
24 A    -- and Rebecca Snow.  I'm sorry, I forgot Rebecca Snow.
25 Q    Time out.  So Rebecca Snow was an applicant, and she

Page 88

1     doesn't get the position and then she is brought in to
2     evaluate the other applicants, is that correct?
3  A    Yes, because she was still part of the senior leadership
4     team.
5  Q    Does that open up the doors to bias, by any chance, in your
6     opinion?
7  A    It could, but that's how we were directed, to include all
8     the members of the senior leadership team in the interview
9     process.
10 Q    Who directed you to do that?
11 A    The search committee and the search company said here's all
12    the information for the senior leadership team.
13 Q    Who from the search committee told you that?
14 A    I don't recall anyone specifically.  I think it was just --
15    maybe it was just you guys need to -- the senior leadership
16    team should be included in the process.
17 Q    Did Randy say that Rebecca should be involved in this
18    process?
19 A    I don't recall talking to Randy about that.
20 Q    Okay.  So you said Dr. Thornton raised concerns.  What did
21    Dr. Thornton raise concerns about?
22 A    There were concerns about the resume, about Terry's resume
23    and his skills and experience.  I can't tell you
24    specifically what each person said.  It was so long ago,
25    but I can tell you that they all had concerns about things

Page 89

1     on the resume that seemed embellished.
2          And they knew, for example, that he didn't have
3     any direct supervision of a team of three who oversaw
4     operations.  They knew -- Kim knew and Rebecca knew that he
5     didn't work on federal grants, and I'm trying to think
6     through the rest of -- it was also pretty highly
7     embellished, the description of managing the board, the
8     Board Development Committee.  I remember that was something
9     that was mentioned.  It was -- I think those are the things
10    that are coming to my mind right now on his particular
11    resume.
12 Q    What about Mouhanad's resume, what was the issue there?
13 A    I think the concern was whether or not he was going to be
14    interested in staying for any length of time, because he
15    was -- he had several different positions.  If I remember
16    correctly, one of the questions was did he still have a
17    medical license.  How was he managing -- how was he doing
18    those senior level jobs at multiple -- at the same time?
19    There was overlapping and there was overlapping -- yeah,
20    that's what I recall on his.
21 Q    So who said that about Mouhanad's resume?
22 A    I believe Dr. Johnson or Dr. Thornton questioned about
23    whether he had -- it wasn't clear whether he still had a
24    medical license.  There was question about -- I don't
25    remember who said what, but there was question about his

Page 90

1  length -- yeah, about his length of stay, as to whether or
2  not he would stay at the center for any length of time,
3  because he had had several different jobs over the past
4  couple of years.
5 Q  Do you know if anyone asked Mouhanad how long he would
6  stay?
7 A  We were not part of that, so we did not interview him.
8 Q  So you presumed that Mouhanad would not stay at the center
9  for a while?
10 A  We didn't presume it.  We just had a question about it,
11  because we weren't given any other information except
12  here's the questions you should ask and here's the resumes.
13  These were just the questions that we were raising.
14 Q  So you never sought clarification?
15 A  Pardon me?
16 Q  I'm -- I'm sorry for interrupting you.  You never sought --
17  never sought clarification?
18 A  No, I did not ask the search firm.  I didn't feel
19  comfortable talking to the search firm about our concerns
20  at this point.
21 Q  Okay.  And what was the issue with George's resume?
22 A  I think his was that -- just the least concern.  There was
23  not as much concern, but there was overlapping timelines on
24  his job as well.
25 Q  What overlapped -- what overlapped on his resume?

Page 91

1 A  Two CEO jobs at the same time, one ended and started in
2  overlapping years or something to that effect.
3 Q  Is it possible for someone to work at two companies at the
4  same time?
5 A  Yes.
6 Q  Okay.  Is it possible for someone to be CEO of two
7  companies at the same time?
8 A  Not typically for two FQHCs, it's not.  There's very
9  specific rules in the HRSA guidelines about being the CEO.
10 Q  What rules?
11 A  Pardon me?
12 Q  What rules?
13 A  You have to be a full-time CEO.  You can't have -- it's
14  very difficult to say that you are the -- to get federal
15  approval, that you could be the CEO of two different FQHCs.
16  You would have to have federal approval to do that.
17 Q  Do you know how big these companies were?
18 A  I know one of them was fairly small, because it was listed
19  at some point.  I -- I don't know how big the other one
20  was.
21 Q  Okay.  So it's your testimony today that you can't be the
22  CEO of two companies at the same time?
23 A  No, that's not my testimony.  What I'm saying is that when
24  you receive federal funding through HRSA, the 330 funding,
25  it is very specific as to what the requirements of a CEO

Page 92

1  are, and you would have to get approval to be CEO or hold
2  any senior level, like CFO, position.
3          An example is when the -- when Rebecca resigned,
4  I had to talk to -- I talked to our project officer about
5  whether or not and how to fill the CFO position, and I was
6  told that if I was working with another health center, that
7  the only -- their CFO could only work for me after five
8  p.m. because they were designated full-time at the other
9  health center.  So that's an example of why that seemed off
10  to me that you would be able to do that.  I'm not saying
11  that he was -- what he was told, that he could or couldn't.
12  It just is odd in an FQHC environment.
13 Q  Did you or anyone else in the senior leadership team, that
14  you know of, seek clarification with George about being a
15  CEO of two companies at the same time?
16 A  No.  We were not to talk directly to the candidates.
17 Q  Did you direct or did you ask anyone from Campbell and
18  Company, that you know of -- strike that.
19 A  No.
20 Q  Did you or anyone from the senior leadership team ask
21  Campbell and Company to clarify that?
22 A  No, I did not.
23 Q  Okay.  And all three of these finalists were men, correct?
24 A  Correct.
25 Q  And is everyone on the senior leadership team a female?

Page 93

1 A  No, not currently.  Dave Fiero is our CFO, and I appointed
2  him as interim.
3 Q  Okay.
4 A  And our new -- our new CEO is also a male.
5 Q  That's wonderful, but I'm asking at the time of this
6  search.  Was the leadership team consisting of all women?
7 A  No.  Terry was on the senior -- senior leadership team.
8 Q  Was he the only male on the senior leadership team?
9 A  Yes.  At that time, yes.
10 Q  Okay.  So Mr. Hogwood told you to go ahead and debunk
11  during the interview process.  That was with respect to all
12  three finalists, right?
13 A  Yes.
14 Q  Okay.  And did he elaborate what he meant by that?
15 A  Yeah.  At one point he actually said to me if someone on my
16  team were embellishing or not being truthful on the resume,
17  I would terminate them.  What does the center do?  I said
18  our polices would be if you're not truthful, then you --
19  that could be grounds for corrective action, disciplinary
20  action.
21 Q  So you're saying it was Steve's idea to give you -- Steve's
22  words that gave the center its idea to terminate Terry?
23 A  No, I'm not saying that.  I'm just telling you that's what
24  he told me.
25 Q  Okay.  When did the -- when was the decision made to

Page 94

1    terminate Mr. Langston?

2 A   Around about May -- I can't remember the dates, but like
3     the 12th or 15th or something like that of May.

4 Q   And who was involved in the decision to terminate
5     Mr. Langston?

6 A   I made the decision in consultation with my attorney and
7     the HR manager, Michelle Lutz.

8 Q   Is there anyone else who was involved in the decision?

9 A   Not in making the final decision.

10 Q  Who are all the individuals that thought Terry should be
11    terminated, that you know of?

12 A  The only ones that I know of are me and Michelle Lutz.  The
13    senior leadership team, it is not typical that you would
14    ask people's opinion about who should be terminated, but I
15    did weigh their input, which included that they had no
16    further -- they had no trust.  They had lost all trust in
17    Terry and felt like it was going to be difficult for them
18    to work with him, but I did not ask them if they thought he
19    should be terminated.  As the interim CEO, that was my
20    decision.

21 Q  Who specifically said that they lost trust in Terry?

22 A  The senior leaders:  Kim Hinkle, Dr. Thornton, Dr. Johnson
23    and Rebecca.

24 Q  How long had Terry served on the senior leadership team
25    with yourself, Kim, Dr. Thornton, Dr. Johnson and Rebecca?

Page 95

1 A   Five years maybe.  I don't know.

2 Q   So after five years of working with him, you lost trust in
3     him?

4 A   Yes.

5 Q   Did you trust him prior to that?

6 A   There were things that were of concern to me over the
7     years, but it wasn't to the level that happened in the last
8     few weeks or couple weeks of his employment.

9 Q   Okay.  So in those five years, and I know that was a long
10    time ago, tell me what some of those concerns were?  You
11    told me about this activity with the church -- churches in
12    the community?

13 A   Yes.

14 Q   What else?

15 A   It would not be uncommon for me to be in a meeting with all
16    of the senior leadership and for Terry to say words like
17    Sara and I were talking and we believe X or we said this,
18    and that would not be what the nature of our conversation
19    was.  I usually did not want to make him feel -- undermine
20    him, for example.  So sometimes I would re-correct and
21    sometimes it was something that I just didn't think needed
22    re-correcting.

23        At one point, I did talk to Molly Kaser about
24    some things that he hadn't followed through on.  There was
25    also an example of an item where he told me that Molly said

Page 96

1    to do something and it seemed odd to me.  I don't remember
2    what the particular item was.  I went to Molly and asked
3    her, and she said that's not at all what I said.  Please go
4    talk to Terry.  And if you guys need to, you can come back
5    to me and work that out.

6    So there were things like that, nothing that was
7    egregious.  But over a period of time, that is my
8    perspective.  I can't speak to others' perspectives.

9 Q   So then let me get your perspective, okay?  When Terry said
10    the example you said, Sara and I said this, dot, dot, dot,
11    did you not like it if Terry was speaking for you then?

12 A  No, I didn't -- it wasn't speaking for me.  It was
13    misrepresenting what I would have said.  So he might have
14    come into my office and said, hey, what do you think about
15    this; I want to take it to the leadership team.  There were
16    a couple instances where I said I don't feel like that's a
17    conversation you and I should have separately.  I think
18    that should go to the full leadership team.

19 Q   Why did you --

20 A  So then to the leadership team, he would say Sara and I
21    were talking yesterday and said blah, blah, blah.  And
22    sometimes I would say, Terry, that's what we said was we
23    should bring it to this table.  I didn't say what you said
24    I said.

25 Q   Was Terry just informing people that he had a conversation

Page 97

1    with you and then he presented his ideas or was it this
2    is --

3 A   No.

4        MS. BERKERY:  Hold on.  Objection, foundation as
5    to what Terry thought.  Go ahead.

6        MR. VLAHOPOULOS:  Karen, forgive me, I can't hear
7    a word of your objection.  Could you state it again?

8        MS. BERKERY:  I said foundation --

9        MR. VLAHOPOULOS:  Okay.

10 BY MR. VLAHOPOULOS:

11 Q   Go ahead.

12        MS. BERKERY:  -- as to what Terry thought.

13        THE WITNESS:  I don't know what Terry thought,
14    but I know that when -- it did not happen with anyone else.
15    I never had that experience here where if we were
16    talking -- if I had been talking with, say, Dr. Johnson,
17    she would have said Sara and I were talking about an item
18    but she felt it should come to this group first.  She would
19    not have said Sara said XYZ when, in fact, I actually
20    didn't say that.  I actually said this should be talked
21    about with the senior leadership team.

22 BY MR. VLAHOPOULOS:

23 Q   Okay.  You said the decision was made to not participate in
24    these interviews because of feeling awkward and
25    uncomfortable, is that right?

Page 98

1 A    Yes. It was -- it was going to not be our place to debunk.
2      I did not feel comfortable debunking Terry and questioning
3      him.
4 Q    But it wouldn't have just been Terry, right? It would have
5      been the other two gentlemen?
6 A    Correct. It would have been Terry and two board members
7      and Campbell.
8 Q    Right. But I'm saying -- sorry, just to clarify, I'm
9      saying you would have debunked not just Terry's resume, but
10     the other two gentlemen, George and Mouhanad, I think,
11     right?
12 A   When Steven and I were talking about the resumes, I
13     specifically said I'm of particular concern interviewing
14     Terry when there's things that I know not to be true. How
15     am I going to -- how do we proceed with that?
16        Do I, in the interview, say that's not true,
17     Terry? You did not write federal grants or participate
18     annually in implementing federal grants. That would have
19     been very uncomfortable for us to do in front of others,
20     but that was when Steven said, well, you would just debunk
21     that.
22 Q   But lying on a resume would be a serious concern to you,
23     right?
24 A   Yes, it was a serious concern.
25 Q   You had the opportunity to address it in these interviews,

Page 99

1      correct?
2 A    Yes, if we chose that, but we did not feel comfortable
3      doing that and being put in the position to do that.
4 Q    You didn't choose to do that because then you subsequently
5      terminated him, right?
6 A    No. I didn't choose to do it because I didn't feel like it
7      was appropriate for us to be sitting in interviews and
8      debunking the candidates in front of board members, and how
9      would you -- how would I go about doing it and how would
10     the team go about saying, Terry, you're being dishonest,
11     you did not do that. I'm not going to say that.
12 Q   Did you ever -- did you ever have that conversation with
13     him privately?
14 A   No, I did not.
15 Q   Okay. So you never tried to debunk Terry's resume, then,
16     is that correct?
17 A   I did not, not to him and not to the board.
18 Q   So just by yourself when you made the decision to terminate
19     him, right?
20 A   The decision to terminate him was not based solely on
21     the -- on his resume.
22 Q   What else was the termination based on?
23 A   The termination was primarily based on the fact that he was
24     dishonest about the sponsorship. When that --
25 Q   What sponsorship? Sorry, I've got to pause you. What

Page 100

1      sponsorship?
2 A    Okay. So Terry sent me an email around about April
3      28th-ish or 29th or somewhere around there and said that as
4      of today, we now have sponsors for the advocacy -- excuse
5      me, for the awards event. I said okay. He gave me the
6      three names.
7         And then during the event, I thanked the
8      participants -- the sponsors. And after the event, I asked
9      him for their contact information so that I could reach out
10     and thank them. At that point, Terry sent me an email with
11     all the contact information of four alleged sponsors and
12     said something to the effect of all four of them are
13     changing partners -- or not partners, but contact for the
14     next couple of weeks. He said that typically he would be
15     the one to thank them, not Molly.
16        I then checked to see if we received any checks,
17     because I felt like it was suspicious and also the list
18     included names that were different than the original email
19     he sent me. And so I made the decision that I would call
20     the individuals to thank them personally for their
21     contribution, and I reached one individual's supervisor.
22 Q   And who was that?
23 A   I don't recall her name, but she was a supervisor at one of
24     the sponsors.
25 Q   Does the name Lawanda sound familiar to you?

Page 101

1 A    Lawanda is the person that was not the supervisor, but
2      Lawanda is the person that Terry listed on the email that I
3      spoke to later that same day.
4 Q    And what did she say to you?
5 A    Well, first the supervisor -- when I called and I said I
6      was just touching base. We had had an event. I wanted to
7      make sure that I got thank-yous to the right place, and she
8      said we'd be happy to sponsor your event. I said, well,
9      the event already happened. She said, oh, she didn't see
10     it in her records, but it could be that Lawanda hadn't
11     posted it yet and that she would have Lawanda call me back.
12        Lawanda called me back that same day. And when I
13     picked up the phone, she said who she was and that she
14     loves the center and would be happy to sponsor us. She was
15     glad that I reached out, because she hadn't heard from
16     Terry. She actually asked if Terry still worked here. She
17     hadn't heard from him in a while. She was waiting to talk
18     to him about an event coming up later in the summer.
19        She then said that she would be happy to sponsor
20     us for any events and said you can reach out to me at any
21     time. This is, you know, my contact information. You can
22     reach out to me, but they had not sponsored us for any
23     events. She had not even heard from Terry in quite some
24     time.
25 Q   Did you ever ask Molly if Terry -- if Terry sent these

Page 102

1     thank-yous on behalf of the center?
2 A   I don't recall.  I don't think I asked her.
3 Q   So did you --
4 A   I don't recall.
5 Q   So did you just not believe Terry when he said he was the
6     one who traditionally sent the thank-yous?
7 A   It's not that I didn't believe that.  I just felt it was
8     odd that we -- I wasn't aware that he was trying to get
9     sponsors.  All of a sudden -- on the same day, all of a
10    sudden we have sponsors.
11         The sponsors that were listed in the program
12    weren't what -- were not listed in the email that he sent
13    me, and we hadn't received any -- our payment for the
14    sponsorship, which I thought was odd, because I would think
15    that you would get your payment ahead of being a sponsor.
16 Q  So did you think that he was just making this all up, the
17    sponsorships?
18 A  Pardon me?
19 Q  Did you think he was making the sponsorships up?
20 A  I didn't really know what to think in the beginning because
21    I would find it extremely shocking that someone would do
22    that, but I felt like it was something that I needed to
23    pursue.
24         The other thing is that I was not recalling that
25    we had had sponsors at past awards events.  I have since

Page 103

1     looked into that, and we have not.  There's no sponsors
2     listed at the last three virtual -- or live events that we
3     did.  We didn't even have sponsors for this event.  I did
4     confirm that with Molly, that we typically did not have
5     sponsors for the awards event.
6 Q   So you're telling me the main reason that Terry was
7     terminated is not because he lied on his resume, but
8     because of this sponsorship issue, is that right?
9 A   My feeling was that if you are -- if one of your primary
10    roles is fundraising and development and you are dishonest
11    about sponsorships and money received from other partners,
12    that was my biggest concern.
13         But then I also learned, in talking to Michelle
14    Lutz, that there was a situation that had happened with
15    another employee, where the employee had asked for their
16    sponsorship to be stopped or their payment to be stopped.
17    She said she had communicated that with Terry when, in
18    fact, that is not the case, and then --
19 Q  What employee is this?  Who are you referring to?
20 A  I'm referring to -- I think her name was Lillian.
21 Q  Lillian, with an L?
22 A  Yes.
23 Q  And what was the last name?
24 A  Rogers.
25 Q  And what happened with Ms. Rogers?

Page 104

1 A   Excuse me.  That she had had a conversation with Michelle
2     Lutz about stopping her employee contribution, and Terry
3     had told Michelle Lutz conflicting information and Michelle
4     shared that it was very concerning because Terry had said
5     that he had permission to continue it.  When it was
6     continued, Lillian called and said why is this money coming
7     out of my paycheck?  I told Terry I didn't want to do it
8     anymore, and Michelle was very concerned about that.  That
9     had happened shortly -- several weeks before all of this.
10 Q  Sara, do you know if there is any record of that, these
11    communications between Terry and Ms. Rogers?
12 A  Yes.
13 Q  There is?
14 A  Yes.  There's communication from Michelle Lutz that
15    summarizes that happening.
16 Q  Okay.
17 A  I believe that was sent to you.
18 Q  That's all right.  Okay.  Was this included on Terry's
19    paperwork -- termination paperwork?
20 A  The note wasn't, but the summary of that happening was.
21 Q  So what were the reasons that were presented on
22    Mr. Langston's termination paperwork, if you remember?
23 A  The sponsorship, which we just discussed, the falsification
24    of his resume, the example of Lillian and the payroll
25    piece.  There's one other item that was an example that I'm

Page 105

1     blanking on at the moment, and then the lack of -- the
2     overall loss of trust from the senior leadership team.  Oh,
3     there was a billboard, an issue with a provider not wanting
4     to have her picture on the billboard.
5 Q   We'll talk about that billboard in a little bit.  Do you
6     have any documents that prove the sponsorships Terry
7     claimed he got were false or untrue?
8 A   I don't have documents.  I just have my notes of the
9     conversation with the two individuals from the one payer,
10    and the fact that we did not receive any payment.  And then
11    I do have a note, an email that I found that is from Mel
12    Bice at Wild Design when she's asking for clarification
13    from Terry, because when he communicated with her, he gave
14    different names for the brochure than he gave her for the
15    posters to make.  So she was asking for clarification for
16    which sponsors to have.
17 Q  Okay.  So we have no tangible proof, but you have two --
18    conversations with two individuals, right?
19 A  Yes.
20 Q  Okay.  Who are those individuals?  One of them is Lawanda,
21    I think?
22 A  Yes.
23 Q  And what's Lawanda's last name?
24 A  I don't remember.
25 Q  Okay.  Who is the second individual you had a -- you had a

Page 106

1   conversation with?
2 A   The second individual is her supervisor. I don't remember
3     her name, maybe it was Ashley. I don't know. It was a
4     long time ago, so I don't know her name.
5 Q   That's fine. Ashley? And this is from -- what entity are
6     they a part of?
7 A   I can't recall. It might be Molina.
8 Q   Okay. And then so we have Lawanda and Ashley and then this
9     other communication you have from Wild Design, right?
10 A   Yes.
11 Q   Okay. And explain to me again what happened with Wild
12     Design?
13 A   That was just something that I came across after the fact
14     where it's just her asking for clarification, because she
15     was told different information as far as who the sponsors
16     were, which is the same thing that I was told, different
17     sponsors in the email, and then now there's one more
18     sponsor and this is what's on the brochure, those kinds of
19     things.
20 Q   One second. I apologize, sorry. Gees, that's someone from
21     the office outside.
22       You said the senior leadership team had no
23     confidence in Terry's ability to represent the senior
24     leadership team or the center accurately, is that correct?
25 A   Something to that effect, yes.

Page 107

1 Q   Okay. We've talked about Terry's termination a little bit.
2     I want to go back to Campbell and Company. You -- so as I
3     understand it, there was the opportunity for you all to --
4     when I say you all, the senior leadership team -- to debunk
5     these resumes, all three resumes that you believe to be
6     either inflated or untrue, is that correct?
7 A   Yes.
8 Q   Okay. And that opportunity never happened, because you
9     felt uncomfortable, correct?
10 A   Correct. We did not -- beyond uncomfortable, we did not
11     feel it was our place to do that in the interview,
12     particularly with Terry.
13 Q   So just because other people were around, you felt
14     uncomfortable of addressing all three of these individuals
15     directly, is that right?
16 A   Yes. I felt that it was uncomfortable and not our place
17     and also put us in a bad position to look like we were
18     trying to -- that we were saying that these things are not
19     true on Terry's resume.
20 Q   Does it -- so does it put the company in a bad position to
21     search for the truth; is that what you're telling me?
22 A   No, I'm not telling you that. I said it puts me in a bad
23     position and the senior leadership team in a bad position
24     to --
25 Q   But, Sara, you were the interim CEO. I mean, isn't

Page 108

1     there -- isn't there some sort of inherent responsibility
2     to have the interests of the company -- to have the best
3     interest of the company when going through these steps?
4     All I'm asking is whether -- I just don't quite understand
5     why you did not directly speak with any of these three
6     individuals. I mean, it's not just Terry. It's the two
7     others as well. Why was there no communication directly
8     with them?
9       MS. BERKERY: Form. Go ahead.
10       THE WITNESS: There was no communication directly
11     with them because I talked to Steven Hogwood, and he's my
12     chair of the board. He said go ahead and debunk the
13     resumes during the interview process, and we said we were
14     not comfortable doing that and we -- and I explained to him
15     why. Then, in my understanding, he was going to take it
16     from there. It's his responsibility to talk to the search
17     committee.
18 BY MR. VLAHOPOULOS:
19 Q   Okay.
20 A   I had not been part of the search process at all. I was
21     not in communication with the search committee. It was to
22     be very separate. The board was managing that, and so I
23     shared my concerns with the board chair. I don't know what
24     course of action he took after that. I don't know what
25     conversations he had.

Page 109

1 Q   So the board chair told you and the senior leadership team
2     to debunk this yourselves during the interview, and you did
3     not listen because you said it was -- you felt
4     uncomfortable, right?
5 A   What I did is I called him and I said we are not
6     comfortable doing this. The senior leadership staff do not
7     want to interview, and he said that's fine. You don't need
8     to interview them, and I thanked him for that support. And
9     then he said I will take it from here and I will get back
10     to you on whatever next steps. The next things could have
11     been he could have come back and said you will interview
12     them. I don't know what the next -- what his thought
13     process was about the next steps.
14 Q   Is there anything in writing amongst the senior leadership
15     team about feeling uncomfortable about these interviews?
16 A   Not that I'm aware of.
17 Q   Okay. So there's nothing in writing to formalize your
18     feelings of being uncomfortable about these interviews, is
19     that right?
20 A   That's -- I take that back. I believe there is a summary
21     statement that I emailed to Steven, if I recall.
22 Q   And did you --
23 A   It's either a written document summary or an email summary
24     that states that in writing.
25 Q   Did you create that document yourself?

Page 110

1 A   Yes.
2 Q   Did any of the other senior leadership team have input into
3      that document?
4 A   Yes.
5 Q   Okay.  Who from -- strike that.  Has that document been
6      produced?
7 A   I believe so, yes.
8 Q   Okay.  But there's no communications, let's say, for
9      instance, between, hypothetically, you and Dr. Thornton,
10     talking about feeling uncomfortable, right?
11 A   There is not written documentation of that.
12 Q   What about with Ms. Hinkle, did you have any written
13     documentations or communications between you and her about
14     feeling uncomfortable?
15 A   No, I do not.
16 Q   What about with Rebecca Snow, were there any communications
17     with her about feeling uncomfortable?
18 A   Not written, no.
19 Q   Okay.  So when did you have this conversation with these
20     people?
21 A   I don't know what day it was, but it was shortly after
22     receiving the resumes.  The next day after we received them
23     is when --
24 Q   So you --
25 A   -- I was approached --

Page 111

1 Q   So you all received -- sorry, go ahead, Sara.
2 A   They each approached me when they received the resumes with
3      concerns, and then we held a meeting.  Then at that time,
4      in the meeting, is when we discussed that people were not
5      comfortable with moving forward with the interviews.
6 Q   Did you suggest that Campbell and Company should be let go?
7 A   No, I did not.
8 Q   Who, that you're aware of, suggested that Campbell and
9      Company's contract should be terminated?
10 A   All I know about that is that Steven sent -- I can't
11     remember if he called me.  I believe he called me first and
12     told me that that was the decision that he had made with
13     the officers on the board.  I was not part of that
14     conversation and I did not talk to the other officers about
15     that.  I just got communication from Steven that said I
16     want you to -- this is what the officers decided and we are
17     cancelling the contract.
18 Q   I want to go back to this written communication you said
19     you created to summarize the senior leadership team's
20     feelings about being uncomfortable.  Do you know who you
21     sent that to?
22 A   I believe there was an email.  If I recall, Steven asked us
23     to send him something summarizing the conversation that we
24     had with him verbally.
25 Q   Oh, so it was a summary of your conversation with Steven?

Page 112

1      So it wasn't actually you memorializing your concerns prior
2      to speaking with Steven, is that right?
3 A   It was a summary of the conversation that the senior
4      leadership team had with Steven, and then he asked me to
5      put it into a written format.
6 Q   Okay.  And what was done with that document, do you know?
7 A   I believe I emailed it to Steven.
8 Q   Do you know what Steven did with it?
9 A   No.
10 Q   Is there anything at the top of that document, that you can
11     think of, just to identify it, so I know where -- what to
12     look for?
13 A   No, I don't recall.  I just -- I think it was an email.
14 Q   And this was an email from your email address to Steven
15     Hogwood's email address?
16 A   I believe so.  That's how it would have been, as I recall.
17     I might have copied the senior leadership team.  I don't
18     recall.
19 Q   Do you know when the contract with Campbell and Company was
20     terminated?
21 A   I don't know the exact date, but it was in May.
22 Q   What reasons were you -- were you told that the contract
23     with Campbell and Company was being terminated?
24 A   Steven told me that the officers decided upon their
25     discussion that it was being terminated and told me to let

Page 113

1      Campbell and Company know that it was terminated.  I
2      did not have the specifics.
3 Q   Was there ever -- if you know, was there ever a time that
4      the board contemplated making Terry the interim CEO?
5 A   I became aware of that after the fact, yes.
6 Q   What is after the fact?  When did you become aware of that?
7 A   I became aware of that after Terry's departure when I was
8      going through the normal process of reviewing emails of
9      Terry's and Molly's, which I did on a regular basis, to
10     make sure I wasn't missing anything.
11         And there was an email from Jessica Embury,
12     communications with Campbell and Company, and I believe
13     Terry was a blind copy on it.  And what I knew from that
14     email -- that's what I know from that email, that Jessica
15     made a statement in the email that the board was
16     considering hiring Terry as the interim CEO and they would
17     ask that he terminate me and Rebecca.
18 Q   So you weren't aware of any other communications amongst
19     board members about Terry becoming the interim CEO, is
20     that -- is that true?
21 A   No, that is true.  I was not aware of any other -- that was
22     the only thing that I had seen any communication up to
23     that -- up to that point.  Now, in this process, I've
24     become aware of other things in prepping for -- or in the
25     lawsuit that I was not aware of at the time.

Page 114

```
 1 Q   Understood.
 2         MR. VLAHOPOULOS:  Let's go off the record.
 3         (Lunch recess was taken at 1:01 to 1:33 p.m.)
 4         MR. VLAHOPOULOS:  We are back on the record.  I
 5    just wanted to make a quick correction to a name that we
 6    had said earlier.  When we reference Mouhanad, the real
 7    name is -- I'm going to spell it -- m-o-u-h-a-n-a-d, and
 8    then the last name is h-a-m-m-a-m-i.  And then the last --
 9    then the other individual that we spoke to -- spoke about,
10    the finalist, his name is George Olson, o-l-s-o-n.
11 BY MR. VLAHOPOULOS:
12 Q   All right.  With that being said, Sara, I wanted to ask you
13    about the accusation that Terry deleted files and other
14    data off of his computer and phone.  Are you familiar with
15    that?
16 A   I'm familiar with the accusation, but I'm not -- that's not
17    something I ever said.
18 Q   Okay.  Tell me who made the accusation?
19 A   So I don't really believe there ever was an accusation.
20    What happened was after Terry left that day, I -- one of
21    the first things I wanted to do was to see if there were
22    anything -- was there anything coming up on his calendar or
23    reach out -- any contacts I needed to reach out to.
24         And when I went to look on his phone for any
25    contacts, there were almost no contacts on his phone.  And
```

Page 115

```
 1    when I went to look in the computer, which probably wasn't
 2    the same day, because -- maybe in the next couple of days,
 3    excuse me -- I didn't see a lot of documents there, so I
 4    reached out to IT and I asked.  I said are there things
 5    that are not there?
 6         I did have a conversation with Steven immediately
 7    after Terry left and just gave him an update, and I
 8    shared -- I did make a comment to him, because he said,
 9    well, what are your next steps?  I said, well, I need to do
10    a lot of communication and I'm trying to find some of the
11    key folks that Terry worked with and communicated with, but
12    I'm not seeing anything on his phone.
13         I may have said I'm not sure if it was deleted or
14    if it's just not something that he had, but I never said
15    that Terry deleted files.  So I don't know how that spun
16    out.  I read some things in the case notes that you guys
17    had shared, and I don't know how that got spun out of
18    control.
19 Q   So as you sit here today, is it your belief that Terry
20    deleted things from his computer and phone?
21 A   No, it is not.
22 Q   Is there anyone that you know of that does believe Terry
23    deleted things off of his computer and phone?
24 A   No.  I do know that when I tried to get the contacts, I had
25    asked Nilda if there was any other way -- Nilda is our IT
```

Page 116

```
 1    manager, and I asked her if there was any other -- like if
 2    I was doing something wrong.  I'm not a techno-geek kind of
 3    person or whatever.  She shared that it's just possible
 4    that he never had the contacts on his work phone.
 5 Q   You said you brought it to Steven Hogwood's attention?
 6 A   Yes, as a -- as a point of saying here's the update and
 7    here are the next steps.  Steven said, well, what are your
 8    next steps?  I said, well, I need to contact people.  And
 9    in the nature of that conversation, I said I'm trying to
10    get that information, because I need to know who the key
11    contacts are, if there is anyone that I need to reach out
12    to, and I wasn't able to find them, so I will do it other
13    ways.
14 Q   Did you say that deleting this data or files, that that
15    is -- that an investigation is necessary in order to assess
16    whether he actually did?
17 A   No, because at that point, it wasn't really an
18    investigation.  It was like the first day, and I'm just
19    saying I don't see the contacts.  I'm working with -- I'll
20    work with IT.  I didn't really ask IT to investigate.  I
21    just asked them if I was doing something wrong, to see the
22    contacts on his phone.  They said no.
23         And then later when it came to the computer and I
24    asked about documents, our IT manager said, well, I'll look
25    into it.  It may be that we have to do like a reboot -- not
```

Page 117

```
 1    a reboot, but some other language that she used.  I said,
 2    okay, just let me know.  Then she got back with me and said
 3    everything is there, and that was the end of that and that
 4    was it.
 5 Q   Okay.  Who is the IT manager?
 6 A   Nilda Ward.
 7 Q   I'm sorry, could you say that again?
 8 A   Nilda.  It's n, as in Nancy, i-l-d-a, and then her last
 9    name is Ward, w-a-r-d.
10 Q   Thank you.  Did you ever speak with someone named Kyle
11    Hammond?
12 A   I don't recall.  I typically would talk to Nilda, the
13    manager.
14 Q   Do you have any knowledge -- you told me earlier that you
15    watched the videos?
16 A   Yes.
17 Q   Okay.  Was one of those videos with Mr. Hammond?
18 A   Yes.
19 Q   Okay.  And so you saw what he said, right?
20 A   Yes, I did.
21 Q   And to the best of your memory, as you sit here today
22    having just recently reviewed it, what did Mr. Hammond say
23    in that video?
24 A   He said a lot of things.  Do you want me to talk
25    specifically to --
```

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
118..121

Page 118

1 Q   I want you to summarize, to the best of your knowledge?
2 A   To the best of my knowledge or to the best of my
3    recollection, he said a lot of things that he had no
4    firsthand knowledge of, a lot of hearsay, a lot of comments
5    that related to the whole phone thing; that we were
6    required to have phones, which is true.
7        All leadership, not just senior leaders, are
8    required to have phones.  He did say that Terry did not use
9    his work phone for contacts, which now I know, in
10   hindsight, that's probably why I couldn't find any contacts
11   on his phone.  I think that's the nature.  I'm trying to
12   think if there's anything else.
13 Q   Did that -- did that video of Mr. Hammond, did it worry you
14   at all?
15 A   No.  It actually made me -- I was just appalled.  It made
16   me -- it did not worry me.  It makes me angry, because he's
17   not a part of anything.  Anything that he shared was
18   third-hand information.
19 Q   You said that his -- I don't want to call it testimony, but
20   his Zoom interview was based off of a lot of hearsay,
21   right?
22 A   Yes.
23 Q   Okay.  Aren't the accusations against Terry Langston also a
24   bunch of hearsay?
25 A   No.

Page 119

1 Q   But you're relying on conversations that haven't been
2    recorded in writing that you had with multiple individuals,
3    right?
4 A   Yes, but I don't --
5        MS. BERKERY:  I'm going to place an objection.
6    That's -- that's not hearsay.  If she had a first-party
7    conversation with someone, that's not pertaining -- just
8    because that's not in writing doesn't mean it didn't
9    happen.
10       MR. VLAHOPOULOS:  All right.
11 BY MR. VLAHOPOULOS:
12 Q   You've told me today, Sara, that a lot of this information
13   that you've gathered from others, including from the senior
14   leadership team, that they didn't just express their
15   concerns directly to you; they've expressed their concerns
16   amongst each other as well, right?
17 A   I don't --
18       MS. BERKERY:  To who?  I'm sorry, I didn't hear.
19   To who?
20       THE WITNESS:  Each other.
21       MS. BERKERY:  Oh, each other?  I'm sorry.
22       THE WITNESS:  I don't know if I said that they've
23   expressed it to each other.  I don't know what their
24   conversations amongst each other were.  I was only speaking
25   to the things that they shared with me directly.

Page 120

1 BY MR. VLAHOPOULOS:
2 Q   Understood.  So Terry deleting any sort of information,
3    that had no bearing on his termination, right?
4 A   No.  None of that even came up until after he was gone.
5    And again, I did not give anyone -- I did not state to
6    people that Terry deleted information.
7 Q   You told Steven, though, right?
8 A   No.  I told him I couldn't find information, and I may have
9    said I don't know what happened.  I'm going to be looking
10   for it, but I did not say I know that Terry deleted
11   information.
12       I just said something to the effect of I'm
13   looking for information.  I may have said I don't know if
14   it's deleted or if it's not -- if it's just that I can't
15   find it, but I never told him or anybody that Terry deleted
16   any information.  I never had that knowledge.
17 Q   So what led to them even -- when I say -- what led to Dale
18   Moretz, Jessica Embury and Steven Hogwood, what led them to
19   interview Kyle?
20 A   I don't know.  I have no idea.
21 Q   There had to be some sort of accusation -- I'm not asking
22   you to speculate here, but there had to be some sort of
23   basis for them to pull an employee and interview them on
24   Mr. Langston deleting material, right?
25       MS. BERKERY:  Foundation.

Page 121

1        THE WITNESS:  I really don't know.  I could -- I
2    could guess that --
3        MS. BERKERY:  Don't guess.
4        THE WITNESS:  Okay.  I don't know.
5 BY MR. VLAHOPOULOS:
6 Q   Okay.  So if they were to testify that they interviewed
7    Mr. Hammond because of your accusations of Terry deleting
8    things, that would be false?
9 A   Yes, because I never made an accusation that Terry deleted
10   things.
11 Q   Did Rebecca --
12 A   I didn't talk to Kyle about that either.  I never -- I
13   didn't have conversations with Kyle.
14 Q   Did Rebecca Snow ever make accusations that Mr. Langston
15   deleted things off of his computer and phone?
16       MS. BERKERY:  Foundation.
17       THE WITNESS:  Not to my knowledge.
18 BY MR. VLAHOPOULOS:
19 Q   So you were the only person who realized that -- or who
20   thought, rather, that Mr. Langston potentially deleted
21   things off of his computer and phone, is that correct?
22       MS. BERKERY:  Foundation.
23       THE WITNESS:  I -- I wouldn't characterize it
24   that way.  I would say I was looking for information and I
25   didn't find it.  It's highly unusual that someone who was a

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
122..125

---

Page 122

1  fund developer and worked with folks in the community, that
2  I wouldn't be able to find contacts on his phone of people
3  that I would need to contact.
4          That's -- so then I said I need -- I don't know
5  what happened to that information.  Now I know, from
6  reading and listening, that Terry didn't use his work phone
7  for work things.  He used his personal phone.  At least
8  that's what Kyle said in the video.  I guess I don't know
9  if that's true now either, but it would make sense now as
10  to why I couldn't find it if that's the case.
11 BY MR. VLAHOPOULOS:
12 Q  When Molly stepped down as CEO, can you just explain to me
13    the morale within the center, how you perceived it?
14 A  How I perceived it?
15 Q  Yes.
16 A  I perceived that things were going well.  I thought that
17    some -- that there was a little bit of what you would
18    expect to be typical concern when the founding CEO, after
19    so many years, was leaving.
20          I thought things were going well.  I had people
21    ask me -- several providers and a couple of managers -- ask
22    if I was going to be the CEO, because they thought I would
23    be a good candidate and they were excited about the
24    center's future.  There's always going to be one or two
25    individuals that may not be happy with something, but I

Page 123

1  think overall I thought the environ- -- the culture was
2  very positive and we were meeting our organizational goals
3  and serving our patients.
4  Q  Did anyone ever vocalize to you that there might be fear
5    amongst the employees towards the -- towards the executive
6    team or what we have called the senior leadership team?
7  A  No, not that I recall.
8  Q  Did you read any of the surveys that were issued amongst
9    employees for what they expect from the new CEO?
10 A  Can you repeat that, sorry?
11 Q  Yes, that's okay.  Let's -- let's take it one step back.
12    Are you aware that Campbell and Company surveyed employees
13    on the qualities that they would like from the new CEO?
14 A  Yes.
15 Q  Okay.  Did you read that document?
16 A  Yes.  I read a summary.  I didn't have access to any of the
17    details, but whatever summary they shared back to all the
18    staff, I read as well.
19 Q  So are you aware that some -- one anonymous employee said
20    that the new CEO should not be related to any member of
21    our -- and I'm quoting here -- of our current human
22    resources nor managerial team?
23 A  I don't recall reading that.  Yeah, I don't recall that.
24 Q  Are you aware that an anonymous employee said that the new
25    CEO should, quote, make certain that there is not a great

Page 124

1  divide amongst the -- amongst administration and employees?
2  A  That was on the survey?
3  Q  Correct.
4  A  Yeah, I -- I can't recall any specific comments about the
5    survey off the top of my head.
6  Q  Okay.  Were you aware that employees felt this way?
7  A  No.
8  Q  Okay.
9  A  I also am not aware that they -- that because an employee
10    says a comment, that that means that something was
11    happening either.  They just were --
12 Q  So you're denying the truth of what that anonymous employee
13    might have said then, is that --
14 A  No, no.  I'm talking in general.  If someone makes a
15    comment about I want to see an employee -- a leader that
16    does XY and Z, that does not, to me, mean that Molly was
17    not doing that; that's what I mean, or that it wasn't
18    happening.
19 Q  Don't you have employees that report to you?
20 A  Yes.
21 Q  And how many employees, give or take, report to you?
22 A  Well, at the time -- or currently, I think 14.
23 Q  Only 14 employees, as interim CEO, reported to you?
24 A  Yes.
25 Q  Okay.  And none of those --

Page 125

1  A  Directly to me.
2  Q  Directly to you?  That's fine.  And none of those 14
3    employees never once mentioned, hey, employees are
4    concerned about a divide between the senior leadership team
5    and the general employees?  No one ever raised that as a
6    concern?
7  A  No one has ever raised that as a concern during that
8    whole -- during this process.
9  Q  What do you mean by that?
10 A  No one -- I guess what is the timeline that you're
11    referring to?  You mean last year when Campbell did the
12    surveys?
13 Q  I'm talking about from the moment you became interim CEO,
14    no one ever approached you and said, hey, there's -- the
15    employees are fearful of retaliation?
16 A  No, no one ever told me that.
17 Q  No one ever -- no one ever told you that the employees
18    didn't trust the senior leadership team?
19 A  No.
20 Q  Did you work close with Teri-Sue Steele?
21 A  Yes.
22 Q  Would Ms. Steele have ever mentioned anything like this to
23    you?
24 A  Not that I recall.
25 Q  Okay.  So you didn't -- were any of these comments about

Page 126

1    distrust between the employees and the senior leadership
2    team, was that in the summary that you read?
3 A   I don't recall if it was in that summary or not.  I recall
4     that we have employee satisfaction surveys.  And certainly,
5     we don't get a hundred percent on every score, so I'm sure
6     there are some employees that might feel that they don't
7     trust or feel like they can communicate, but I don't
8     remember the specifics on the survey that you're talking
9     about.
10 Q   Okay.  I'm going to show you another document here.
11       (Mr. Vlahopoulos screen shared a document via video.)
12 BY MR. VLAHOPOULOS:
13 Q   For the record, this is Defendant -- Bates stamped
14     Defendant 000156.  Sara, can you see my screen?
15 A   Yes, I can.
16 Q   Is it -- is the text large enough for you?
17 A   Yes.
18 Q   Have you seen this before?
19 A   Yes.
20 Q   Okay.  What is this?
21 A   My understanding is that this is an anonymous letter that
22     was sent to a couple of people on the board.  I don't know
23     who all.
24 Q   We can see Theo Hilleary's name on this, right?
25 A   Yes.

Page 127

1 Q   So we know it was at least sent to him?
2 A   Yes.
3 Q   How many other board members, that you are aware of,
4     received this letter?
5 A   I believe one other one, that I know of, and that was
6     Randy.
7 Q   So only Randy and Theo, to your knowledge, received this
8     letter?
9 A   To my knowledge.
10 Q   Okay.  And it says, quote:  What's the most important skill
11     set for a new CEO?  Trust.  If the survey response is
12     small, please don't justify why with historic trends and no
13     other -- and other excuses.  No one believes the survey is
14     confidential.
15       Trust eroded when Rebecca pushed her Theory X
16     management style into daily operations at CFH.  She brought
17     a culture of suspicion and a negative view of employees.
18     Good employees are called out for bogus incidents that
19     inflate into accusations as they rise up the bureaucratic
20     ranks for her desk.
21       She can't see past her own biases and is
22     incapable or unwilling to accept truth when it is told to
23     her if it doesn't fit her preconceptions or expected
24     outcomes.  She is the wrong person [sic] now and will be
25     the wrong person as CEO.

Page 128

1       Do you agree with this statement?
2 A   No.
3 Q   When did you become aware that someone sent this to members
4     of the board of directors?
5 A   At some point last spring.  I don't recall specifically
6     when, sometime in May of 2022 maybe.
7 Q   The date at the top says February of 2022, right?
8 A   Yes.
9 Q   February 3rd, to be exact?
10 A   Yes.
11 Q   Had the search process with Campbell and Company taken
12     place by that time?
13 A   Yes.
14 Q   Was it well-known within the center that Rebecca had
15     applied?
16 A   I don't know if it was at that time, and I don't know if it
17     was ever well-known that she applied.
18 Q   Okay.  Had she been rejected as a candidate by this time,
19     if you know?
20 A   I don't believe in February it had gotten that far.  I
21     think they were still in the vetting phase.
22 Q   Okay.  Do you know who could have sent this?
23 A   No.
24 Q   Do you have any suspicions as to who sent this?
25 A   No.  I know that -- I really don't have any suspicions, but

Page 129

1    I know that one person sending an anonymous letter is one
2    person.  I don't -- I don't have any -- I don't know who it
3    would be.
4 Q   Did you talk to Theo Hilleary when you received this?
5 A   No, I never talked to Ted about that.
6 Q   Is it Theo or Ted?  Do you know what he prefers, just so I
7    can call him by the right name?
8 A   I've only ever heard him ever referred to as Ted.
9 Q   Thank you.  And you said Randy also received this, right?
10 A   I believe so.
11 Q   Did you talk to Randy about this?
12 A   I can't recall if I talked to Randy, but I did talk to
13    Steven about it.
14 Q   And what did Steven say?
15 A   I can't remember if Steven said he knew about it or not.  I
16    believe -- I can't recall if he said he knew about it, but
17    I told him that I became aware of it and I wondered if he
18    was aware of it and if he knew who it all went to.
19       I do recall talking to Molly about it to see if
20    she had been aware of it after she left, because I didn't
21    know about it, like I said, at the time.  She said she had
22    been made aware of it and that the search committee had
23    received it.  I think that's what she said.
24 Q   There was no -- did she give any like context to her
25    thoughts?  I'm talking about Molly here.  What did Molly

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
130..133

Page 130

1    say when she -- when you guys talked about this?  I mean,
2    was she surprised?  Was she angry?  Can you describe --
3 A  She wasn't angry.  She did not seem angry to me, but she
4    seemed -- she had already known about it.  So she said --
5    she seemed surprised that somebody had sent it, but...
6 Q  You said she already knew about it; what does that mean?
7 A  When I reached out to her, she said she was aware that an
8    anonymous letter had been sent to her -- not her, excuse
9    me, that she was aware of this.  I do not know how she
10   became aware of it.
11 Q  She wasn't CEO at the time, right?
12 A  She was CEO until the end of March.
13 Q  Okay.  Thank you.  And Randy, I mean, it seems like you've
14   had these conversations with Randy and Steven about
15   Rebecca's potential to become interim CEO.  Did Randy have
16   a response to this?
17 A  I don't recall his response at the time.
18 Q  Do you recall how he reacted?
19 A  No.
20 Q  Did he say anything to you about it?
21 A  I don't recall.  I think I just recall him saying was I
22   aware that there was an anonymous letter.  I think that's
23   how I became -- that's how I knew.
24 Q  Did you discuss that letter with anyone on the senior
25   leadership team?

Page 131

1 A  No.
2 Q  Did you discuss it with Rebecca?
3 A  No, I did not.
4 Q  Do you know if Rebecca was ever made aware about this?
5 A  I don't know if she was.  I have since made Michelle Lutz
6    aware of it.  I believe I gave -- gave a copy to Michelle
7    Lutz.
8 Q  Are you aware that members of the board thought it might be
9    suspicious that Terry was terminated after just being a
10   finalist in the CEO search?
11 A  Several members told me that, yes.
12 Q  All right.  Which members told you that they thought that
13   it was suspicious?
14 A  There was a meeting, and I think you have those notes, the
15   summary of the meeting.  I know for sure -- I'm pretty sure
16   it was Lori Heiler that said in the meeting this looks
17   suspicious, something to that effect.
18 Q  Okay.  Hold on.  I asked you who told you it was
19   suspicious, and now you told me that there was a meeting
20   that we have documents on.  Let's -- let's try and break
21   this down a little bit here.  Who told you that they
22   thought it was suspicious?
23 A  Lori Heiler I believe is the one who told me.
24 Q  She's the only one?
25 A  Yes, I believe.

Page 132

1 Q  Did Ms. Embury, Jessica Embury, ever tell you that she
2    thought it was suspicious?
3 A  I don't think she was in that meeting, and I didn't have
4    any conversations with Jessica about this.
5 Q  Did Ted tell you he thought it was suspicious?
6 A  I don't recall if he -- I believe he was in that
7    conversation in the meeting, but I don't recall him saying
8    anything specific.
9 Q  Okay.  Who was in this meeting?
10 A  Our attorney, Lori, Steven Hogwood, I believe was there,
11   Jennifer White, I believe was there, Randy Treacher, and I
12   believe maybe Zoe Lyons.  It was basically the officers.
13 Q  When did this meeting take place?
14 A  Probably mid to late May maybe.
15 Q  I don't want to know what was said, okay, if your attorney
16   was there, the context of the discussion.  But at that
17   time, was there belief in the center that it might face a
18   lawsuit?
19 A  I don't recall.
20 Q  Okay.  Was any legal advice given during this meeting?
21 A  I don't recall anything.
22 Q  It's you don't recall or no?
23 A  I don't recall.  I think it was just a conversation.
24 Q  Are you certain that this document from this meeting in mid
25   to -- in mid to late May, are you certain that it was

Page 133

1    produced?
2 A  I'm pretty sure that it was in the packet of information.
3    But I don't have it in front of me, so I can't say for
4    sure.
5 Q  When you say the packet of information, what are you
6    referring to?
7 A  The information that I was asked to share -- any
8    documentation that I was asked to share regarding this
9    lawsuit.
10 Q  Did your attorney ask you to provide this documentation?
11 A  Not that specifically but just, you know, the documentation
12   that is then sent.
13 Q  I don't understand.
14 A  Pardon me?
15 Q  I don't understand.  This document, it's -- I'm just trying
16   to understand how I can identify it, okay, so that I can
17   review it.  What about this document would be unique to
18   you?  Like how could we tell which one you are referring
19   to?  Does it have a date on it?
20 A  It probably has a date, and it probably says -- it would
21   have a date and it would say who was present.
22 Q  Would it have a time as to when the meeting took place?
23 A  Probably not a timestamp.  I don't know.  I wouldn't
24   typically make a timestamp.
25 Q  Okay.  How long was this meeting?

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
134..137

Page 134

1 A    Maybe a half hour.

2 Q    Were there meeting minutes recorded?

3 A    No, I don't believe so.

4 Q    Okay.  So what exactly is in this document?  What does it

5      say?

6 A    It just talks about the nature of what was going on.  You

7      know, without having it right in front of me, I can't say

8      exactly, but it reflects what the board thought, and

9      that -- I believe at the end of it, Steven says we're

10     moving forward and we're going to focus on resuming this

11     search, something to that effect.

12 Q   So this was a -- how would you label this?  Was this a

13     debrief following Terry's termination?

14 A   Kind of a reset meeting with the leadership of the center

15     and the executive committee of the board.  I cannot recall

16     who called the meeting.  It might have been Steven.  I

17     don't recall.  It might have been me.  I don't know.

18 Q   And Terry was terminated on, let's see here --

19 A   Are you asking me?

20 Q   No, I'm sorry.

21 A   Okay.

22 Q   -- terminated on May 17, right?  So this document, it must

23     have been created sometime after May 17?

24 A   Correct.

25 Q   Would it be before June 1st?

Page 135

1 A    I'm thinking it would have been, but I couldn't say for

2      sure.  Actually, I -- I can't say.  I'm not sure.

3 Q    What about before July 1?

4 A    Probably before July 1.

5 Q    Okay.  So sometime after May 17 and possibly in the month

6      of June, is that fair?

7 A    And possibly what?

8 Q    In the month of June?

9 A    Correct.  That would be my guess.

10 Q   Sorry, there is somebody chattering in the background.  I

11     don't -- I don't know if you can hear it.

12 A   We can't hear it.

13 Q   Okay.  Tell me, who is Georgia Fojtasek, f-o-j-t-a-s-e-k?

14 A   Georgia Fojtasek was the CEO of Henry Ford, prior to that

15     Foote Hospital, and she was a reviewer that the board

16     retained to do an internal investigation or a review.

17 Q   Is she an attorney?

18 A   No.

19 Q   Okay.  And who is Karen Chaprnka, c-h-a-p-r-n-k-a?  And I

20     apologize for any mispronunciation.

21 A   Yeah, it's Chaprnka.  She was a colleague of Georgia's.  I

22     don't remember her exact title, but she also was part of

23     who the board retained to do the internal investigation and

24     review.

25 Q   When was there -- when was the idea proposed to conduct an

Page 136

1      internal investigation?

2 A    I don't recall when it was proposed or when it was told to

3      me that it was going to happen.  I wasn't part of those

4      conversations, but I believe it happened in July.  So I

5      believe it would have been before that at some point.

6 Q    And what was this investigation pertaining to?

7 A    The investigation was pertaining to the termination of

8      Terry.  Yeah, that's what I understood.

9 Q    Was it just regarding the termination of Terry?

10 A   I think it became about board -- the board inner workings

11     as well.

12 Q   What does that mean?

13 A   The board -- the structure of the board and the governance

14     of the board and the relationships of the board members.

15 Q   You've got to be more specific here.  So relationships of

16     board members regarding what exactly?

17 A   So as things unfolded -- and I know this now from reading

18     the document, not from the time -- that there was a

19     conversation at the board level about items that I'm not

20     privy to.  I don't know firsthand information about what

21     happened, but there was a conversation about -- the board

22     members were all interviewed, or at least several of them

23     were interviewed.  It was something to do with the board as

24     well.

25 Q   Were you interviewed?

Page 137

1 A    Yes.

2 Q    Did you discuss any legal advice with Karen and Georgia?

3      I'm not asking what was said, but did you discuss legal

4      advice with them?

5 A    No.

6 Q    No?

7          MS. BERKERY:  You don't have an exact

8      recollection of everything that you discussed?

9          THE WITNESS:  No, I don't have a recollection of

10     everything that was discussed.

11         MR. VLAHOPOULOS:  Karen -- Karen, I'm going to

12     ask you not to question the witness.

13         MS. BERKERY:  Well, no, you're not showing her

14     any documents.  You're asking her to go off her memory.

15         MR. VLAHOPOULOS:  Karen, she just told me -- she

16     just told me that after remembering -- after reviewing the

17     documents, she has a recollection.

18 BY MR. VLAHOPOULOS:

19 Q   So again, Sara, do you --

20         MS. BERKERY:  Do you --

21 BY MR. VLAHOPOULOS:

22 Q   Sara, do you have a recollection of speaking and being

23     interviewed by Georgia and Karen?

24 A   I do have a recollection of being asked questions by

25     Georgia and Karen.

Page 138

1 Q   Okay.  In that conversation, did you discuss any legal
2      advice?
3 A   Can you clarify what you mean by legal advice?
4 Q   I want to be careful of not intruding onto the
5      attorney/client privilege.  By legal advice, I mean did you
6      discuss anything that you and your attorneys have said
7      amongst each other?
8 A   I can't recall specifically, but I know that I was asked
9      questions about the events that led up to the termination
10     and what steps I took, and one of the steps I took was
11     talking with my attorney.  So that was probably -- it's
12     possible that that was part of the conversation.
13 Q   And were you -- do you know if a presentation was offered
14     after this investigation conducted by Georgia and Karen?
15 A   Yes, I know there was a presentation offered to the board.
16 Q   Were you present at that meeting?
17 A   No.
18 Q   Do you know who was?
19 A   No.
20 Q   Who is Dennis Litos, l-i-t-o-s?
21 A   Dennis was the -- I think the CEO of -- an interim CEO at
22     the Michigan Primary Care Association and I believe was
23     asked if he would do -- take part in the review, yeah.
24 Q   Review of what exactly?
25 A   This investigation that we were just talking about that

Page 139

1      Karen and Georgia did.
2 Q   Do you know when you entered -- or when Mr. Litos was
3      hired?
4 A   I don't know that he ever was.
5 Q   Not hired.  Let's say when an agreement was struck with him
6      to investigate?
7 A   I don't -- I don't think it ever was.  I think -- my
8      understanding was that he declined.
9 Q   Okay.  Are you saying that would have been before or after
10     the investigation by Georgia and Karen?
11 A   It was before.
12 Q   Who picked Georgia and Karen to conduct this investigation,
13     if you know?
14 A   I don't know.  I was not part of that.
15 Q   Would it have been -- okay.  Is it possible that the search
16     committee selected them?
17        MS. BERKERY:  Objection, foundation.
18        THE WITNESS:  I really don't know who was part of
19     that decision.
20 BY MR. VLAHOPOULOS:
21 Q   That's okay.  Did you ever provide a timeline regarding
22     Mr. Langston's termination?
23 A   Can you repeat that?  I didn't catch that.
24 Q   Sure.  Did you ever provide a timeline to anyone regarding
25     Mr. Langston's termination?

Page 140

1 A   I believe so.
2 Q   Who did you provide that to?
3 A   I believe to my attorney and I believe to the board's
4      attorney.
5 Q   Who is the board's attorney?
6 A   Greg Drutchas.
7 Q   Okay.  And he's a part of the -- yes, I understand.  Okay.
8      Did you ever break -- did you ever create a document that
9      breaks down all of the discrepancies you had with
10     Mr. Langston's resume?
11 A   Yes.
12 Q   When was that document created?
13 A   I don't recall the exact time, but it would have been after
14     reviewing the resumes, at some point after that.
15 Q   So sometime after May 9?
16 A   Probably around then.
17 Q   Do you know what role Ms. Embury has in -- strike that.  Do
18     you know how Ms. Embury has responded to Terry's
19     termination?
20 A   I know through the emails that I saw that she was not happy
21     about it, and I know that she sent me an email after
22     Terry's termination stating that she was no longer
23     comfortable participating with the Ambassador event,
24     because she was not in agreement with it.  And then the
25     rest of it that I think I know was from the documents that

Page 141

1      I was given through this proceeding.
2 Q   Following Mr. Langston's termination, did anyone -- I know
3      you told me that people expressed their suspicions and that
4      there was -- in a meeting that took place in mid to late
5      May.  Apparently, there is documentation between Lori
6      Heiler, yourself, Steven Hogwood, Jennifer White and Zoe
7      Lyons that discussed suspicions about Mr. Langston's
8      termination.  What suspicions did they identify?
9 A   I think there was one that I was referencing.  Again, I
10     don't have it in front of me, but there was a comment made,
11     I believe, by Lori, that it looked suspicious that Terry
12     didn't -- or that the interview -- or the search committee
13     was cancelled or contract was cancelled, and then Terry got
14     fired right away and it looked suspicious, something to
15     that effect.
16 Q   Suspicious how?
17 A   How?  I don't know if she said.
18 Q   Is it because Mr. Langston is a man of color?
19 A   No, she did not say that, I don't believe.  I think she
20     said -- I think it was it looked suspicious that I didn't
21     want Terry to be my boss or the CEO or something to that
22     effect.
23 Q   Did you want Terry to be your boss or CEO or something to
24     that effect?
25 A   Can you repeat that?

Page 142

1 Q   Yes.  Did you want Mr. Langston to become the CEO?
2 A   I didn't think that he had the skills and qualifications to
3   become -- to be the CEO.
4       MR. VLAHOPOULOS:  Let's take a -- let's go off
5   the record real quick.
6       (Off the record at 2:14 to 2:21 p.m.)
7       MR. VLAHOPOULOS:  All right.  We are back on the
8   record.
9 BY MR. VLAHOPOULOS:
10 Q   Sara, I've seen your notes with regard to Mr. Langston's
11   resume and what you think are discrepancies.  Has anyone
12   else taken notes on discrepancies that they might -- that
13   you know of, has anyone else taken notes on discrepancies
14   that they've identified on Mr. Langston's resume?
15 A   Not that I'm aware of.
16 Q   Why is it that only you made notes on Mr. Langston's
17   discrepancies?
18 A   Because I think I was just making notations when I talked
19   with Molly, and that's when those notes were there.  I
20   didn't ask anybody to make notes in particular, so it's
21   possible --
22 Q   So did you -- sorry, go ahead.
23 A   It's possible that they did, but I just don't know.
24 Q   If they did, they would have been produced, right?
25 A   I would think so, but I did not have them.  I don't have

Page 143

1   any notes.
2 Q   Okay.
3       MS. BERKERY:  I can follow up and find out if
4   there's other notes.  I'm not aware of any other notes, but
5   I would be happy to follow up.
6       MR. VLAHOPOULOS:  I appreciate that.
7 BY MR. VLAHOPOULOS:
8 Q   Okay.  I'm going to show you just a few more documents?
9 A   Okay.
10 Q   These are all documents that we filed pursuant to this
11   case, all right?  The first one I'm going to show you are
12   some Interrogatories that we asked your attorney.  Give me
13   one moment.  I'm going to share the screen, and let me know
14   when you can see it, all right?
15 A   Okay.
16       (Mr. Vlahopoulos screen shared a document via video.)
17       THE WITNESS:  Okay.  It's there.
18 BY MR. VLAHOPOULOS:
19 Q   Is it large enough?
20 A   Yes.
21 Q   You will see here the first interrogatory asks to identify
22   the names, job titles and dates of employment of the
23   persons responding to Plaintiff's Interrogatories to
24   Defendant and the names and job titles of all persons who
25   participated in, assisted with, or were consulted in

Page 144

1   connection with the drafting, investigation, execution,
2   review or consideration; basically, anyone who helped
3   respond to these Interrogatories.
4       And you'll see here, Sara, that at the bottom,
5   you, Michelle Lutz and Nilda Ward are all included, is that
6   right?
7 A   Yes, that's what I see.
8 Q   Is there anyone else, that you know of, that might have
9   helped you answer the Interrogatories here?
10 A   No.
11 Q   Aside from your attorney?
12 A   I'm sorry?
13 Q   Aside from your attorney?
14 A   Not that I can think of, no.
15 Q   Okay.  At the bottom here, you will see that there is an
16   Interrogatories verification.  Do you see this page?
17 A   Yes.
18 Q   And who signed this?
19 A   That's Michelle Lutz.
20 Q   Did you ever sign an Interrogatories verification?
21 A   I don't recall if I did or not.
22 Q   Do you know if Nilda Ward ever signed an Interrogatories
23   verification?
24 A   I don't know.
25 Q   Do you know why Michelle Lutz did and you did not?

Page 145

1 A   No, just -- that was the person responsible for collecting
2   all of the HR-related documents.  I don't know.
3 Q   I'm going to show you Interrogatory Number 11 -- excuse me,
4   Interrogatory Number 13.
5 A   I can't look at it.  The screen, it makes me dizzy.
6 Q   I know.
7 A   I'm just looking down until you get there.
8 Q   I can assure you that I am there.  I apologize for that.
9 A   Okay.
10 Q   I'll quit scrolling.
11       MS. BERKERY:  Can you see it?
12       THE WITNESS:  Yes.  I just can't watch the paging
13   down.  Okay.
14 BY MR. VLAHOPOULOS:
15 Q   Can you see it?
16 A   Yes.
17 Q   Perfect.  So Interrogatory Number 13 asks you to identify
18   every individual who had input into Plaintiff's
19   termination.  The individuals listed are Rose Johnson,
20   Katie Thornton, Kim Hinkle, Michelle Lutz, as well as
21   Rebecca Snow and Steven Hogwood.  Do you agree that all of
22   these individuals had input into Mr. Langston's
23   termination?
24 A   They were all people I spoke to, yes.
25 Q   But did they make the suggestion to terminate Mr. Langston?

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
146..149

Page 146

1 A   No, I decided that.

2 Q   Okay.  So what input did Mr. Hogwood have to terminate
3     Terry?

4 A   When I spoke to him and gave him an overview of what was
5     happening, he just shared that in his experience when there
6     are people that are not truthful in an organization -- he,
7     basically, shared his opinion on that, and then he shared
8     his concern of the -- of a senior level leadership person
9     not being trustworthy.  He did not tell me I needed -- what
10    to do, but that was his comments.

11 Q   So he didn't tell you what to do; is that what you just
12    testified?

13 A   Correct.  He did not tell me what to do.

14 Q   So how do you define input?

15 A   Excuse me?

16 Q   How do you define input, you personally?

17 A   How do I personally define input?

18 Q   Yes.

19 A   I define it as someone that gives their feedback on a
20    particular situation that contributes to a decision-making
21    process.

22 Q   So did Mr. Hogwood ever say that Sara should terminate
23    Terry?

24 A   Not that I recall.

25 Q   So then listing Mr. Hogwood here might not be accurate, is

Page 147

1     that fair?

2 A   It may not be, but I'm not familiar with the legal
3     terminology.  When I say --

4 Q   It's not a legal question.  I'm not asking you any sort of
5     legal knowledge here.  I'm just asking -- I mean, this
6     interrogatory, this question, asked who had input into the
7     decision to terminate Mr. Langston and here we have an
8     answer that says Mr. Hogwood?

9 A   Yes.

10 Q   Now you're telling me that he did not have input.  So I
11    just want to make sure that -- go ahead.

12 A   I was going to say he gave input by my definition by
13    sharing his thoughts and concerns about the type of
14    individual and the type of characteristics that are in
15    senior leadership, and he shared that it is critical that
16    you have someone that's trustworthy and that was what I
17    considered input.

18 Q   Did he say that Mr. Langston was untrustworthy?

19 A   Yes, based on my concerns.

20 Q   What proof did he rely on, based off of your concerns that
21    Mr. Langston is untrustworthy?

22        MS. BERKERY:  Foundation.

23 BY MR. VLAHOPOULOS:

24 Q   Go ahead.

25        MS. BERKERY:  Go ahead, Sara, and answer if you

Page 148

1     know what he thinks.

2        THE WITNESS:  I don't know he thinks, but I know
3     that what I shared with him about the fundraising --
4     sponsorship, I should say, not fundraising, excuse me, but
5     the sponsorship piece, and the conversation that I already
6     had with him about the resume.

7 BY MR. VLAHOPOULOS:

8 Q   Did he ever suggest that the appropriate action to take is
9     to terminate Mr. Langston?

10 A   The language that he used was if we had someone like
11    this -- if someone is not trustworthy, then that would be
12    his typical course of action.  What does the center's
13    typical course -- what would the center's typical course of
14    action be?

15 Q   Did you ask Mr. Hogwood whether he would agree that he had
16    input into Mr. Langston's termination before answering
17    this?

18 A   I don't recall.

19 Q   Now, the second part -- the person above Mr. Hogwood is
20    Rebecca Snow, is that right?  Can you see that?

21 A   Yes.

22 Q   You see Ms. Snow's name, right?

23 A   Yes.  I'm just trying to read the sentence.  It just
24    says --

25 Q   Oh, it just says that she can be contacted through defense

Page 149

1     counsel, and I can assure you that we will take her
2     deposition.  So I'll have the opportunity to speak with
3     her, but you listed her here as someone who had input into
4     Mr. Langston's deposition -- excuse me, termination.  What
5     input did she have?

6 A   She had input the same as the rest of the senior leadership
7     team, which was that they shared that they could -- didn't
8     feel that they could trust him as a colleague or as a
9     representative of the organization.

10 Q   What specifically did she say, that you remember?

11 A   Basically what I just repeated, that I don't remember any
12    specifics, other than there was -- that was the general
13    comment.  I don't remember specific details of what any of
14    them said.

15 Q   You don't remember the details of what they said, but yet
16    you answer here that they had input into the termination,
17    is that --

18        MS. BERKERY:  I'm going to place an objection
19    because she did not write the Answers to Interrogatories.

20        MR. VLAHOPOULOS:  I understand she didn't write
21    them.

22 BY MR. VLAHOPOULOS:

23 Q   But again, Ms. Benedetto, do you see here at the top in
24    answer 1, it says that you had input -- not input, excuse
25    me -- that you participated in, assisted with, or were

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
150..153

Page 150

1  consulted in connection with the drafting, investigation,
2  execution, review or consideration of the responses to
3  these Interrogatories?  You see that, right?
4 A  Yes.
5 Q  Okay.  Did you also have any input into something called
6  Requests for Admissions?
7 A  I don't recall if I did.
8 Q  That's okay.  I'm going to show you -- oh, actually, before
9  we get to that, did you have any input into Defendant
10  Center for Family Health's Initial Disclosures?  Does that
11  sound familiar to you?
12 A  I would have to read through here.
13       MS. BERKERY:  That's -- that's not the Initial
14  Disclosures.
15       THE WITNESS:  Oh.
16 BY MR. VLAHOPOULOS:
17 Q  This isn't the Initial Disclosures.  I'll represent to you
18  that this is question 2 on the Interrogatories which asks:
19  Please identify all persons whom Defendant intends to call
20  as a lay witness at trial and give a summary of their
21  anticipated testimony.  We were referred to, in response,
22  Defendant's Initial Disclosures.
23       I'm not asking you a legal question.  All I want
24  to know is whether you've heard of Initial Disclosures
25  before and if you participated in helping draft those?

Page 151

1 A  I've heard of Initial Disclosures.  I can't recall offhand
2  my participation in drafting it.
3 Q  That's fine.  That's okay.
4       (Mr. Vlahopoulos screen shared a document via video.)
5 BY MR. VLAHOPOULOS:
6 Q  So now I'm showing you the Initial Disclosures.  Can you
7  see my screen?
8 A  Yes.
9 Q  All right.  And you'll see that Initial Disclosure Number 1
10  requires a disclosing party to give the name, if known, the
11  address and telephone number of each individual likely to
12  have discoverable information in this case, okay?
13 A  Okay.
14 Q  The first person the center listed was you.  Do you see
15  that?
16 A  Yes.
17 Q  Okay.  The second person is Michelle Lutz.  Do you see
18  that?
19 A  Yes.
20 Q  Okay.  It says it is anticipated that Ms. Lutz can testify
21  as to the reason -- as to the reason for Plaintiff's
22  discharge and Defendant's policies and procedures.  Do you
23  see that?
24 A  Yes.
25 Q  Okay.  Now, Ms. Lutz is also acknowledged in Interrogatory

Page 152

1  Number 13 as someone who had input into Mr. Langston's
2  termination, right?
3 A  Yes.
4 Q  Okay.  What input did Ms. Lutz have into the termination of
5  Mr. Langston?
6 A  So I worked with Michelle Lutz and had conversations with
7  her about the events that were listed that we reviewed, the
8  sponsorship, the reasons for termination.  And she -- that
9  is when she shared with me that there was another situation
10  that she wanted to make me aware of.  Then Michelle and I
11  reviewed that, and she shared her input as to whether or
12  not it was -- from the HR perspective, that it made sense,
13  and then she participated in the conversation with our
14  attorney.
15 Q  Okay.  And I don't want to know what conversations were had
16  there.  Who does Michelle Lutz report to?
17 A  At the time, she reported to Rebecca.
18 Q  Interesting.  Is there anything in writing about Michelle
19  Lutz's input into Mr. Langston's termination, that you're
20  aware of?
21 A  There is not -- I'm not aware of any document where she
22  said this is what I think should happen, if that's what
23  you're asking, no.
24 Q  Okay.  So if Ms. Lutz reported to Ms. Snow, do you know if
25  there are any communications between those two individuals

Page 153

1  about Mr. Langston's termination?
2 A  I'm not aware of that -- of any conversations that they had
3  or if they had them.  I work directly with Michelle, and
4  Michelle and I work directly with Karen Berkery.
5 Q  Understood.  Another person on the Initial Disclosures, and
6  we've talked about him quite a bit today, is Randy Treacher
7  or Treacher.  Do you see that?
8 A  Yes.
9 Q  It says:  It is anticipated that Mr. Treacher can testify
10  as to his knowledge of the CEO search process and the
11  hiring of outside investigators and that he did not support
12  Plaintiff as a finalist based on his abilities and not
13  because of his race.  Do you see that?
14 A  Yes.
15 Q  Okay.  When it says the hiring of outside investigators,
16  who is that referring to?
17 A  I believe it's referring to Ms. Fojtasek and Ms. Chaprnka.
18 Q  Did he help select them?
19       MS. BERKERY:  Foundation.
20       THE WITNESS:  I don't know.
21 BY MR. VLAHOPOULOS:
22 Q  Okay.  Do you have any idea how Campbell and Company's
23  contract was terminated, the search firm, how that came to
24  an end?
25 A  I was directed by the board chair to notify them via email,

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
154..157

Page 154

1    which I did and copied the board chair on that.
2 Q    So you're the one who communicated to Campbell and Company
3    that the search is off, is that correct?
4 A    I'm the one that communicated to them, yes, at the
5    direction of Mr. Hogwood.
6 Q    And what did Mr. Hogwood exactly say to you about the
7    decision to terminate that contract?
8 A    He told me that the members had met. I don't recall
9    specifically who. I believe he said the officers, and the
10    decision was made to end the search process and that I
11    would -- I would need to notify Campbell and Company.
12 Q    Okay. Did he ever say it was the full board of directors
13    who was ready to terminate this contract with Campbell and
14    Company?
15 A    I don't recall if he said the full board or officers or
16    who. I know he did not give me a list of names or
17    anything, but just -- I don't recall who specifically. He
18    just said a decision was made. He did say that he made the
19    ultimate decision and that I was to communicate that.
20 Q    Understood. I'm going to show you the Requests for
21    Admissions I briefly referenced earlier. Give me just one
22    moment.
23        (Mr. Vlahopoulos screen shared a document via video.)
24 BY MR. VLAHOPOULOS:
25 Q    Can you see my screen?

Page 155

1 A    No.
2 Q    Now can you see my screen?
3 A    Yes.
4 Q    Okay. Request Number 4 says admit Plaintiff -- meaning
5    Mr. Langston -- never destroyed Defendant's computer files.
6    And the response here that we received is that Defendant
7    cannot admit nor deny for lack of information as the
8    information known is insufficient to admit or deny.
9        You told me earlier today that as you sit here
10    today, Mr. Langston did not destroy computer files, is that
11    right?
12 A    Not that I'm aware of, he did not. What I think I said
13    earlier is I never said that he did do it. I just said
14    that I couldn't find his files. So I don't have knowledge
15    that he did or did not do it.
16 Q    You don't have knowledge that he did or did not do it, but
17    you spoke with the IT director, right?
18 A    I spoke with the IT manager and said I am not able to find
19    contacts on his phone. Am I doing something wrong? Can
20    you help direct me?
21 Q    So now, I mean, as time has passed, you have information
22    that is sufficient to either admit or deny this?
23        MS. BERKERY: You know, I'm going to place an
24    objection, because the question asked whether or not he
25    ever -- which one is this?

Page 156

1        MR. VLAHOPOULOS: I'm looking at Request Number
2    4. The word ever is not in there.
3        MS. BERKERY: Admit Plaintiff never destroyed
4    Defendant's computer files. I mean, how would -- how do we
5    know if he ever deleted a file --
6        MR. VLAHOPOULOS: I -- I appreciate that you're
7    answering --
8        MS. BERKERY: -- in all of his years of
9    employment?
10        MR. VLAHOPOULOS: I understand that you're
11    answering for the witness, but this is her deposition.
12 BY MR. VLAHOPOULOS:
13 Q    So again, Sara, do you have information to confirm or deny
14    whether or not Mr. Langston has never destroyed Defendant's
15    computer files?
16 A    I guess I would say no, I don't have any --
17 Q    Okay.
18 A    -- information that says he did or did not.
19 Q    Okay. Do you know what race or ethnicity the three
20    finalists were?
21        MS. BERKERY: I'm sorry, what was the question?
22        THE WITNESS: Do I know what -- can you repeat
23    the question?
24        MS. BERKERY: I didn't hear it.
25        MR. VLAHOPOULOS: Yes, it's okay.

Page 157

1 BY MR. VLAHOPOULOS:
2 Q    I asked do you know the races and ethnicities -- we can --
3    we don't have to look at this document. Do you know the
4    races and ethnicities of the three finalists?
5 A    I know Terry is black. I know -- I do not know the other
6    finalists at the time. I do now know that George is white,
7    because I met him recently. I mean, I could guess that he
8    is. No one ever told me.
9 Q    Was Mouhanad -- Mouhanad, was he white?
10 A    I don't know. I never met with him or saw him.
11 Q    Fair enough. But all of them are males, correct?
12 A    Yes.
13 Q    I just want to ask you some final questions on Teri-Sue
14    Steele's termination. Are you familiar with what happened
15    there?
16 A    Yes.
17 Q    Can you explain to me how -- rather why Ms. Steele was
18    terminated?
19 A    Yes. She was terminated because of her behaviors and her
20    actions after Molly left. I was trying to coach her on how
21    to prepare for a new CEO, and I gave her specific
22    instructions that she did not follow. She also was making
23    negative, disparaging comments to me about several of the
24    board members. I told her that's the kind of thing that is
25    inappropriate, and as the new CEO comes on, you cannot --

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
158..161

Page 158

1    it is not appropriate for you to cast board members in a
2    negative light.
3         And she also did not follow instructions when I
4    asked her to not respond to any of Molly's emails.  She
5    always -- I had learned that she had access to Molly's
6    emails, and I had asked her that -- to bring anything to my
7    attention should something come up urgently, but not to
8    respond, and she did not do that.  She responded to a
9    federal attorney about a matter and did not communicate
10   that with me.
11        So it was a pattern of behavior.  I felt that it
12   was not in the best interest of the organization to have
13   someone in such a key role as to support the new CEO and
14   the board to be in that position.
15 Q  Did you terminate her personally?
16 A  Yes.
17 Q  How long was she executive -- the executive assistant for
18   Ms. Kaser?
19 A  Several years.
20 Q  What's several years?
21 A  Ten, maybe less than -- around ten.
22 Q  So about a decade, is that fair?
23 A  Yes, that's my guess.
24 Q  In that ten years, did Molly ever say that Teri Steele ever
25   exhibited these behaviors and actions, as you put it, that

Page 159

1    you described today?
2 A  No.  Molly wouldn't have talked to me about her
3    subordinates directly.  Unless it was me, she would not
4    have done that.
5 Q  So you never heard any concerns about Teri Steele's
6    performance prior to you becoming the CEO, is that
7    correct -- the interim CEO?
8 A  Not from Molly.
9 Q  From who?
10 A  Teri would sometimes make negative comments.  I shared that
11   with Molly myself, that I would hear her sometimes making
12   negative comments.
13 Q  I'm sorry, when you say Teri, are you talking about Terry
14   Langston saying negative things?
15 A  I'm talking about Teri Steele.
16 Q  Teri Steele said negative comments about herself?  I'm
17   sorry, I'm asking who raised concerns about Ms. Steele's
18   job performance, if anyone, aside from you?
19 A  I don't know, because Molly would not have talked to me
20   about that.
21 Q  So only you observed -- only you observed bad performance
22   from Ms. Steele, is that correct?
23 A  When I was the interim CEO, not only me observed.  I
24   observed bad behavior and others observed that as well and
25   shared it with me.

Page 160

1 Q  Who?  My question is who?
2 A  Okay.  I thought you were talking about in her past,
3    because in her past, I wouldn't know.  It was shared to me
4    by Michelle Lutz that Teri would repeat comments to her
5    that were very negative and disparaging.  Rebecca had
6    shared that Teri had made -- had participated in negative
7    conversations.  Teri would often talk outside of my office
8    to my assistant and so she could sometimes hear that.  So
9    when I was coaching Teri, I was bringing those pieces into
10   it.
11 Q  Who else?
12 A  I'm trying to think.  Kim Hinkle may have made a comment.
13 Q  What comment would Kim Hinkle have made?
14 A  That Teri sometimes made -- was negative and made negative
15   statements about others.  Kim Hinkle was in a meeting,
16   actually, with me and Teri when we were talking about
17   Teri's interaction with the attorney and trying to talk
18   about what information we would need to be giving to them.
19        And during the meeting, Teri continued to push
20   back towards me and made inappropriate comments.  At that
21   point, I asked Kim to leave the room so that I could
22   continue the conversation with Teri about what I would
23   expect and what behavior was appropriate.  So Kim was
24   witness to those kinds of things.
25 Q  We're talking about Teri Steele, right?

Page 161

1 A  Correct.
2 Q  Okay.
3        MR. VLAHOPOULOS:  Just for the record, when we
4    refer to Teri, it's t-e-r-i.
5        THE WITNESS:  Yes.
6 BY MR. VLAHOPOULOS:
7 Q  Can we just call her Teri-Sue?
8 A  It's t-e-r-i.
9 Q  Right.  Can we just call her Teri-Sue just to distinguish
10   between --
11 A  Oh, okay.
12 Q  I'm sorry, not to correct you or anything?
13 A  That's okay.  I can do that.
14 Q  So Teri-Sue was in a meeting with regard to Mr. Langston's
15   termination?
16 A  No.
17 Q  Is that what you're saying?
18 A  No.
19 Q  Okay.
20 A  Teri-Sue was in a meeting with Kim Hinkle and I, because
21   Kim is the QI director and oversees a program called FTCA,
22   the Federal Tort Claims Act, and there was communication
23   about a case that was sent directly to Molly.
24        Teri-Sue responded to that without talking with
25   me.  This was new for me as the interim CEO.  I had not

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
162..165

Page 162

1  been involved in the process.  So I asked the two of them
2  to come meet so I could understand who does what, who pulls
3  what together.
4        And in the course of that conversation, Teri-Sue
5  continued to debate back with me about what she should do
6  and what she did and that she had all the information, but
7  sent off already, et cetera.  That was the nature of that.
8 Q  Was there anyone else who observed Ms. Steele's poor
9  performance --
10       MS. BERKERY:  Foundation, but go ahead.
11 BY MR. VLAHOPOULOS:
12 Q  -- that you know of?
13 A  Those are the things I recall.  Those are the incidents
14  that I recall that were under my purview when I was the
15  interim CEO.
16 Q  So the individuals who observed this are yourself, Michelle
17  Lutz, Rebecca Snow and Kim Hinkle, is that correct?
18 A  Yes.
19 Q  Am I excluding anyone?
20 A  That's everybody at the time.  After Teri's departure, I
21  had other people make comments -- other staff make comments
22  to me.
23 Q  Okay.  You said she -- sorry, sorry, Sara.  You said she
24  made disparaging comments about board members?
25 A  Yes.

Page 163

1 Q  Who were the board members and what were those disparaging
2  comments?
3 A  The types of comments -- she, one time, made reference to
4  Dale Moretz in a very negative light, saying you don't have
5  to worry about Dale.  He can't hear anything anyway,
6  something to that effect.  She made a comment about Ted
7  falling asleep on a Zoom board meeting.  She made a comment
8  about Jessica, something to the effect of, well, you know
9  Jessica, those kinds of things.  She made a comment about
10  Randy Treacher.
11 Q  What was the comment she made about Mr. Treacher?
12 A  Something to the effect of, you know Randy, that's how he
13  does stuff, something like that, in effect.
14 Q  And that's disparaging?
15 A  Yes.  I feel like it's disparaging when I am working with a
16  board in a new -- in a new capacity and I'm talking with
17  her about board members and meetings and her making a
18  comment about, you know Randy, he never does that, or
19  whatever it was.  I feel like that's disparaging.  It's
20  casting board members in a negative light.
21 Q  What was the exact comment that she stated, Sara?
22 A  Pardon me?
23 Q  What was the exact disparaging comment that she said about
24  Randy Treacher?
25 A  I can't remember exact -- exactly.  It's the tone is what I

Page 164

1  can remember.
2 Q  So it wasn't egregious enough for you to remember, is that
3  right?
4 A  Correct.  It was part of a pattern.
5 Q  Okay.
6 A  I do recall an incident where she had -- I had asked her
7  not to send something out to the board, but she did send
8  something out to the board in a Survey Monkey fashion.  And
9  she -- when I approached her about it, she -- I said, Teri,
10  I asked you not to do that.  I need to talk to Steven
11  Hogwood first because he wasn't at the meeting.
12       She then told me that she didn't remember me
13  saying that, but she did make a comment that you don't need
14  to worry about it, because the board -- you're not going to
15  be able to do it anyway because you know our board, or
16  something of that nature.
17 Q  Are you aware that other employees told her that they don't
18  trust the human resources department?
19 A  I was not aware of that.
20 Q  So if yourself, Michelle Lutz, Rebecca Snow and Kim
21  Hinkle -- I just want to clarify -- you're telling me that
22  all of these individuals had a formal issue with
23  Ms. Steele's performance, is that correct?
24 A  They had raised concerns.
25 Q  Is any of this in writing?

Page 165

1 A  Not that I'm aware of.
2 Q  Did she ever receive a negative performance evaluation?
3 A  Not -- I don't know, because she didn't report to me, but
4  not that I'm aware of.
5 Q  Okay.  Did Mr. Langston ever receive a negative performance
6  evaluation?
7 A  Pardon me?
8 Q  Did Mr. Langston, Terry Langston, did he ever get a
9  negative performance evaluation?
10 A  I wouldn't know how Molly evaluated her employees.
11 Q  Okay.  Is it true that Randy sent you a text message from
12  Ms. Steele that discusses you?
13 A  Yes.  He first told me about it and then he sent it to me.
14 Q  Okay.  Was this before or after she was terminated?
15 A  It was before she was terminated, but after I had had
16  several coaching sessions with her.
17 Q  When was the message sent to you?
18 A  I don't recall which day.
19 Q  That's fine.  What did the message state?
20 A  It was something to the effect of -- it started, I think,
21  with I don't know why she told -- I had given her direction
22  not to send something out to the board or to redact an
23  email, and I said please don't respond.  Randy questioned
24  her about that.  She said that I never told her why, which
25  is not true.  I had told her that Steven had not been made

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
166..169

Page 166

1    aware of it yet, and then she texted something to the
2    effect that she is glad that I would not be the CEO, and
3    she can't wait until her new person -- her new person gets
4    here.
5 Q    And you took offense to that, right?
6 A    I took -- my bigger concern -- my biggest concern about
7    that is when a new CEO comes on board and she has that kind
8    of relationship with the board, especially after -- first
9    of all, she was stating something that wasn't true to one
10    of the board members.  And then she was also going outside
11    of what she and I discussed when I asked her to keep
12    things -- the nature of our conversation confidential and
13    she did not.
14 Q    So you terminated her?
15 A    Yes.
16 Q    Did anyone else have input into that termination or was it
17    just you?
18 A    It was me and I typically would have -- I think Rebecca was
19    present at the termination, but it was my decision.
20 Q    How many employees have you personally terminated?
21 A    I've been here a lot of years.  I don't -- I would say 20
22    maybe-ish.
23 Q    In the last five years, how many employees have you
24    terminated?
25 A    Five maybe.

Page 167

1 Q    So one employee a year, basically?
2 A    Okay.  I don't -- it's really hard.  I don't know off the
3    top of my head.
4 Q    Fair enough.  No, that's okay.  So within the last five
5    years, you would estimate about five employees, is that
6    right?
7 A    I think so.
8 Q    Okay.  Out of those five employees, how many of them are
9    male?
10 A    Terry -- I'm trying to think who was -- I don't know if
11    anyone else was.
12 Q    Was Mr. Langston --
13 A    I don't know if anyone else was male off the top of my
14    head.  I know there was a pharmacy manager that was female.
15    I replaced her position with a male, Teri and Terry.  There
16    was a clinic manager who was female.  Those are the ones
17    popping into my head at the moment.
18 Q    Was anyone else involved in their terminations?
19 A    I would say yes.  I can't recall the particulars, but our
20    practice is that it's discussed with HR.  I also would have
21    discussed it with Molly, when she was the CEO, before any
22    termination was done, and then typically HR -- the HR
23    representative would sit in the termination conference.
24 Q    Okay.
25        MR. VLAHOPOULOS:  Let's take a five-minute break

Page 168

1    and go off the record.  I don't think I should have much
2    more for you, okay?
3        THE WITNESS:  Okay.
4        (A recess was taken at 3:01 to 3:05 p.m.)
5        MR. VLAHOPOULOS:  We are back on the record.
6 BY MR. VLAHOPOULOS:
7 Q    So I just want to go through the report structure for the
8    senior leadership team that we have been discussing so much
9    today?
10 A    Okay.
11 Q    Who does Rose Johnson report to, Dr. Johnson?
12 A    So do you want me to talk about currently or when there was
13    a -- when Molly was here?
14 Q    Let's do both.  So actually, when you -- let's break it
15    down into three ways?
16 A    Okay.
17 Q    When Molly was there, when you were the interim CEO and now
18    with the new CEO.  Do you understand those three
19    categories?
20 A    Yes.
21 Q    Okay.  So when Molly was CEO, who did Rose report to?
22 A    Molly.
23 Q    Okay.  When you were -- when you were interim CEO, who did
24    Rose report to?
25 A    She reports to me.

Page 169

1 Q    And the new gentleman, what's his name?
2 A    His name is Bill.
3 Q    Bill?  Now that Bill is CEO, who does Dr. Johnson report
4    to?
5 A    He starts on May 30th.  And when he starts, she will report
6    to him.
7 Q    Who does she currently report to?
8 A    Me.
9 Q    So the chief medical officer position always directly
10    reports to the CEO, is that fair?
11 A    That is correct.
12 Q    Okay.  Same question for Ms. Kathryn Thornton --
13    Dr. Thornton.  She's the dental director, correct?
14 A    Correct.
15 Q    When Molly was CEO, who did Dr. Thornton -- Thornton, I'm
16    sorry --
17 A    Thornton.
18 Q    -- Thornton, who did she report to?
19 A    Molly.
20 Q    Okay.  When you were interim CEO, did she also report to
21    you?
22 A    She reports to me, yes.
23 Q    And currently she still reports to you, right?
24 A    Yes.
25 Q    Okay.  And the plan is once the new CEO is in place, she

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
170..173

Page 170

1  will report to the new CEO?
2 A  Correct.
3 Q  Does dental have any supervision by the human resources
4  department?
5 A  Not by the human resources department, but by -- at one
6  point, one week before Rebecca left, the dental manager,
7  Erin, reported to Rebecca, but not the dental director.
8  The dental director reported to Molly and the dental
9  manager then reported to me.
10 Q  I'm sorry, who did you say reported to Rebecca?
11 A  The dental manager.
12 Q  Okay.  Who was that?
13 A  Her name was Erin Tomb, t-o-m-b.
14 Q  And what about -- same questions for Ms. Hinkle?
15 A  Kim Hinkle reported to Molly, and then now she reports to
16  me as the interim.  And then when Bill starts, she will
17  report directly to Bill.
18 Q  Are there any employees that report directly or reported
19  directly to Ms. Snow?
20 A  Not senior leader employees, but she had a staff of
21  managers that reported to her.
22 Q  How big of a group is that?
23 A  I want to say seven or eight -- no, I can count them if you
24  want to take a minute.
25 Q  No, that's okay, just a general number.  What was the

Page 171

1  number?
2 A  Like five maybe.
3 Q  Following Mr. Langston's termination, did Ms. Snow try to
4  become the CEO again?
5 A  No, not to my knowledge.
6 Q  Did you ever try to become the permanent CEO?
7 A  I was approached by a board member.  I was actually
8  approached by board members before, and they asked if I --
9  if this process didn't work out, would I have interest.  I
10  thought about it, and I did let them know that I would have
11  interest only if the process didn't work out so that the
12  center would not go without a permanent CEO.
13 Q  After Mr. Langston's termination, who from the board
14  approached you about becoming the permanent CEO?
15 A  So after -- I don't know if this was after or before, but
16  Ted Hilleary, when I met with him at one point, asked why I
17  didn't.  He said I thought you would make a good CEO.  I
18  said I was not interested.  That was sometime last summer.
19  I don't remember specifically.
20 Q  I'm sorry, wait.  I don't mean to interrupt you.  Did Ted
21  ever encourage you to become the new CEO, or did he just
22  ask, hey, I thought it might be you?
23 A  He just asked.
24 Q  Okay.  So --
25 A  He asked and made a statement that he thought I would be a

Page 172

1  good CEO, and I said that I was not interested in that.
2  That was about it.
3 Q  Okay.  Fair enough.  I'm sorry to interrupt you.  You were
4  going on to the second person.  Who was that?
5 A  Steven Hogwood asked me last summer in a one-on-one
6  conversation.  I would say that he encouraged me and said I
7  think you could do it.  The center wouldn't want to -- we
8  wouldn't have to go through another whole search process.
9  You know how to do it.  I said, no, I was not interested.
10  That was last summer also.  I'm not sure exactly what
11  month, but at some point last summer.
12      And then around about December sometime of 2022,
13  Randy Treacher asked if I would have interest in the
14  position if -- and I had to think about it for a couple
15  days, and I said I -- I would only in the event that the
16  board felt that they didn't -- weren't finding the
17  candidate that they wanted.
18 Q  Did you ever submit a formal application to become the CEO?
19 A  I submitted a letter at the request of the board chair,
20  Steven.  I was asked to just put my intention in writing or
21  my interest, if you will, but I never submitted an
22  application, a formal one, and then submitted it to HR or
23  anything.
24 Q  What did your letter say?
25 A  It said that I had been approached before, that I had not

Page 173

1  had interest when Molly first acknowledged it.  I thought
2  about it again and I did not have interest when the second
3  search started.
4      I shared that I had experience now as the CEO and
5  that I was passionate for the organization, and that I
6  would throw my -- not these words, throw my hands, but I
7  would be interested if the board wanted to pursue it, but
8  that I would also be completely fine to stay in my current
9  role as the COO.
10 Q  And what was the response you received?
11 A  I was told that the board found a candidate and hired Bill
12  Wypyski, our new CEO.
13 Q  How did they find Bill to become the new CEO?
14 A  Through a second search process.
15 Q  So the search -- the second search process had began, but
16  you still sent a letter saying I would like to become the
17  new CEO if presentable, is that correct?
18 A  The second search process was in process and I had not
19  thought about it at all.  I was anticipating that the
20  position would be filled by January, which is what I was
21  told.  But then in December, Randy reached out and said if
22  this doesn't -- if the search doesn't end with someone
23  being hired, would you be interested, and I said I would
24  think about it.
25      I said I don't want to even go there if there are

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
BENEDETTO, SARA 05/10/2023

Job 23438
174..177

Page 174

1 others that are interested, so he followed up with Steven.
2 This is all my understanding of how it went, and then
3 Steven -- I can't remember if Steven is the one that told
4 me or if Randy did, but I was to -- if I was interested, to
5 submit something in writing so that they would have that in
6 front of them. And I believe they shared it with the
7 board, and the board hired Bill Wypyski, which I am very
8 pleased with.
9 Q Sure. So Randy -- Randy approached you, said think about
10 applying for this. And then he went to Steven, and then
11 Steven said submit a letter for formal processing so that
12 we can make a determination; is that -- is that about
13 right?
14 A That's about right, I think.
15 Q Okay. So it was Randy's encouragement to get the letter
16 first, right?
17 A It was Randy that reached out to me first. I don't know
18 the nature of their conversations. It was my understanding
19 in talking with Steven, that if Steven was like no way,
20 we're not doing that, then I probably would not have made
21 contact with the board.
22 Q Do you know if board members regularly conduct business on
23 their cell phones?
24 A I don't know.
25 Q Okay.

Page 175

1 A I just know the numbers that I have on that sheet that you
2 reviewed with me earlier. That's all I know.
3 Q Fair enough. And the numbers that you have and that you
4 texted or communicated with, those -- let me rephrase.
5 You've communicated with board members via text, right?
6 A I have at times.
7 Q Is there any board member that you don't text, that you
8 have not texted?
9 A Steven has asked that I text him, Randy. Most of the board
10 members I don't unless something comes up. I think I've
11 texted with Lori before, yeah. It's just --
12 Q Did you ever text -- sorry, go ahead.
13 A It's just for something specific if I was texting. Or
14 sometimes a board member might text me if the board meeting
15 has started and they might say I'm on my way or I can't
16 make it, something's come up, something like that.
17 Q And have you ever discussed Mr. Langston in any text
18 messages?
19 A Not that I recall.
20 Q Okay. All right.
21 MR. VLAHOPOULOS: Well, I have no further
22 questions.
23 THE WITNESS: Okay.
24 MS. BERKERY: I have no questions.
25 THE WITNESS: Do we just --

Page 176

1 MS. BERKERY: Hold on.
2 MR. VLAHOPOULOS: Karen, I might just ask you to
3 move closer to the microphone just so I can hear you a
4 little bit, if that's okay.
5 MS. BERKERY: Is that the microphone?
6 THE WITNESS: I think the microphone -- we're
7 having trouble. Can you hear us better when we move up?
8 MR. VLAHOPOULOS: It's better when you move up,
9 yes.
10 THE WITNESS: Okay.
11 MS. BERKERY: What's up?
12 MR. VLAHOPOULOS: Oh, no, nothing. Please
13 proceed, just so I can hear you better.
14 MS. BERKERY: No, I said I had no questions.
15 MR. VLAHOPOULOS: Oh, you have no questions?
16 MS. BERKERY: No questions.
17 MR. VLAHOPOULOS: Forgive me. Sara, thank you so
18 much for your time. I appreciate it.
19 THE WITNESS: Thank you.
20 MR. VLAHOPOULOS: Have a wonderful rest of your
21 day, okay?
22 THE WITNESS: You, too.
23 MR. VLAHOPOULOS: I would like to order an etrans
24 while we're on the record.
25 THE REPORTER: Okay.

Page 177

1 MS. BERKERY: And I would like to order -- I'll
2 order a copy of an etrans.
3 THE REPORTER: You would like an etran, too? Is
4 that what you said?
5 MS. BERKERY: Yes. Thank you.
6 THE REPORTER: Okay.
7 MS. BERKERY: Yes.
8 THE REPORTER: All right. Sounds good.
9 (Deposition concluded at 3:17 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH

Job 23438

BENEDETTO, SARA 05/10/2023

178

Page 178

1                    CERTIFICATE
2
3     STATE OF MICHIGAN )
                        ) SS
4     COUNTY OF KENT    )
5
6          I certify that this transcript, consisting of 177
7     pages, is a complete, true, and correct record of the
8     remote testimony of SARA BENEDETTO, held in this case on
9     Wednesday, May 10, 2023.
10         I also certify that prior to taking the deposition,
11    SARA BENEDETTO was duly sworn to tell the truth.
12
13
14    *Christine Hagle*
15
16    CHRISTINE HAGLE, CSR-5748
      Notary Public, State of Michigan,
17    Kent County, acting in Kent County.
      My commission expires:  01/22/28.
18    Dated:  This 21st day of May, 2023.
19
20
21
22
23
24
25