## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TERRY LANGSTON,

      Plaintiff,                          Case No. 22-cv-11883

v.                                        Hon. Terence G. Berg

CENTER FOR FAMILY HEALTH,

      Defendant.

---

## Steven Hogwood Deposition Testimony Index

**Exhibit A**:  February 3, 2022 Anonymous Letter Re: Ms. Snow

**Exhibit B**:  Sara Benedetto's Written Timeline of Plaintiff's Termination

**Exhibit C**:  Letter Cancelling Search Process with Campbell & Company

| Summary of Testimony | Transcript Citations |
|---|---|
| • Molly Kaser met with Mr. Hogwood in August 2021 and told him that she is retiring.  Mr. Hogwood testified: "And she said, 'By the way, I think that Rebecca would do an outstanding job in the position of CEO' … It's not anything I asked for.  She just volunteered that information." | • 26:21-27:9 |
| • Mr. Hogwood appointed Ms. Embury to serve as the Search Committee Chair. | • 38:18-21 |

| | |
|---|---|
| • Mr. Hogwood was questioned on an anonymous letter that Board members received in February 2022, stating:<br><br>What [is] the most important skillset for a new CEO?  Trust.  If the survey response is small, please don't justify [it] with historic trends and other excuses.  No one believes the survey is confidential.  Trust eroded when **Ms. Snow** pushed her Theory X management style into daily operations at CFH.  She **brought a culture of suspicion and a negative view of employees.  Good employees are called out for bogus incidents that inflate into accusations as they rise up the bureaucratic ranks to her desk.  She can't see her own biases and is incapable or unwilling to accept truth when it is told to her if it doesn't fit her preconceptions or expected outcomes**.  She is in the wrong position now and will be in the wrong position as CEO.<br><br>**Ex. A**, February 3, 2022 Anonymous Letter Re: Ms. Snow | • 44:5-46:13 |
| • Mr. Hogwood received a copy of the anonymous letter, Ex. A, and his reaction was, "Wow.  It's interesting that someone is finally speaking up." | • 45:12-56:2 |
| • Mr. Hogwood testified that Ms. Embury and Mr. Hilleary reported to him that Mr. Treacher "needs to be removed" from the Search Committee because he was acting "bbelligerent" during meetings—"he doesn't listen" and "wants things his way." | • 40:8-42:10 |
| • Mr. Treacher told Mr. Hogwood that "he could do or say anything he wants to do on the Search Committee because [Mr. Hogwood] appointed him." | • 40:9-41:18 |

| | |
|---|---|
| Mr. Hogwood's testimony contradicts Ms. Benedetto's written timeline of events regarding Plaintiff's termination. *See* **Ex. B**, Sara Benedetto's Timeline of Plaintiff's Termination. | |
| • Mr. Hogwood testified that he canceled the CEO search *because* Ms. Benedetto and Ms. Snow told him that Plaintiff was going to be fired. | • 48:3-49:19 |
| • During the conference call with Ms. Snow and Ms. Benedetto, Ms. Benedetto led-off by stating that the entire Leadership Team reviewed Plaintiff's resumé and discovered "embellishments" and "lies." Ms Snow then "stepped-in" and demanded that Plaintiff "needs to be terminated." | • 50:17-21 |
| Mr. Hogwood's response was "You have got to be kidding me" and "you are making a bad decision," to which they replied, "we're doing it anyway." Mr. Hogwood "couldn't believe it." | |
| • Mr. Hogwood testified: "I canceled the search because of infighting that was going on with the search committee and Randy. And now this was the last straw. They bring in [Plaintiff], [who] was also part of the process. I guess he was gonna be looked at as a candidate. And I stopped the whole thing." | • 51:13-18 |
| • Mses. Benedetto and Snow "only targeted" Plaintiff's resumé | • 51:20-52:4 |
| • The Leadership Team **never** mentioned the resumés of the other two candidates. | • 51:20-52:4 |
| • Ms. Benedetto **never** told Mr. Hogwood that she felt "uncomfortable" confronting Plaintiff on any discrepancies on his resumé | • 67:13-15 |

| | |
|---|---|
| • Mr. Hogwood categorically denied instructing Ms. Benedetto to "debunk the discrepancies" in Plaintiff's resumé during the interview process. | • 65:23-66:4 |
| • Mr. Hogwood concluded that "something is going on behind the scenes that I'm not aware of" and that is "frustrating." | • 66:12-67:4 |
| • Ms. Benedetto wrote the letter cancelling the search process with Campbell & Company on behalf of Mr. Hogwood.  *See* **Ex. C**, Letter Cancelling Search Process with Campbell & Company.   Mr. Hogwood merely "signed it and sent it back."  Hence, although the letter asserts that Mr. Hogwood's decision was "based on serious concerns about the search firm's performance," that statement is false.  "It really had nothing to do with that," according to Mr. Hogwood. | • 61:12-62:8 |
| • According to Mr. Hogwood, the Leadership Team told the Board "what they wanted us to hear" regarding Plaintiff's termination. | • 77:14-78:3 |
| • Mr. Hogwood explained that Georgia Fojtasek and Karen Chaprnka, representatives from Henry Ford Allegiance Health, investigated Plaintiff's termination because a Principal Attorney from Defense Counsel's firm, Greg Drutchas, recommended them to the Board. | • 82:24-84:13 |
| • Mr. Hogwood testified that Ms. Fojtasek and Ms. Chaprnka's "investigation" into Plaintiff's termination did not confirm that Plaintiff lied on his resume and did not give the Board "anything of substance. . . . But in terms of [Plaintiff's] performance, there was nothing ever mentioned.  They just simply validated the fact that what [Ms. Snow] and [Ms. Benedetto] did was the right thing to do. | • 83:8-86:21 |
| • Mr. Hogwood testified that Mr. Moretz submitted a Motion to the Board to make Plaintiff the Interim CEO after his termination.   Mr. Hogwood "supported the Motion." | • 92:4-93:11 |

| | |
|---|---|
| • Mr. Hogwood testified that he was never advised save all communications and documents with respect to Plaintiff's termination | • 108:1-9<br>• 115:18-21 |
| • Mr. Hogwood destroyed all text messages and written communications he had saved. | • 113:22-115:21 |
| • The first time Mr. Hogwood was asked for electronic communications in his possession was in May 2023. | • 113:22-115:21 |
| • **Mr. Hogwood declared that it is "obvious" that Plaintiff's termination was motivated by his race** – "And as long as I've been on the Board, it just seems that, you know, men don't last, and a black man didn't last. It's just apparent. It's in your face." | • 104:18-105:25 |
| • Mr. Hogwood testified that the only input he had into Plaintiff's termination is that he "disagreed with it" and told Ms. Benedetto and Ms. Snow, "There's no reason to do this, at all. You are going to hurt the center." | • 110:25-112:11 |
| • Mr. Hogwood testified that he was led to believe that Plaintiff's termination "was a decision of [Ms. Benedetto] and [Ms. Snow]," and Mr. Hogwood did not know that other members of the Leadership Team "had any influence in [Plaintiff's] termination." | • 110:25-112:11 |
| • Ms. Snow was "adamant in her vocabulary", "she was aggressive" and "passionate" to terminate Plaintiff— "[Ms. Benedetto] did not talk much, at all. 90 percent of the talking to me was from [Ms. Snow]." | • 99:12-100:12 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TERRY LANGSTON,                    )
                                   )
                Plaintiff,         )
                                   )
vs.                                )   Case No. 22-cv-11883
                                   )   Hon. Terence G. Berg
CENTER FOR FAMILY HEALTH,          )
                                   )
                Defendant.         )
_____)


            Remote deposition of STEVEN HOGWOOD, taken

via Zoom videoconference, commencing at 9:35 a.m., on

Monday, May 22, 2023, before CYNTHIA M. THOMAS, a

Registered Professional Reporter, Registered Merit

Reporter, Certified Realtime Reporter, Michigan Certified

Shorthand Reporter, License No. 3836, and Notary Public.

Fortz Legal Support

www.FortzLegal.com

844.730.4066



Page 2

```
 1   APPEARANCES:
 2        Grant M. Vlahopolous [P85633]
          HURWITZ LAW PLLC
 3        340 Beakes Street
          Suite 125
 4        Ann Arbor, Michigan  48104
          (844) 487-9489
 5        grant@hurwitzlaw.com
                    Counsel for Plaintiff
 6
 7
 8
          Karen B. Berkery [P38698]
 9        KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK
          One Woodward Avenue
10        Suite 2400
          Detroit, Michigan  48226
11        (313) 965-7344
          karen.berkery@kitch.com
12                  Counsel for Defendant
13
14
15        Terry Langston
                    Also Present
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2
 3   WITNESS              EXAMINATION            PAGE
 4   STEVEN HOGWOOD       BY MR. VLAHOPOLOUS    4, 117
 5                        BY MR. BERKERY          116
 6
 7
 8
 9
10
11
12            EXHIBITS FOR IDENTIFICATION
13   LETTER                                     PAGE
14   A - Emails                                   79
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              Monday, May 22, 2023
 2              9:35 a.m.
 3              - - -
 4         THE COURT REPORTER:  Mr. Hogwood, can you
 5   raise your right hand for me, please.
 6         THE WITNESS:  (Witness complies.)
 7         THE COURT REPORTER:  Do you swear to tell
 8   the truth, the whole truth, and nothing but the
 9   truth, so help you God?
10         THE WITNESS:  Yes, I do.
11         THE COURT REPORTER:  Thank you.
12              EXAMINATION
13   BY MR. VLAHOPOLOUS:
14   Q   Good morning, Mr. Hogwood.
15   A   Good morning.
16   Q   Would you please state and spell your full name for
17      the record.
18   A   Steven, S-t-e-v-e-n; Hogwood, H-o-g-w-o-o-d.
19   Q   It's nice to meet you, sir.  My name is Grant
20      Vlahopolous, and I'm one of the attorneys for
21      Mr. Langston.
22         Have you ever been deposed before?
23   A   Yes.
24   Q   Okay.  When were you deposed?
25   A   Oh, let's see.  Probably a couple of years ago.
```

Page 5

```
 1   Q   Do you have a year -- an exact year for that?
 2   A   Not off the top of my head, no, I don't.
 3   Q   That's okay.
 4         Do you know what it was about?
 5   A   It was about a McDonald's operator and McDonald's
 6      corporation.
 7   Q   Okay.  And in that case, just as a refresher for how
 8      depositions will work, this is a question-and-answer
 9      dialogue.  I ask you the questions and you give me
10      the answers.  Those answers need to be verbal for
11      the court reporter.
12         You understand?
13   A   Yes.
14   Q   And we can take a break whenever you want, but we
15      need to make sure you finish an answer to a question
16      that's pending before we break.
17         You understand?
18   A   Yes.
19   Q   Now, if for some reason you don't understand a
20      question that I ask, tell me you don't understand,
21      ask me to repeat it, clarify it, whatever you need
22      in order to understand the question.  Okay?
23   A   Yes.
24   Q   Last thing, please let me finish the question before
25      you start answering and I will let you finish your
```

Page 6

1    answer before asking another question.
2         Do you understand that?
3  A  Yes.
4  Q  And you understand that your testimony today is
5    under oath.  Correct?
6  A  Yes.
7  Q  And I don't want to know what was said, but did you
8    prepare with the attorneys for CFH ahead of your
9    deposition today?
10  A  Say that again.
11  Q  Sure.
12         I don't want to know what was said, but
13    did you prepare with the attorneys for the Center
14    for Family Health before your deposition today?
15  A  Yes.
16  Q  Okay.  When did you meet with the attorneys for the
17    Center?
18         THE WITNESS:  When did we do that?
19    Thursday?
20         Thursday of last week.
21  BY MR. VLAHOPOLOUS:
22  Q  How long did you meet with them for?
23  A  Less than an hour.
24  Q  Did you speak to anyone other than the attorneys for
25    the Center about today's deposition?

Page 7

1  A  No.
2  Q  Did you look at any documents in preparation for
3    today's deposition?
4  A  No.
5  Q  Did you look at any emails or text messages in
6    preparation for today's deposition?
7  A  No.
8  Q  Mr. Hogwood, I understand you joined the Center's
9    board in 2004.  Is that correct?
10  A  That's correct.
11  Q  What month in 2004?
12  A  Lord.  Probably June.
13  Q  And the Center's website says that you are the
14    Chair, Executive Compensation; ex-officio member of
15    all other committees.
16         Can you tell me about what positions
17    you've held on the board over the years?
18  A  Initially, I was a board member.  After a period of
19    so many years, they asked me to join the finance
20    committee.  After that, the finance chair
21    resigned -- I don't remember his name -- and they
22    asked me to become the chair of the finance
23    committee, as well as to be on the executive
24    compensation committee.
25         Ted Hilleary was the board chair at that

Page 8

1    time and resigned.  And then I was elected to become
2    the board chair.  And I have been the board chair
3    probably -- and I'm guessing -- about the last five
4    years now.
5  Q  Can you tell me some of your responsibilities
6    sitting on the finance committee?
7  A  My major opportunity, so to speak, was to review all
8    of the financial statements, making sure that they
9    were in compliance with the various accounting laws,
10    as well as with -- I don't know the name --
11    NACA (phonetic) or whoever -- whoever they are --
12    whoever we get our money from, the government -- and
13    to ensure that we were either at break-even or that
14    we had a profit.
15         And then justify any type of expenditure
16    that was necessary, then present that information to
17    the board, in addition to asking the board to
18    approve the financial statements not only on the
19    monthly basis, but also the annual basis, as well,
20    when we were getting ready to start a new year.
21         And it was approximately 25 to either
22    30 -- 25 to $30 million we were responsible for.
23  Q  Okay.  Did you ever review any grants on the finance
24    committee?
25  A  Yes.  It was a high-level overview.  The grants that

Page 9

1    were given to me had already primarily been approved
2    by either Molly or Sara.  And it was just, you know,
3    a stamp of approval.
4  Q  And would this apply to, let's say, federal grants,
5    state grants, and then local grants, as well?
6  A  That's correct.
7  Q  Okay.  Do you know how the process works for writing
8    grants for the Center?
9  A  I know that they hired someone -- I believe her name
10    was Regina -- or is Regina.  I think her last name
11    is Pinckney.  And she was the one that did primarily
12    most of the grant writing at that time.
13  Q  Was this a consultant, Ms. Pinckney?
14  A  It was a consultant that Molly or Sara would choose.
15  Q  And you said "at that time."  So is this during the
16    time that you served as the -- or on the finance
17    committee?
18  A  On the finance committee, yes, and as the board
19    chair.
20  Q  Okay.  Were there any employees that were involved
21    in grant writing?
22  A  Not that I'm aware of.
23  Q  Do you know if Mr. Langston was involved in grant
24    writing?
25  A  I have no idea.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
10..13

Page 10

1  Q  Okay.  Do you have any reason to doubt that he might
2     be involved in grant writing?
3  A  No.
4  Q  Do you often communicate with the Center's executive
5     team as board chair?
6  A  Yes, I do.
7  Q  And just for the record, the executive team, that
8     would consist of Sara Benedetto, who is the interim
9     CEO and COO.  Is that correct?
10 A  That's correct.
11 Q  And that would also include Dr. Rose Johnson, who is
12    the chief medical officer.  Correct?
13 A  Yes.
14 Q  As well as Kathryn Thornton, who is the dental
15    director?
16 A  Yes.
17 Q  And Ms. Kim Hinkle, who is the quality improvement
18    director and compliance officer.  Right?
19 A  Yes.
20 Q  Is there anyone else on the executive team that
21    I might be missing?
22 A  Randy Treacher.  Lori -- I can't think of Lori's
23    last name.  Lori Heiler.
24       MS. BERKERY:  No, no.  He's asking about
25    the executive team, like Sara --

Page 11

1        THE WITNESS:  Yes.  Yes.
2  BY MR. VLAHOPOLOUS:
3  Q  So just to be clear, I think Randy Treacher and Lori
4     Heiler, they're both board members.
5  A  They're board members.  They're board members.
6  Q  And they might have been on, let's say, a search
7     committee?
8  A  They were on the executive compensation committee.
9  Q  Understood.
10 A  I got the two confused.  Sorry.  Sorry.
11       MS. BERKERY:  That's all right.
12 BY MR. VLAHOPOLOUS:
13 Q  No problem.  No problem.
14       So just to be clear, the leadership team,
15    it's confined to those individuals that I named
16    earlier.  Is that right?
17 A  That's correct.
18 Q  Perfect.
19       And if you often communicate with them,
20    what are those communications about, generally?
21 A  Most of the time I only communicated with Sara.  The
22    others did not attend.
23       And what Sara and I would discuss is
24    primarily the upcoming meeting, what she was gonna
25    discuss, did I want to make any changes to the

Page 12

1     agenda.  The meeting would last less than
2     30 minutes.  So before every meeting, we would
3     either -- she would meet me at one of my restaurants
4     or I would just pick up the phone and we would talk
5     about the agenda.
6  Q  Understood.
7        And this would be the agenda for a board
8     meeting.  Right?  Just the standard --
9  A  This is a board meeting.  Correct.
10 Q  So is Ms. Benedetto present at every board meeting
11    then?
12 A  Yes.
13 Q  Was she present at even closed sessions?
14 A  No.
15 Q  Okay.
16 A  No.
17 Q  During these board meetings, who would take the
18    minutes?
19 A  Oh -- Stephanie would take the minutes at the board
20    meetings.
21 Q  And who is Stephanie?
22 A  Stephanie is Sara's secretary.
23 Q  What's Stephanie's last name?
24 A  I have no idea.
25 Q  That's okay.

Page 13

1  A  I don't know.
2  Q  Prior to that, would it be someone named Teri Sue
3     Steele?
4  A  Yes, that's correct.
5  Q  Okay.  So Ms. Steele, she was the executive
6     assistant to Ms. Kaser at one point.  Right?
7  A  That's correct.
8  Q  And so when Ms. Kaser -- actually, strike that.
9        During the time of Ms. Steele's
10    employment, she would take meeting minutes for the
11    board.  Is that correct?
12 A  That's -- that's correct.
13 Q  Okay.  Are you familiar with the employment of
14    Ms. Steele?
15 A  Repeat that.
16 Q  Of course.
17       Are you familiar with the employment of
18    Ms. Steele?
19 A  Oh, yes.  Yes.
20 Q  Okay.  We'll talk about her a little later.
21       But for now, can you explain to me the
22    duties and responsibilities as board chair?
23 A  Overall, my job is to provide leadership to the
24    entire board, giving one -- everyone an opportunity
25    to discuss any -- any various issues that are going

Page 14

1   on in the Center.  If there's any conflicts, by any
2   means, to see if we could reach some type of
3   agreement.  Talk about any type of future
4   expansions.  Talk about any type of new procedures
5   or enhancements that could be, you know, viable for
6   the -- viable for the community.
7          We would talk much about finances and
8   where the money was going and how it was allocated.
9   Engage people who were quiet to talk because they
10  were supposed to at least give us their opinion upon
11  things.  And be efficient and effective, because we
12  are all busy people.
13 Q  I want to ask you about the last thing you said.
14  You said asking people about their opinions when
15  they're quiet about things.
16         Does that happen often?
17 A  No, no, no.
18 Q  Most of the time people let their voices be heard
19  then.  Right?
20 A  Most of the people are not shy and they do speak up.
21 Q  Okay.  And would these opinions be about the general
22  operation of the Center or would it be, let's say,
23  any personnel issues that would be going on at the
24  Center?
25 A  Well, mostly what they talked about was issues that

Page 15

1   was going on in the Center.  They would talk
2   primarily about a bad experience that they may have
3   had with one of the doctors or one of the nurses.
4          Very seldom did they talk about personnel,
5   because we had very little contact with the
6   personnel.
7  Q  Understood.
8          Do you report to anyone as board chair?
9  A  Technically, I'm supposed to report to my little
10  executive team, which is Randy and Zoe and Lori.
11 Q  So the local executive team, these are all board
12  members then.  Right?
13 A  That's correct.
14 Q  Okay.  And so we have Randy Treacher, Zoe --
15 A  Yes.  Lori Heiler and Zoe Lyons.
16 Q  I believe Mr. Treacher is the treasurer.  Right?
17 A  That's correct.
18 Q  Okay.  And what position does Ms. Lyons hold?
19 A  She's in charge of board development.
20 Q  Does she have an official title on the board?
21 A  Not to my knowledge.
22 Q  That's okay.
23         And what about Ms. Lori Heiler?
24 A  No official title.
25 Q  All right.  Is there anyone else on the executive

Page 16

1   committee?
2  A  Not -- not that I recall.
3  Q  Theo Hilleary, would he be on the executive
4   committee?
5  A  I think they call him an ex-something.  Ex --
6   ex-something.  But -- he was allowed to come, but he
7   never showed up.  Ex-officio, yeah, something like
8   that.
9  Q  Ex-officio, okay.
10 A  But he never showed up.
11 Q  And what about Ms. Jennifer White?  Was she on an
12  executive committee?
13 A  She -- I'm glad you mentioned her.  She is also on
14  the executive committee, but she never showed up.
15  It conflicted with her job, I believe.
16 Q  Understood.
17         Is there anyone else who might be on the
18  committee and didn't show up regularly?
19 A  Not off the top of my head, no.
20 Q  Okay.  Mr. Hogwood, I'm gonna share my screen
21  momentarily.  Let me know if you can see it in just
22  a moment.
23         Can you see that?
24 A  Yes, I can.
25 Q  Do you need me to zoom in or -- is that a little bit

Page 17

1   better?
2  A  That's good.
3  Q  Okay.  These have been produced over the course of
4   discovery from the Center's attorneys.  These are
5   Bates-stamped Defendant 1330 and 1331, for the
6   record.
7          Mr. Hogwood, would you agree with me that
8   this is a list of all of the board of directors for
9   the Center?
10 A  Yes.
11 Q  And this is three pages.  And I wanted to make sure
12  that you have the time to review all of it.
13         So this lists yourself, Ms. Lyons,
14  Mr. Treacher, Ms. Heiler, Mr. Hilleary, Ms. White,
15  Dale Moretz.
16 A  Yeah.  "Mor-ETS," yeah.
17 Q  We haven't talked about him yet.
18         Oh, I'm sorry.  How did you pronounce the
19  name?
20         MS. BERKERY:  Mor-ETS.
21         MR. VLAHOPOLOUS:  Mor-ETS, thank you.
22 BY MR. VLAHOPOLOUS:
23 Q  Was Mr. Moretz on an executive committee?
24 A  No.
25 Q  We have on the next page Mr. Lee Hampton.  Was he on

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
18..21

Page 18

1    an executive committee?
2  A   No.
3  Q   And what about Karen Barrett?
4  A   No.
5  Q   Jessica Embury?
6  A   No.
7  Q   Chelsea Poole?
8  A   No.
9  Q   And what about Monica Pierce?
10  A   No.
11  Q   Okay.  Now, on this final page there's some names on
12    here that I'm not too familiar with.
13        Could you please tell me who is Mr. Ryan
14    Ambs, A-m-b-s?
15  A   Ryan is a local businessman.  That's about all
16    I know.
17        Mindy Bradish-Orta works for Consumers
18    Energy.
19        And I am not aware of Crampton or Anders
20    or Sheila.  I don't -- I don't know what they do.
21  Q   That's okay.
22        So when there's a star next to it and it
23    says "Denotes committee member only," do you know
24    what that means?
25  A   Yes.  They're only on a subcommittee.  And they

Page 19

1    normally do not attend a full meeting.
2  Q   Gotcha.
3        How many subcommittees are there?
4  A   There's finance, there is public relations, and
5    there is board development.
6  Q   Are there any other subcommittees that you can think
7    of?
8  A   Not that I can think of.
9  Q   Okay.  I'm gonna go back up to the board members.
10        You see here that there are a few columns.
11    One of them lists a phone number.  Is that right?
12  A   Yes.
13  Q   So, for example, here -- and I won't read it -- but
14    it lists your phone number.  Correct?
15  A   That's correct.
16  Q   Is that a personal cell phone or is that a phone
17    that you use for business with the Center?
18  A   This is my personal cell phone.
19  Q   Okay.  And in this column over here there's an email
20    address listed -- right? -- for you?
21  A   Yes, that's correct.
22  Q   And is this email address -- do you use this email
23    address for Center business?
24  A   Yes.
25  Q   And your phone -- that phone number that's listed,

Page 20

1    it might be for personal reasons, but did you also
2    use it for Center business?
3  A   Yes.
4  Q   So you would use it for both personal and for
5    business.  That's fair?
6  A   That's correct.
7  Q   And with the other individuals that are below you,
8    do you know if they also used these phone numbers
9    that are listed for Center-affiliated business?
10  A   I don't know how they use their phone, but those
11    numbers are probably what I have in my cell phone.
12  Q   Understood.
13        And then same with their email addresses
14    then.  Right?  You would use --
15  A   That's correct.
16  Q   Okay.
17  A   Yes.
18  Q   So if you needed to communicate with them for Center
19    business, you would use those email addresses.
20  A   That's correct.
21  Q   Have you seen this document before, by any chance?
22  A   Yes, I've seen it.
23  Q   Where is it from?  Is it just a directory that the
24    Center maintains?
25  A   It is -- it is a directory that the -- that Sara or

Page 21

1    someone else puts together once a year at the
2    beginning of the year to make sure that the
3    committee members and board members, their names are
4    accurate and they have the appropriate contact
5    information that is necessary.
6  Q   So this document is supposed to be what a board
7    member or a committee member can refer to if you
8    need to reach out to anyone else who might be on the
9    board.  Is that right?
10  A   That is correct.  And it is updated annually.
11  Q   Understood.
12        Do you know if there's a policy for board
13    members with respect to their phone usage for the
14    Center?
15  A   Not -- not to my knowledge.
16  Q   Okay.  And what about for email addresses?
17  A   Not to my knowledge.
18  Q   Okay.  Mr. Hogwood, I understand you also own a few
19    McDonald's establishments.  Is that correct?
20  A   That's correct.
21  Q   How many locations?
22  A   20.
23  Q   Wow.  Is this across Michigan?
24  A   It's in the state of Michigan, yes, sir.
25  Q   When did you first acquire -- strike that.

Page 22

1   When did you acquire your first McDonald's
2   restaurant?
3  A   1995.
4  Q   Mr. Hogwood, when did you first meet Terry Langston?
5  A   I have no idea.
6  Q   That's okay.
7   Was it when he was a consultant for the
8   Center or was he an employee at the time?
9  A   When I met Terry, I believe he was an employee --
10  Q   Okay.
11  A   -- of the Center.
12  Q   Do you know what position he might have held at that
13   time?
14  A   I -- I don't know official name or titles.  I just
15   know he worked for the Center.
16  Q   That's okay.
17   What was your impression of him?
18  A   Nice guy.
19  Q   Do you know how he performed on his job?
20  A   I -- I don't know how he performed.  I never saw any
21   type of written performance review.  But it appeared
22   that he did a very good job by listening to him in
23   the meetings, giving an update, things of that
24   nature.
25  Q   What meetings would Mr. Langston be at that you

Page 23

1   would also attend?
2  A   He'd be at the board meetings.
3  Q   How often did Mr. Langston come to board meetings?
4  A   Every one, that I know of, unless he was out of
5   town.  But normally he was at every board meeting.
6   Sometimes he'd be late and I'd crack on
7   him, but he was there.
8  Q   Were others late, as well?
9  A   Oh, yeah, someone's always late.  But I start on
10   time anyway.
11  Q   And when Mr. Langston was present at these board
12   meetings, would he give a presentation or did he
13   have a designated time to speak?
14  A   He normally had a designated time to speak because
15   he would give an update regarding what was going on,
16   you know, in the political arena, as well as what
17   was going on in Jackson County, how we could take
18   advantage of this or that or this or that.
19   But there were also times that we would
20   have discussions -- and I don't know what topic --
21   but he would -- he would raise his hand and
22   intervene and offer his opinion and things of that
23   nature.
24  Q   When he gave his opinion, what was the feedback
25   typically?

Page 24

1  A   Well, it was -- it was -- it wasn't negative, by any
2   means.  Many times it was a clarification, giving up
3   some more information about something that we may
4   not be fully aware of, such as that.
5  Q   Understood.
6  A   It was --
7  Q   And --
8  A   It was -- it was valued information.
9  Q   I'm sorry --
10  A   He wasn't talking just to talk.
11  Q   I'm sorry, you said it was -- I missed what you
12   said.  Could you repeat that again, Mr. Hogwood.
13  A   It was of value.
14  Q   Of value.
15  A   It was of value.
16  Q   And when he had a designated time to speak, was this
17   pursuant to a committee report?
18  A   Yes.  We would go over, you know, the CEO's report
19   at first.  And afterwards then we would go into
20   committee assignments.  So the finance chair would
21   talk, board development would talk.  And then after
22   that, it would be public relations or whatever would
23   talk.  So Terry would talk during the public
24   relations time primarily.
25  Q   Understood.

Page 25

1  A   Him or a designated person if he wasn't able to
2   attend.
3  Q   Now, if you know, what was his reputation with the
4   other employees at the Center?
5   MS. BERKERY:  Foundation.
6   You can answer.
7   THE WITNESS:  Say that -- ask me that
8   again.
9  BY MR. VLAHOPOLOUS:
10  Q   Of course.
11   If you know, Mr. Hogwood, what was
12   Mr. Langston's reputation like with other employees
13   at the Center?
14   MS. BERKERY:  Same objection.
15   But go ahead.
16   THE WITNESS:  It seemed to be positive, to
17   me.  Always positive.
18  BY MR. VLAHOPOLOUS:
19  Q   Did you ever hear any complaints about his
20   performance as director of communications and
21   advocacy?
22  A   No.
23  Q   And I understand we mentioned her earlier, but Molly
24   Kaser was the former CEO of the Center.  Right?
25  A   Correct.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
26..29

Page 26

1  Q   Okay.  How long was she CEO for?
2  A   30 years.
3  Q   30 years.
4         And when exactly did she retire from the
5      Center?
6  A   In March of, I think, 2019.  Right -- right before
7      COVID.
8  Q   All right.  Had the Center ever had to replace an
9      executive position before?
10 A   You mean as a CEO?
11 Q   Correct, yeah.
12 A   No.  This is the first time.
13 Q   What was that process like?
14 A   It was grueling.
15 Q   It was grueling.
16 A   And, again, I say that from a --
17 Q   I can imagine.
18 A   I say that from a high-level overview because
19      I wasn't involved in the day-to-day aspects of the
20      selection process.
21 Q   Did you have any communications with Ms. Kaser about
22      who she wanted as a replacement?
23 A   During -- Molly met me in August at one of my
24      restaurants.  She told me that she was retiring.
25      And she said, "By the way, I think that Rebecca

Page 27

1      would do an outstanding job in the position of CEO."
2         That was the only discussion that we had.
3  Q   Did she elaborate as to why she thought Ms. Snow
4      would be qualified for the job?
5  A   She just simply said that she understood the role
6      and that she would be able to carry on what she had
7      established.
8         And it's -- it's not anything that I asked
9      for.  She just volunteered that information.
10 Q   Describe to me that conversation then.  So what were
11      you meeting for and how did that come up?
12 A   She was meeting with me to let me know that she was
13      resigning and that her last day would be the end of
14      March.
15         And then we talked about what she was
16      gonna do during retiring, you know, just stuff like
17      that.  And then she mentioned -- before she left,
18      she just simply said, "I think that Rebecca would do
19      an outstanding job."
20 Q   Did she ever mention anyone else?
21 A   No.  No one else was named.
22 Q   How did Sara Benedetto become the interim CEO?
23 A   I think our bylaws state that.  The bylaws stated
24      that.
25 Q   So procedurally --

Page 28

1  A   Yes.
2  Q   -- when the CEO steps down, the interim is going to
3      be the COO until the --
4  A   I believe so.
5  Q   Okay.
6  A   I believe so.
7  Q   Prior to becoming the interim CEO, did you ever work
8      with Ms. Benedetto during her time as COO?  Just
9      COO.
10 A   Sara and I had very little contact.  She would --
11      I would only see her and talk to her in a meeting.
12      But my primary contact was only Molly.
13 Q   And did that change when she became the interim CEO
14      then?
15 A   Oh, yes.  I talked to Sara most of the time,
16      naturally.
17 Q   Of course.
18         How was Ms. Benedetto's performance as the
19      interim CEO?
20 A   I would say very good.  And I say that because there
21      were no major bumps in the road.  We were still able
22      to carry on, you know, the mission of the Center.
23      The team worked together well, the executive team.
24         I personally didn't hear of any internal
25      problems, and neither did any of the board members.

Page 29

1  Q   Is that with respect to the operation of the Center
2      itself?
3  A   Yes.  The overall operation of the Center went very
4      well.  She handled it very well when it came to, you
5      know, the COVID situation and following the various
6      laws and procedures and things of that nature.  So
7      she did a very good job.
8  Q   Would you consider what happened to Mr. Langston as
9      a bump in the road?
10 A   It was unusual, very unusual.
11 Q   Okay.  And we'll talk a little bit more in depth
12      about it later.
13         But there's one more person I wanted to
14      ask you about.  You talked about Ms. Snow earlier.
15      Who exactly is Rebecca Snow?  What was her position?
16 A   Rebecca was the head of personnel and the head of
17      finance.
18 Q   You said head of personnel --
19 A   Yes.
20 Q   -- and head of finance?
21 A   Yes.  And I say "head" because she had an assistant
22      in both of those positions.  One assistant in
23      finance and one assistant in personnel.
24 Q   Do you know the names of those assistants, by any
25      chance?

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
30..33

Page 30

```
 1  A   I -- I don't.
 2  Q   That's okay.
 3          Was she under the human resources
 4      department then?
 5  A   Was who under the human resources --
 6  Q   Was Ms. Snow a part of the human resources
 7      department?
 8  A   Yes.  She was -- she was the boss, I guess.
 9  Q   Gotcha.
10  A   Yes.
11  Q   So she oversaw the entire --
12  A   Yes.
13  Q   -- human resources for the Center.
14  A   Yes.
15  Q   Okay.  Did she report to anyone that you know of?
16  A   I'm assuming she reported to Molly.  I'm assuming.
17  Q   Who reported to Ms. Snow, if you know?
18  A   Only those two individuals that was underneath her.
19  Q   Okay.  And is Ms. Snow -- is she still with the
20      Center?
21  A   Not to my knowledge.
22  Q   Okay.  Do you know when she left?
23  A   I don't have the exact date, but it was -- it was
24      either the third quarter of last year -- probably
25      December sometime.
```

Page 31

```
 1  Q   So maybe December 2022?
 2  A   Yes.
 3  Q   Do you know why she left?
 4  A   Well, I never had a conversation with her, so only
 5      thing I have is hearsay.
 6          Sara called me and said that she quit.
 7          And I said, "Why"?
 8          And she said she didn't know.  She just
 9      gave her her keys and left.
10          And I said, "Okay."
11  Q   You said you never spoke with Ms. Snow.  Was this
12      just about her leaving or have you never had any
13      communications with her in general?
14  A   Very little conversations did I have with Rebecca.
15      Mostly my conversations was with the CEO.
16  Q   Understood.
17          Did anyone on the board comment about
18      Ms. Snow's departure?
19  A   Not to me.
20  Q   What knowledge do you have about Ms. Snow's
21      performance as the head of personnel and finance at
22      the Center?
23  A   Personally, I have no knowledge about her
24      performance, at all.  It appeared, though, outside
25      looking in, that Molly had a great deal of respect
```

Page 32

```
 1      for her because she did a lot of work for Molly.
 2      She obviously trusted her quite well to carry on
 3      both of those positions.
 4  Q   So Ms. Kaser might have had a great deal of respect
 5      for Ms. Snow, but have you ever talked to any other
 6      employees that might have been fearful of Ms. Snow?
 7  A   I have had two individuals -- and don't ask me their
 8      names; I don't remember -- talk to me about Ms. Snow
 9      and her -- her negative attitude towards them.
10  Q   Would one of these individuals be named, if you
11      remember, Kyle Hammond, by any chance?
12  A   You know what?  That -- that is one.  Yes, that is
13      one.
14  Q   Do you recall when that conversation took place?
15  A   No.  It was -- it was probably a year ago during the
16      time that we were discussing who our new CEO would
17      be.  It was during that timeframe.
18  Q   Would it be after Mr. Langston's termination?
19  A   I would -- I would say yes.  I would say yes.
20  Q   Okay.  When these employees told you that they were
21      fearful of Ms. Snow, how did you respond?
22  A   I didn't respond, at all.  I just simply listened.
23      And I was more aggravated than anything else.  And
24      I was aggravated because why are we just now hearing
25      this and why hasn't this been channeled through the
```

Page 33

```
 1      appropriate departments?
 2  Q   Did you have any reason to doubt those concerns by
 3      those employees who you spoke with?
 4  A   Excuse me?
 5  Q   Did you have any reason to doubt the concerns of
 6      those employees?
 7  A   No.  None whatsoever.
 8  Q   Have those concerns been substantiated, at all,
 9      since you spoke with them?
10  A   Not to my knowledge.
11  Q   Okay.  And does the name Liz Findley-Knapp seem
12      familiar to you?
13  A   It sounds familiar, yes.
14  Q   Okay.  Have you --
15  A   There was only two individuals that, you know,
16      I heard from.  So it was probably them.
17  Q   Okay.
18  A   But don't hold me to it.
19  Q   How did you learn that Mr. Langston was going to
20      apply for the vacant CEO position?
21  A   He told me.
22  Q   Do you know when he -- about when he told you?
23  A   I'm going to assume during the -- right before, you
24      know, Molly left, which was in March.  I don't know
25      the exact date.
```

Page 34

1  Q   Okay.  Well, how did that conversation go?  What did
2      you say to him?
3  A   Well, I think it started out by him telling me that
4      he was gonna throw his hat in the arena.  And
5      I said, "Well, good.  Go for it."
6  Q   Did you think he would be a good candidate?
7  A   I believed that he had the necessary skills.
8      I'd never seen him in a CEO position, so I really
9      couldn't make any type of assumption on it.  But
10     I said, "Go for it."
11  Q   Sure.
12  A   He -- he had a broad understanding, in my opinion,
13     of the Center of Family Health and how it works.  He
14     was on the executive team with Molly.  So I'm sure
15     he had a good understanding of concepts and things
16     of that nature.
17         So that's why I said, "Well, go for it."
18  Q   Were employees ever surveyed on the qualities or
19     what they wanted from the new CEO?
20  A   I'm not aware of that.  But I am aware that as part
21     of the search process, we determined the type of
22     characteristics and skills that we wanted for the
23     CEO.
24  Q   Tell me a little bit about those characteristics.
25  A   You know, I don't have that information in front of

Page 35

1      me.  It was written.  And it's still here somewhere
2      in the office.
3  Q   Understood.
4  A   Because we had to put them together in order to tie
5      our search firm.  So we can get you those documents.
6  Q   Understood.
7         All right.  Mr. Hogwood, I'm gonna share
8      my screen again.  Let me know if you can see this
9      document in just a moment.
10        Can you see that, by any chance?
11  A   Can you make it bigger?
12  Q   I can try.  Let's see.  How is that?
13  A   Well --
14  Q   A little bit more?
15  A   If you want me to read it, it's gonna be a
16     challenge.
17  Q   You see that I've highlighted some spaces.  Right?
18  A   Yes, I see that.  Yes.
19  Q   Okay.  I'm gonna direct you to a few of those.
20        But first, Mr. Hogwood, this appears to be
21     a survey from employees and board members of
22     questions that they wanted for the CEO.
23        So one of the questions says -- and let me
24     know if you see this:
25        "In your view, what are the most

Page 36

1      important skillsets and characteristics
2      needed in the next CEO?"
3         Do you see where I've highlighted there?
4  A   Yes.
5  Q   And then another question is:
6         "What do you believe are the major
7      challenges for the Center for Family
8      Health over the next few years?"
9         Do you see that?
10  A   Yes.
11  Q   And you'll see here -- I've highlighted it again --
12     under the column that asks for "... the most
13     important skillsets and characteristics ..." one
14     employee wrote that:
15        "They should not be related to any
16     member of our current Human Resource nor
17     managerial team."
18        Do you see that?
19  A   Yes, I see that.
20  Q   Had you seen this prior to the CEO search?
21  A   I -- I have never seen this.
22  Q   Okay.  And then in the column where it asks "What
23     are the biggest opportunities facing the Center in
24     the next few years?" the same person wrote:
25        "Positive change without the fear

Page 37

1      of retaliation from within the executive
2      team.  New policies which would bring an
3      entirely new outlook at Patient Centered
4      Medical Practice."
5         Do you see that?
6  A   Okay.  I see that.
7  Q   You said you haven't seen this document before, but
8      were concerns of that nature ever discussed prior to
9      the CEO search?
10  A   Not to my knowledge.  I was not involved in the CEO
11     search.  That is a job that I delegated to Jessica
12     to do that, as well as a few other board members.
13     And then they also were able to gather, I think, a
14     few people that was outside in the township to help
15     do this.
16  Q   Understood.
17        That might be the search committee then --
18  A   Yes, the search committee.
19  Q   -- what you're referring to.  Right?
20        I'm gonna take this down for you,
21     Mr. Hogwood.
22        Let's talk about the search committee real
23     quick.  Who was on the search committee?
24  A   Well, Jessica was; Dale; I believe Randy Treacher
25     was on; Ted; Mindy Bradish-Orta.  That's all I can

Page 38

1    think of now.  I'm sure there's a few others I'm
2    missing.
3  Q  That's okay.
4        Was Ms. White on --
5  A  Yes.
6  Q  -- or Ms. Jessica --
7  A  Yes.
8  Q  -- Jennifer White?
9  A  Yes.
10       THE COURT REPORTER:  If you could please
11   remember that I can't take two people speaking at
12   the same time.
13       MR. VLAHOPOLOUS:  Of course.
14  BY MR. VLAHOPOLOUS:
15  Q  And so, Mr. Hogwood, we said that was Jennifer
16   White.  Correct?
17  A  Yes.
18  Q  And Jessica Embury, she was appointed -- or, rather,
19   you appointed her as the head of the search
20   committee.  Right?
21  A  That's correct.
22  Q  When was this committee established?
23  A  I think it was established around the middle part of
24   March when Molly left.  And I delegated this to her
25   and I told her to take care of it.

Page 39

1  Q  Do you know how the search committee selected
2   Campbell & Company to conduct an outside search?
3  A  I don't know all the facts.  I believe they sent a
4   few emails out to several companies, and one
5   responded.  And I believe they chose that one.
6  Q  When you say you don't know all the facts, is that
7   just with respect to how Campbell & Company was
8   selected?
9  A  That's correct.  I -- I wasn't involved in any of
10   the meetings.  Jessica would give me an update, as
11   needed.  So at least once a month there was an
12   update not only to me, but to the entire board.
13  Q  Okay.  Did you have any interactions with Campbell &
14   Company directly ever?
15  A  No, I never did.
16  Q  Did you ever review any meeting minutes --
17  A  No.
18  Q  -- that Campbell -- from Campbell & Company?
19  A  No.  But I will say this:  There were highlights of
20   the meeting that Jessica gave to all the board
21   members when we had our meetings.
22  Q  Tell me about some of those highlights.
23  A  I'd just be guessing.  We got --
24  Q  Do the best --
25  A  She would give me an update to say that "We've had,

Page 40

1    you know, 15 interviews" -- no.  That "We would have
2    15 applicants so far.  Looks like that three of them
3    we just set aside because they don't meet the
4    criteria."  You know, things of that nature.
5        The updates lasted less than -- less than
6    five, six minutes.
7  Q  Understood.
8        And I know this might feel like a memory
9    test, so I don't mean it to be.  But was the conduct
10   of anyone -- any particular individual on the search
11   committee ever discussed with you?
12  A  Yes.  I received a phone call from Jessica and from
13   Ted Hilleary.  Ted Hilleary said to me, "Steven, he
14   needs to be" -- he, not -- "Randy needs to be
15   removed.  He's belligerent.  He doesn't listen.  He
16   wants things his way.  And he just got up one day
17   and walked out of the room."
18       So I said, "Well, I need a little bit more
19   information than that before I speak up -- before
20   I give, you know, Randy a call."
21       This happened on a Friday.  He said that
22   he would have the information for me by Sunday
23   afternoon as to why we should ask Randy to remove
24   himself.  But Ted never gave me any information.
25       So on Monday morning, I called Randy and

Page 41

1    I said, "Hey, what's going on?"  I said,
2    "Everybody -- it appears that they don't want you on
3    the search committee."
4        And he was shocked by that statement.  He
5    told me that he could do or say anything he wants to
6    do on the committee because I appointed him.  And no
7    one is going to remove him except me because
8    I appointed him to the board.
9        And he also mentioned at that time, "We
10   have a committee meeting that night."  And he says,
11   "I'm going anyway."
12       And I said, "Well, behave yourself at the
13   meeting."
14       After the meeting was over, he called me
15   and said, "I went to the meeting.  No one said
16   anything to me negative, and everything went fine."
17       So I dropped it after that, never
18   mentioned it again.
19  Q  Okay.  So I want to try to unpack this with you.
20       You said you received a phone call from
21   Jessica and Ted.  When was that call made?  I know
22   you said it was a Friday, but do you recall the
23   month?
24  A  I -- I don't remember the month.  I'm sorry.
25  Q  That's okay.

Page 42

```
 1  A   I -- I just don't.
 2  Q   Would it have been --
 3  A   It was in the summertime.  So ...
 4  Q   Does the month of May sound about right?
 5  A   Probably.
 6  Q   And this would be May of 2022 maybe then.  Right?
 7  A   Yes.
 8  Q   Okay.  Did you talk to anyone else about the
 9      concerns that might have been raised about
10      Mr. Treacher's conduct?
11  A   I don't -- I don't believe I did.
12  Q   Did you take any notes on this conversation?
13  A   No, no.
14  Q   Mr. Hogwood, do you take any handwritten notes with
15      respect to -- or did you take any handwritten notes
16      with respect to the search process?
17  A   No, I didn't.
18  Q   Okay.
19  A   I delegated everything to Jessica to take any notes
20      that was necessary.
21  Q   What about during your meeting with Mr. Hammond, for
22      example, Kyle Hammond?  He was the employee that we
23      spoke about earlier.  Did you take any notes on your
24      conversation with him?
25  A   I did not take any notes on that.  Jessica told me
```

Page 43

```
 1      that she recorded those conversations though.
 2  Q   I think -- so I've seen the video.  In that video
 3      you told her to ask someone to transcribe it.
 4          Do you know if that was ever done?
 5  A   I have no idea.  If -- if I told that to Jessica,
 6      I'm sure she did it.
 7  Q   Also in that video Mr. Hammond told you someone to
 8      speak with who might shed light on Ms. Snow's
 9      conduct.  Does someone by the name of Kenjuan
10      Petty --
11  A   That's true.
12  Q   -- does that sound familiar?
13  A   That's true.
14  Q   Okay.  Who is Mr. Petty?
15  A   Kenjuan Petty is an employee at the Center.  And
16      I believe he's in charge of maintenance.
17  Q   Did you ever speak with Kenjuan?
18  A   No, I did not.
19  Q   How did that fall through?
20  A   I had no intentions of speaking with Kenjuan because
21      that is something that Jessica was going to handle.
22  Q   So you told Ms. Embury at some point to speak with
23      Kenjuan then.  Is that fair?
24  A   I don't -- I don't think I told her.  I just think
25      she said, "Well, I'm gonna go talk to him myself."
```

Page 44

```
 1      However, I don't know if she did or not.
 2  Q   I'm gonna show you another document, Mr. Hogwood.
 3      Can you see my screen, sir?
 4  A   Yes, I see it.
 5  Q   And for the record, this is Bates-stamped
 6      Defendant 156.
 7          Have you seen this before, Mr. Hogwood?
 8  A   Hmm.  If -- if I did, I don't remember it.
 9  Q   Do you see the top here?  It says February 3rd,
10      2022.
11  A   Yes, I see that.
12  Q   And would you agree with me that this was sent to
13      Mr. Theo Hilleary?
14  A   Yes, I would.
15  Q   So this states:
16          "What [is] the most important
17      skillset for a new CEO?
18      "Trust.  If the survey response is
19      small, please don't justify why with
20      historic trends, and other excuses.  No
21      one believes the survey is confidential.
22          "Trust eroded when Rebecca pushed
23      her Theory X management style into daily
24      operations at CFH.  She brought a
25      culture of suspicion and a negative view
```

Page 45

```
 1      of employees.  Good employees are called
 2      out for bogus incidents that inflate
 3      into accusations as they rise up the
 4      bureaucratic ranks to her desk.  She
 5      can't see past her own biases and is
 6      incapable or unwilling to accept truth
 7      when it is told to her if it doesn't fit
 8      her preconceptions or expected
 9      outcomes."
10          Did Mr. Hilleary ever talk to you about
11      this?
12  A   I remember this memo because it was -- a copy was
13      sent to me, as well, and I think -- I think another
14      person, but I don't -- I don't know who the other
15      person.  But I remember seeing that.
16  Q   What was your -- what was your reaction?
17  A   Wow.  It's interesting that someone is finally
18      speaking up.
19  Q   And you would agree with me, Mr. Hogwood, that
20      February 3rd of 2022 is prior to when Campbell &
21      Company started conducting its search.  Is that
22      right?
23  A   It probably is.  Yes, sir.
24  Q   Okay.  So prior to the search committee going about
25      the search, there were concerns already raised about
```

Page 46

1    Ms. Snow that the board was aware of. Is that fair?
2  A   Yes, that's -- that's a correct statement.
3  Q   Okay. What was the discussion like with other board
4      members about this memo?
5  A   You know, I don't -- I don't remember that.
6  Q   Okay.
7  A   I do not believe that we even discussed it as a
8      group. I don't remember discussing that as a group.
9  Q   Did you discuss it with the other individuals who
10     might have received this letter?
11  A   I'm sure I did, but we did nothing with it.
12  Q   Do you know who sent this, by any chance?
13  A   No, I don't.
14  Q   Mr. Hogwood, how are you doing?
15  A   I'm doing fine.
16  Q   Do you need a break?
17         Okay. Now, I understand that you halted
18     the CEO search on May 13th, 2022. Does that sound
19     about right?
20  A   You said I halted the CEO search?
21     That's correct.
22  A   Yes, I did.
23  Q   Okay. Why did you halt the search on that date?
24  A   I was mad, frustrated, and angry. And I made that
25     decision without discussing it with anyone. I just

Page 47

1    did it.
2         And I made that decision because there was
3    so much animosity within the search committee, with
4    Randy and others, that I just stopped it. And
5    I said, "We're gonna start all over again." And
6    I had just heard news from Sara and Rebecca that
7    they terminated Terry Langston. So I stopped the
8    whole thing.
9         I discussed it with Randy and Zoe. And
10   they recommended to me that, you know, I should
11   probably take it to the board. And I said, "I'm not
12   gonna do it." I said, "I'm gonna use my power and
13   just stop the whole thing." And I stopped it.
14        And I said, "We're gonna start all over
15   again and we're gonna do this the right way."
16        I picked up the phone. I called Sara and
17   I said, "I'm stopping the search committee now. Let
18   me know how much money we owe them, and pay them.
19   And I will be back in touch with you."
20        And she said, "Yes, sir."
21  Q   Now, one thing I wanted to just clarify real quick:
22     Mr. Hogwood, do you know when exactly Mr. Langston
23     was terminated? Does May 17th sound correct?
24  A   I'm -- I'm sure it does.
25  Q   So Mr. Langston was terminated after the CEO search

Page 48

1    was halted with Campbell & Company then. Right?
2  A   Yes, it was.
3  Q   Okay. So just procedurally now, or in terms of a
4      timeline, the CEO search stops on May 13th with
5      Campbell & Company. And then just a few days later,
6      on the 17th, Mr. Langston is terminated.
7         Do you agree with me?
8  A   I believe that's correct.
9  Q   Okay?
10  A   Wait, wait, wait, wait.
11        I terminated the search when I found out
12     that Terry Langston was terminated. That's when
13     I stopped the search. It was like the final straw.
14  Q   Who told you that Mr. Langston was terminated?
15  A   Sara picked up the phone, along with Rebecca. It
16     was a conference call. And they said to me -- Sara
17     started out talking stating that "We have reviewed
18     Terry Langston's resume. And there was some
19     embellishments on the resume and some outright
20     lies," they said.
21        And his resume was reviewed not only by
22     Sara and Rebecca, it was reviewed by Dr. Johnson --
23        THE WITNESS: Who's the other doctor's
24     name? The dentist.
25        The dentist.

Page 49

1  BY MR. VLAHOPOLOUS:
2  Q   Ms. Hinkle?
3         (Cross-talk.)
4         THE WITNESS: Oh, I'm sorry. The dentist.
5     I forget her name.
6         And, again, I never -- I never saw Terry's
7     resume. But then Rebecca steps in and simply says,
8     "He lied on his resume stating that he has X number
9     of employees working for him, and he does not. And
10    he needs to be terminated."
11        And I said to them, "You have got to be
12    kidding me."
13        And they said, "No, we're not. But we're
14    gonna terminate him."
15        And I said, "You are making a bad
16    decision."
17        And they said, "Well, we hear you. But
18    we're doing it anyway."
19        And that was it.
20  BY MR. VLAHOPOLOUS:
21  Q   Okay. So you were contacted by the entire
22     leadership committee. And this consists of all
23     women. Right?
24  A   Yes. Well, Terry was on it.
25  Q   Fair enough.

Page 50

1    But excluding Mr. Langston, they were all
2    women --
3  A   Right.
4  Q   -- correct?
5  A   That's correct.
6  Q   And they claimed that Mr. Langston was a liar.  Is
7    that right?
8  A   Yes, they did.
9  Q   And so they said, "Because Mr. Langston is a liar,
10    we're going to terminate him."  Correct?
11  A   No.
12  Q   No?
13  A   They said, "Because he embellished his" -- well,
14    "Because he embellished his resume and lied on his
15    resume, that is grounds for termination."
16    That's what they said.
17  Q   And I understand that you never saw Mr. Langston's
18    resume, but did you have any reason to -- aside from
19    what the leadership team told you, did you believe
20    that he actually embellished his resume?
21  A   I -- I couldn't believe it.
22  Q   Yeah.
23  A   It's -- he'd been with the Center for seven years,
24    and it's the first I've ever heard of it.
25    And I told them that they were making a

Page 51

1    bad decision.
2    And they said, "Well, it's our decision to
3    make."
4    And I said, "Well, I know that.  But
5    you're making a bad decision."
6  Q   So they gave you a heads-up that they were going
7    terminate Mr. Langston before --
8  A   Yes, they did.
9  Q   Okay.  And then following that conversation, you
10    canceled the search?
11  A   Yes.  Following that, I canceled the search.
12  Q   Okay.  And what about the other --
13  A   I canceled the search because of the infighting that
14    was going on with the search committee and Randy.
15    And now this was the last straw.  They bring in
16    Terry, would was also part of the process.  I guess
17    he was gonna be looked at as a candidate.  And
18    I stopped the whole thing.
19  Q   I understand.
20    Did the leadership team ever mention that
21    the other two candidates potentially embellished
22    their resumes?
23  A   No.
24  Q   They only targeted Mr. Langston's resume then.
25    Right?

Page 52

1  A   To me, they only targeted Terry's.
2  Q   Did the leadership team ever raise concerns about
3    the other two final candidates?
4  A   No, not to me.
5  Q   I'm gonna show you my screen just one more time,
6    Mr. Hogwood.  Well, more than this time, but ...
7    Can you see my screen, Mr. Hogwood?
8  A   Yes, I can, if I get up and look at it.
9    MS. BERKERY:  Can you make it bigger?
10    There we go.
11  BY MR. VLAHOPOLOUS:
12  Q   Is this a little bit better?
13  A   Yeah.
14  Q   Okay.  And for the record, this is Bates-stamped
15    Defendant 169.
16    Mr. Hogwood, would you agree with me that
17    this appears to be meeting minutes from Campbell &
18    Company?
19  A   Yeah.  That's their logo on it.
20  Q   And this is --
21  A   Yeah.
22  Q   This is from March 14, 2022.  Correct?
23  A   That's what it says, yeah.  Yes.
24  Q   And I understand your name is not listed with the
25    individuals who were present during this meeting.

Page 53

1    Correct?
2  A   That's correct.
3  Q   So I understand you weren't there when this
4    happened, but I want to direct your attention to the
5    highlighted section down here.  It states:
6    "Discussion regarding two internal
7    candidates.  Terry Langston and Rebecca
8    Snow.  Majority opted to advance Terry.
9    More debate on Rebecca, focusing on
10    Campbell & Company's view that she does
11    not bring the external pieces emphasized
12    throughout [the] process.  4 of 6
13    committee members supported releasing
14    Rebecca, with Chelsea stating she's on
15    the fence.  Randy said he would resign
16    from the Search Committee immediately if
17    Terry advanced, but Rebecca didn't."
18    Do you see that, Mr. Hogwood?
19  A   Yes, I do.
20  Q   Is that along the same lines of what Jessica and
21    Theo told you on the phone?
22  A   Yes.
23  Q   So you had heard before that Randy had threatened he
24    would step away if Mr. Langston moves forward but
25    Rebecca Snow does not.  Correct?

Page 54

1   A   Yes.  I -- it was told to me that Randy would get
2       up -- he'd left the meeting.  As he was walking out,
3       he says something about Rebecca should be the one,
4       and I'm not going to, you know, recommend Terry.
5   Q   Do you think Mr. Treacher treated Rebecca Snow
6       differently than Mr. Langston?
7   A   I don't know --
8           MS. BERKERY:  Foundation.
9           But go ahead.
10          THE WITNESS:  I don't know if he treated
11      her any different- -- her differently.  I just think
12      he preferred, for whatever reason, Rebecca.
13  BY MR. VLAHOPOLOUS:
14  Q   I'm going to now show you document Bates-stamped
15      Defendant 179.
16          Same thing, Mr. Hogwood.  Would you agree
17      with me that this is meeting minutes from Campbell &
18      Company?
19  A   Yes, I will agree.
20  Q   And this is on April 11th, 2022.  Correct?
21  A   Yes, sir.
22  Q   And, Mr. Hogwood, I just want to go back real quick.
23          You haven't seen these records before,
24      have you?
25  A   I haven't seen these.

Page 55

1   Q   Okay.  I'm sorry, you said you have not seen them
2       before?
3   A   I have not seen these before.
4   Q   Okay.  Here at the bottom you'll see again another
5       highlighted section.  It says:
6           "Randy reiterated that he will not
7       vote for Terry to be CEO.  Campbell &
8       Company asked for feedback on why he's
9       so opposed to Terry's candidacy; [and]
10      Randy declined to say."
11          Did Mr. Treacher ever -- was he ever
12      inclined to tell you why he rejected or was opposed
13      to Terry's candidacy?
14  A   I believe the only thing that he told me was that
15      Terry was not qualified.  The only thing --
16  Q   Do you find it odd -- I'm sorry.  Go ahead,
17      Mr. Hogwood.
18  A   The only thing that I remember Randy ever telling me
19      was that he felt that Terry was unqualified for the
20      position.
21  Q   Do you find it odd that Mr. Treacher would decline
22      to elaborate during that during the meeting minutes?
23  A   No, I don't find it odd.  Because when -- when Randy
24      is Randy, if he chooses not to talk, he's not gonna
25      talk.  He's done that often in various meetings.

Page 56

1   Q   Does that take place when he doesn't like something?
2       He'll just keep it to himself?
3   A   It takes --
4           MS. BERKERY:  Foundation.
5           Go ahead.
6   BY MR. VLAHOPOLOUS:
7   Q   Go ahead, Mr. Hogwood.
8   A   It takes place if he feels that someone is picking
9       on him and his opinion.  Then he shuts down and says
10      he's not gonna talk and then he leaves the room.
11  Q   He leaves the room physically?
12  A   Yes.  He gets up and walks out and leaves the room
13      and doesn't return.
14  Q   And this happens often.
15  A   Well, I've known it to happen once because I was
16      sitting right next to him and I was having a
17      conversation with him and he got angry and left.
18  Q   Do you know why he supported Rebecca Snow so -- it
19      seemed so firmly?
20          MS. BERKERY:  Foundation.
21          Go ahead.
22  BY MR. VLAHOPOLOUS:
23  Q   Go ahead, Mr. Hogwood.
24  A   I have no idea.
25  Q   Do you know if Ms. Kaser may have ever expressed

Page 57

1       that she prefers Rebecca Snow to Randy?
2   A   No.  Molly never said anything to me like that.
3   Q   Do you know if Sara Benedetto, Rebecca Snow, and
4       Mr. Treacher ever communicated about Rebecca's
5       candidacy?
6   A   I have no idea.
7   Q   Do you know if those three individuals -- which
8       includes Rebecca Snow, Sara Benedetto, and Randy
9       Treacher -- do you know if they ever discussed
10      Mr. Langston's candidacy?
11  A   I have no idea.
12  Q   Mr. Hogwood, I'm gonna share my screen again.
13  A   Okay.
14  Q   Do you see my screen, Mr. Hogwood?
15  A   Yes.
16  Q   And for the record, this is Bates-stamped
17      Defendant 1326.
18          Mr. Hogwood, these are text messages that
19      we collected over the course of discovery.  And I'm
20      not sure whose phone this is, but I'll represent to
21      you that a text message was sent to someone by the
22      name of Randy.
23          Do you agree with me there?
24  A   Okay.
25  Q   Is it possible that this text message is to Randy

Page 58

1    Treacher?
2         MS. BERKERY:  Foundation.
3         But go ahead.
4         THE WITNESS:  I -- I'm assuming it is.
5    BY MR. VLAHOPOLOUS:
6    Q   Are you familiar with the phone number at the top?
7    A   No, I'm not.  I'm not familiar with that.
8    Q   And you'll see here on Tuesday, May 10th, at 8:52 in
9        the morning, it states -- the sender says:
10        "Hi Randy - we just got Terry L
11        resume.  Much of the information for the
12        Center is not based in fact.  Do you
13        have time to talk at all today?"
14        Do you see that?
15   A   Yes, I see it now.
16   Q   And the recipient says:
17        "Sure call anytime."
18        Do you see that?
19   A   Yes.
20   Q   So this is just three days before the search was
21       canceled.  Correct?
22   A   Okay.  Yes.
23   Q   And so whoever is sending this is communicating with
24       Mr. Treacher that they -- they say "we" just got
25       Terry's resume.

Page 59

1         Do you know who "we" is referring to?
2         MS. BERKERY:  Foundation.
3         THE WITNESS:  I have no idea.
4    BY MR. VLAHOPOLOUS:
5    Q   Okay.
6    A   Wow.
7    Q   You just said "Wow."  What's on your mind about
8        this?
9    A   I never knew this stuff was going on.  I never knew
10       people were texting each other back and forth on
11       this.  I never seen it.  Wow.
12   Q   Mr. Hogwood, give me just one more moment.  I'm
13       gonna share my screen again.  I apologize to make
14       you stand again.
15        Do you recognize this, Mr. Hogwood?
16   A   Yeah, I recognize my handwriting.
17   Q   And this is Bates-stamped Defendant 1328.
18        Mr. Hogwood, this is the letter that you
19       sent to announce the cancelation of Campbell &
20       Company's search process.  Right?
21   A   That's correct.
22   Q   Were you aware that just three days prior someone
23       texted Randy Treacher that they had found
24       discrepancies in Mr. Langston's resume?
25        MS. BERKERY:  Foundation.

Page 60

1         THE WITNESS:  No.  I'm not aware of that.
2    BY MR. VLAHOPOLOUS:
3    Q   So when Sara and Rebecca and the leadership team
4        called you and said, "We're going to terminate
5        Mr. Langston," were you aware that they had been
6        communicating with Mr. Treacher, as well?
7         MS. BERKERY:  Foundation.
8         THE WITNESS:  It's news to me.
9    BY MR. VLAHOPOLOUS:
10   Q   Okay.  You say:
11        "Today, I made the decision after
12        discussion with the officers ..."
13        And just for my own clarity here, who are
14       the officers you're referring to?
15   A   Myself, Randy, and Zoe.
16   Q   You said Zoe.
17   A   Yes.
18   Q   And you say:
19        "This decision was made based on
20        serious concerns about the search firm's
21        performance."
22        Do you see that?
23   A   Yes.
24   Q   What concerns -- were these concerns coming from
25       Randy and Zoe?

Page 61

1    A   They were coming from the whole search committee.
2    Q   Did, for instance, Jessica Embury say that she was
3        dissatisfied with Campbell & Company's performance?
4    A   All right.  What was your question now?
5    Q   Sure.
6         Did Jessica Embury ever express her
7        dissatisfaction with Campbell & Company's process
8        for finding a -- for conducting the CEO search?
9    A   I -- I don't believe they ever had a problem with
10       it.  If they do, I just -- I just don't -- I just
11       don't remember.
12   Q   So is it fair that it wasn't necessarily Campbell &
13       Company's process that was the problem.  It was the
14       internal conflict coupled with the accusations
15       against Mr. Langston that caused you to cancel the
16       search.  Is that right?
17   A   That is -- that is -- that is a correct statement.
18       I didn't write the letter.  I told Sara to write it
19       for me.
20   Q   I see.  So this --
21   A   That's why -- that's why the decision is made about
22       using the search firm's performance.  It really had
23       nothing to do with the performance of the -- of
24       the -- of the search firm.
25        I told her to write a letter, which she

Page 62

1    said, that said, "I'm stopping the whole thing."
2  Q  Mr. Hogwood, did you review this before Sara
3    published it on your behalf?
4  A  I -- I -- I scanned it and I signed it and sent it
5    back.
6  Q  Fair enough.
7  A  And I see now where it says the performance of the
8    search firm.  It really had nothing to do with that.
9  Q  So then she goes on to write for you:
10   "I recognize many of you may be
11   curious as to my decision, but I am not
12   at liberty to discuss the details at
13   this time.  If and when the timing
14   warrants, full disclosure may occur."
15   Do you agree with that --
16  A  Yes.
17  Q  -- Mr. Hogwood?
18  A  Yes.
19  Q  Okay.
20  A  I'm getting a workout today.
21  Q  Mr. Hogwood, I -- so I just want to, again, for the
22   timeline here -- so we saw the text messages on
23   May 10th between Randy and someone else about the
24   discrepancies in Terry's resume.  And then we just
25   saw the May 13th letter canceling the search.

Page 63

1    If you remember, what's going on?  What is
2    your involvement on May 11th and 12th, the time in
3    between these two occurrences?
4  A  Okay.  Repeat -- repeat the question for me again,
5    please.
6  Q  Sure.
7    So, Mr. Hogwood, I just want to understand
8    what's going on in between the time of May 10th and
9    May 13th.
10   So we see the messages where discrepancies
11   are allegedly found in Mr. Langston's resume.  And
12   then we have, on the 13th, the cancelation of the
13   search process.
14   I just want to know who was communicating
15   with you or what was going on between that timeline
16   between the 10th and the 13th?
17  A  Well, within that timeline there were issues within
18   the search committee, primarily with -- with Randy
19   and his behavior.
20   And also within this timeline there was
21   the termination of Terry Langston.  And with Terry
22   Langston being one of the, I don't know, two or
23   three candidates they had, Randy acting very
24   belligerent stating what he was and was not going to
25   do, I stopped the whole process.  I just stopped it.

Page 64

1    And I didn't ask anyone's permission.  I just --
2    I just did it.
3  Q  I understand.
4    Do you feel like you were led to cancel
5    the search process?
6  A  No one encouraged me to do it, at all.  I did it on
7    my own initiative.
8    Randy was acting the way he was acting.
9    The search committee was having issues going back
10   and forth.  I just said, "You know what?  We're
11   gonna start all over from scratch.  Because this
12   doesn't make any sense, at all."
13  Q  I understand.
14   So, Mr. Hogwood, I'm gonna share the
15   screen.
16   Can you see that, sir?
17  A  Yes, sir.
18  Q  You'll see here that this was an interview schedule.
19   Do you agree with me?
20  A  Yes, sir.
21  Q  And you'll see here that there's some participants
22   who were supposed to be in this interview.  That
23   includes the leadership team.  Correct?
24  A  Yes, sir.
25  Q  And that's Sara Benedetto, Rebecca Snow, Kim Hinkle,

Page 65

1    Rose Johnson, and Kathryn Thornton.  Correct?
2  A  Yes, sir.
3  Q  And then from the board, there was supposed to be
4    Jessica Embury and Randy Treacher participating.  Is
5    that right?
6  A  Yes, sir.
7  Q  So Mr. Langston was scheduled for May 13th, 2022,
8    for his interview.  Correct?
9  A  That's what it says, yes.
10  Q  Do you know when this letter from -- and we're now
11   looking at Defendant 1328 -- do you know at what
12   time of the day this was announced that you were
13   canceling the search?
14  A  I -- I have no idea.
15  Q  That's okay.
16  A  I don't remember that.  Yeah.
17  Q  And just to go back to this -- to the document with
18   the participants and the time scheduled for
19   Mr. Langston, this is Bates-stamped Defendant 187.
20   Mr. Hogwood, are you aware that
21   Mr. Langston did not interview on May 13?
22  A  No, I'm not aware of that, at all.
23  Q  Did you tell Ms. Benedetto to debunk the
24   discrepancies in the resume during the interview
25   with Mr. Langston?

Page 66

1  A   No.  I didn't tell her anything like that.
2  Q   So if she testified that you told her to debunk the
3      discrepancies, would you deny that?
4  A   I never told her anything like that.  Never.
5  Q   Now, Mr. Hogwood, I'll tell you that Mr. Langston
6      did not interview on May 13th.
7  A   Mr. Langston did not what?
8  Q   Did not interview --
9  A   Okay.
10 Q   -- on May 13th.
11 A   Okay.
12 Q   Do you agree with me that if the leadership team and
13     these board participants, including Mr. Treacher,
14     wanted to pursue the truth of whether or not
15     Mr. Langston actually lied on his resume, they had
16     the opportunity to do so on May 13th.  Is that
17     correct?
18 A   That's correct.
19 Q   But instead of interviewing him, they fire him four
20     days later -- is that correct? -- on May 17th.
21 A   Yes, that's correct.
22 Q   Does that seem odd to you?
23 A   Yes, it does.
24 Q   Tell me why it seems odd to you.
25 A   Something is going on behind the scenes that I'm not

Page 67

1      aware of.
2  Q   And I know you're laughing, but I can imagine this
3      is probably frustrating.  Right?
4  A   Yes.
5  Q   So then the only African-American male in a director
6      position was terminated without being confronted of
7      the accusations made against him.  Is that right?
8          MS. BERKERY:  Foundation.
9          THE WITNESS:  I don't know what Sara and
10     Rebecca said to Mr. Langston.  I wasn't involved in
11     that process.
12 BY MR. VLAHOPOLOUS:
13 Q   Did Ms. Benedetto ever tell you that she felt
14     uncomfortable confronting Mr. Langston on this?
15 A   No, she never told me that.
16 Q   Mr. Hogwood, what do you think would have
17     happened -- and I'm asking you to speculate here.
18     But what would have happened if Terry got the
19     position?
20         MS. BERKERY:  Objection; foundation, calls
21     for speculation.
22         THE WITNESS:  Ask me that again.  What
23     would have happened if what?
24 BY MR. VLAHOPOLOUS:
25 Q   Sure.

Page 68

1      What do you think would have happened if
2  Terry got the CEO position?
3          MS. BERKERY:  Same objections.
4          THE WITNESS:  Well, if he had gotten the
5      position, I guess he'd still be working here.
6  BY MR. VLAHOPOLOUS:
7  Q   Fair enough.
8          Would Terry still have his job if he
9      didn't apply to be the CEO?
10 A   Oh, I'm sure --
11         MS. BERKERY:  Foundation.
12         THE WITNESS:  -- he would.
13         MS. BERKERY:  Foundation.
14         I'm sorry.
15         THE WITNESS:  That's okay.
16 BY MR. VLAHOPOLOUS:
17 Q   Go ahead, Mr. Hogwood.
18 A   No, I'm sure he would.
19 Q   He would still have his job --
20 A   Yes.
21 Q   -- if he did not apply.
22 A   Yes, he would.
23         MR. VLAHOPOLOUS:  Let's go off the record.
24     (Recess taken from 11:06 a.m. to 11:15 a.m.)
25         MR. VLAHOPOLOUS:  Back on the record.

Page 69

1  BY MR. VLAHOPOLOUS:
2  Q   All right.  Mr. Hogwood, I'm gonna show you what has
3      been Bates-stamped Defendant 1239.
4          Can you see this, Mr. Hogwood?
5  A   Yes, I do.
6  Q   And it's only one page.
7          I'm gonna have you read this email for me
8      just to yourself.
9  A   Okay.  So Jessica wrote it.  Copied me.  All right.
10     "Given the current situation
11     and after a long thought process" --
12         MS. BERKERY:  Just read it to yourself.
13         THE WITNESS:  Okay.
14         MS. BERKERY:  Read it to yourself.
15         THE WITNESS:  I read it.
16 BY MR. VLAHOPOLOUS:
17 Q   Perfect.
18         Mr. Hogwood, I know you mentioned this
19     earlier, but this is from Jessica Embury.  Correct?
20 A   Yes.
21 Q   And this is sent on May 24th, 2022.  Correct?
22 A   Yes.
23 Q   And this is to Ms. Benedetto?
24 A   Yes.
25 Q   And you're copied on it.  Right?

Page 70

1  A   Yes, sir.
2  Q   Okay.  By May 24th, Mr. Langston was already
3      terminated.  Correct?
4  A   I -- I believe so, yes.
5  Q   So explain to me what is exactly going on in this
6      email.  I understand that Ms. Embury says that she's
7      disappointed, but she says she's not comfortable
8      supporting the Center's ambassador program without
9      Terry.
10         Can you explain that?
11         MS. BERKERY:  Foundation.
12         But go ahead.
13         THE WITNESS:  Well, Terry Langston was in
14     charge of the embassadorship program, which simply
15     meant that he would invite numerous key leaders
16     within the community to get an understanding of the
17     overall operation of how the Center works by giving
18     them a tour, letting them know that our facilities
19     are updated and we can do practically anything any
20     other doctor can do.  And we have a relationship
21     with Henry Ford Hospital, as well, here in town.
22         So Jessica and Terry worked side by side
23     in gathering together the key individuals and
24     conducting the tours throughout the health center.
25         And so by reading this, she felt that

Page 71

1      Terry was an integral process of this committee, and
2      therefore she needed his help.  And she wasn't gonna
3      do it any longer without his assistance.
4  BY MR. VLAHOPOLOUS:
5  Q   Would you describe Mr. Langston as the face of the
6      facility if he's the one giving the tours and
7      bringing in members of the community?  Was he the
8      face of the facility?
9  A   I -- I would say that he -- that he was.  He was out
10     in the community on a regular basis.  He would
11     schedule speaking engagements for myself for the
12     embassador program, raising money, and things of
13     that nature.  So I would say that he was.
14         He -- he was a natural for the job.
15 Q   Understood.
16         Ms. Embury also mentions (as read):
17         Quote, "There's a lot of talk in
18     the community as to the decisions that
19     were made and I do not want to be looked
20     at as someone who supports this kind of
21     decision making."
22         What do you make of that?
23         MS. BERKERY:  Foundation.
24         THE WITNESS:  She's referring to the
25     termination of Terry.  There were letters -- I know

Page 72

1      letters were sent to the board regarding the
2      termination of Terry.  And they wanted a reason why.
3      I believe that is what she was referring to.
4  BY MR. VLAHOPOLOUS:
5  Q   So I want to just -- I want to break that down.
6         Letters were sent to the board from
7      members in the community?  Do you know who in the
8      community sent those letters?
9  A   I don't remember their names.  But one of them works
10     downtown.  I believe he was -- he's one of the --
11     one was a female, and she's a councilwoman.  And
12     I want to say either the deputy, the mayor, or --
13     I think it was the city controller wrote a letter.
14     I don't quite remember.  But it was two letters that
15     was written.
16 Q   And they wanted an explanation of what happened to
17     Terry?
18 A   Yes.  What happened, yes.
19 Q   Do you know what explanation was offered?
20 A   I offered no explanation.  No one from the board
21     offered an explanation.  But I gave that information
22     to Sara.  I --
23 Q   Do you know if Sara ever gave -- I'm sorry.  What
24     was that, Mr. Hogwood?
25 A   And I gave that information to Sara.

Page 73

1  Q   Do you know if Sara --
2  A   I do not know if they responded or not.  I don't.
3  Q   Do you know if the letters from these members in the
4      community, whether it's the deputy mayor or city
5      controller or a female councilwoman, do you know if
6      those have been produced in this case?
7  A   I don't know.
8  Q   Do you know if the Center is still in possession of
9      those letters?
10 A   I don't know.
11 Q   Was there any discussion in a board meeting about
12     those letters?
13 A   I can't -- I can't state a fact.  But knowing --
14     knowing me, I probably mentioned it during a closed
15     session in a board meeting --
16 Q   Okay.
17 A   -- saying this is -- this is an issue.
18 Q   What did you perceive as an issue about it?
19 A   That the Center -- that the community would look
20     unfavorable [sic] at the termination of Terry
21     Langston.  And it could also affect the overall
22     operation of the Center.  It would damage its
23     overall reputation.
24 Q   Were you concerned that members of the community
25     might have thought that Mr. Langston's termination

Page 74

1    was because of his race?
2         MS. BERKERY:  What?  I didn't hear what
3    you said.
4    BY MR. VLAHOPOLOUS:
5    Q    Mr. Hogwood, did you hear my question?
6    A    No, I didn't either.
7    Q    Okay.  Were you concerned that members of the
8    community may have thought that Mr. Langston's
9    termination was because of his race?
10         MS. BERKERY:  Foundation.
11         THE WITNESS:  Yes.  That was -- that
12    was -- that was one of my main concerns.
13    BY MR. VLAHOPOLOUS:
14    Q    Were you concerned that his termination might have
15    been because of his sex as a male?
16         MS. BERKERY:  Foundation.
17         THE WITNESS:  No.
18    BY MR. VLAHOPOLOUS:
19    Q    Ms. Embury also says:
20         "I plan on reaching out to each
21    of the embassadors myself as well to
22    explain my absence."
23         Do you know if she ever did?
24    A    I don't know, sir.
25    Q    Okay.  No problem.

Page 75

1         Mr. Hogwood, I'm showing you what has been
2    marked as -- Bates-stamped Defendant 1335.
3         Same thing as last time.  This is just one
4    page.  So please review this email and let me know
5    when you're ready to discuss.
6         THE WITNESS:  Okay.  I -- I wrote this?
7         MS. BERKERY:  No, it was to you.
8         MR. VLAHOPOLOUS:  It's from Steven
9    Hogwood?
10         MS. BERKERY:  No, no.  Look down further.
11         THE WITNESS:  To Theo -- okay.  "CEO
12    Replacement."
13         All right.  So who's writing this letter?
14         MS. BERKERY:  Hilleary, Ted.
15         THE WITNESS:  Oh, okay.
16         MS. BERKERY:  See the "From"?
17         THE WITNESS:  Oh, okay.  Okay.
18         Okay.  I have it.
19    BY MR. VLAHOPOLOUS:
20    Q    Wonderful.
21         Mr. Hogwood, this was sent from Theo
22    Hilleary on May 31st, 2022.  Correct?
23    A    Yes, sir.
24    Q    And this was to -- you were the recipient.  Correct?
25    A    Yes.

Page 76

1    Q    And Dale Moretz was copied on this email.  Correct?
2    A    Yes.
3    Q    Okay.  Did you three -- Theo, yourself, and Dale --
4    did you have email communications following the
5    termination of Mr. Langston?
6    A    Did -- now say that again.  Did we what?
7    Q    Did the three of you have email communications with
8    respect to the CEO search -- or replacement after
9    Mr. Langston's termination?
10    A    This is the only communication that I -- that I am
11    aware of.
12    Q    Okay.
13    A    We did not meet to discuss it as a -- as a group or
14    as a board.
15    Q    Understood.
16    A    Yeah.
17    Q    So Theo says:
18         "I appreciate how unsettling this
19    is now for the."  Period.  "Clearly,
20    without an honest explanation for
21    Terry's termination, we cannot resolve
22    this stalemate."
23         I'm going to presume he's saying:
24    "... how unsettling this is for the
25    Center."  And that, again, "... without

Page 77

1    an honest explanation for Terry's
2    termination, we cannot resolve this
3    stalemate."
4         Does this mean to you, as the recipient,
5    that there was not an honest explanation for why
6    Terry was terminated?
7         MS. BERKERY:  Foundation.  He's not the
8    author.
9         But you can answer to the best of your
10    ability.
11         THE WITNESS:  Yes, that is -- that is
12    true.
13    BY MR. VLAHOPOLOUS:
14    Q    Did you agree with Theo that there was not an
15    explanation -- an honest explanation for Terry's
16    termination?
17    A    I -- I believe that they gave us the explanation
18    they wanted us to have.
19    Q    Can you explain what you mean by that?
20    A    They told us what they wanted us to hear.
21    Q    Whether or not it may or may not be true, they
22    wanted --
23    A    That's correct.
24    Q    -- to tell you --
25    A    That's correct.  They told us what they felt we --

Page 78

1    that we wanted to hear -- or that we needed to hear.
2 Q  Even if that might not be true.
3 A  That's correct.
4 Q  And Theo says:
5         "Jessica's distrust for Randy has
6     substance because [he] was not a full
7     team player on the search committee and
8     had some insight on him as [a] conduit
9     to staff on the deliberations of the
10    committee."
11        What does that sentence mean to you,
12    Mr. Hogwood? How do you interpret that?
13 A  I interpret that by simply stating that Randy used
14    to be an employee here at the Center. It also means
15    that he had a relationship with most -- with most of
16    the people in the Center. You know, particularly
17    Terry Langston, Teri Steele, Jessica, et cetera.
18    And therefore he had -- he had access to them and
19    had information. That's -- that's my assumption.
20 Q  Could it also mean that Randy informed the
21    leadership team of -- to the deliberations on the
22    committee? So that includes Sara, Rebecca Snow, Kim
23    Hinkle, and Dr. Johnson -- the members of the
24    leadership team that we discussed earlier.
25        MS. BERKERY: Foundation.

Page 79

1 BY MR. VLAHOPOLOUS:
2 Q  Could it be that he was reporting to them as to the
3    deliberations?
4        MS. BERKERY: Foundation.
5        THE WITNESS: You know, it -- it could
6    mean that, but I don't have any facts.
7 BY MR. VLAHOPOLOUS:
8 Q  Fair enough.
9        And he says:
10       "And for him to assert in our
11    meeting today that most of the staff
12    would leave with Terry as [the] CEO ..."
13       Did Mr. Treacher ever tell you that
14    employees would leave with Terry as the CEO?
15 A  No, Randy did not tell me that.
16 Q  Did any other employees tell you that they would
17    leave if Terry became the CEO?
18 A  No.
19 Q  Mr. Hogwood, I'm showing you what I will mark as
20    Exhibit A to your deposition. These are emails that
21    were produced from Dale, but they have not been
22    Bates-stamped by the Center.
23       (Deposition Exhibit A was marked.)
24 BY MR. VLAHOPOLOUS:
25 Q  So I'd like you just to review these first two

Page 80

1    pages, let me know if it's large enough for you to
2    see, and when you would like me to scroll. Okay?
3 A  Okay.
4        THE WITNESS: All right. Now, who wrote
5    this? Dale wrote this. Okay.
6        MS. BERKERY: No, no. It's from Ted to
7    Dale.
8        THE WITNESS: Oh, okay.
9        MS. BERKERY: You're copied.
10       THE WITNESS: You can scroll up. Okay.
11    You can scroll up some more. Okay.
12 BY MR. VLAHOPOLOUS:
13 Q  And then at the bottom here is a message from Theo
14    that I won't ask you about. Okay?
15 A  Okay.
16 Q  I'm just gonna ask you about these first two
17    messages.
18       Mr. Hogwood, do you feel like you've had
19    enough time to read them?
20 A  Yeah, I have a good understanding of them, I think.
21    Yeah.
22 Q  Okay. And you received both of these emails.
23    Correct?
24 A  Yes.
25 Q  Or you were at least copied on them.

Page 81

1 A  Yes, yes, yes, yes.
2 Q  So this isn't your first time reading them. Right?
3 A  Well, it's my second time now.
4 Q  Okay. So on May 31st, Dale messages you:
5        "Steven, I commend you for your
6    handling of this. You were
7    intentionally put in a difficult
8    position. You have demonstrated a calm
9    fortitude in spite of that, and [we]
10    have very visibly invited input from all
11    our board members. That resulted in
12    valuable inputs from several of them."
13       Now, from reading this, I can sense that
14    Dale has a lot of respect for you. And when he says
15    that you were intentionally put into a difficult
16    position, what did you make of that?
17 A  My opinion is that something was going on behind the
18    scenes and someone knew about it. That's how
19    I picked that up.
20 Q  Do you agree that you were intentionally put in a
21    difficult position?
22 A  No, I don't -- I don't agree with that. It just
23    happened.
24 Q  Okay.
25 A  It just happened. This was not on my radar screen

Page 82

1   by any means, you know.
2  Q   I believe that.
3  A   But I can -- I can see how they would make a
4     statement like that.
5  Q   You said something was going on behind the scenes.
6     Who do you think was taking actions behind the
7     scenes?
8  A   Well, my belief is that once they saw Terry's
9     resume, that changed all the dynamics.  That's why
10    I believe Dale is using the word "intentionally."
11 Q   This seems that -- and we've looked at some of the
12    Campbell & Company minutes.  Right?
13 A   Yes.
14 Q   And the concerns that Randy was raising about
15    Terry occurred prior to them claiming that
16    Mr. Langston had discrepancies in his resume.  Is
17    that right?
18 A   I believe so, yes.
19 Q   So it wasn't just once they saw his resume and
20    claimed there were discrepancies.  It seems that
21    there was -- at least from Randy -- some hesitancy
22    for rejection of Terry's candidacy prior to the
23    resume issue.  Is that right?
24 A   From what we were told, Terry's performance wasn't
25    as outstanding as Molly claimed it to be.

Page 83

1  Q   Who told you that?
2  A   That is what Randy is stating.
3  Q   Randy told you this?
4  A   No, Randy did not tell us this.  This is when we
5     hired an outside lawyer -- what's his name? -- Greg
6     to help investigate this situation and give us the
7     truth.
8  Q   Are you satisfied with that investigation?
9  A   You know, yes -- yes and no.
10        First of all, we engaged in -- with two
11    ladies, Georgia and Karen, engaged in the
12    fact-finding mission.  And I don't really believe
13    they gave us anything of substance.  They did agree
14    that Terry should have been terminated based on his
15    resume.  And that is something that they would have
16    done themselves.
17        But in terms of Terry's performance, there
18    was nothing ever mentioned.  They just simply
19    validated the fact that what Rebecca and Sara did
20    was the right thing to do.
21        But there was much confrontation in that
22    meeting when Karen and Georgia gave us this
23    information.
24 Q   And for the record, this is Georgia -- do you know
25    Georgia's last name?

Page 84

1  A   First name is Georgia -- Fojtasek.  Do not ask me
2     how to spell it.  Fojtasek.
3  Q   I'll tell you that it's spelled, for the record,
4     F-o-j-t-a-s-e-k.
5  A   You have more information than me.  Okay.
6  Q   And do you know Karen's last name, by any chance?
7  A   Chaprnka.
8  Q   And I'll spell that one for the record, as well, for
9     you.  It's C-h-a-p-r-n-k-a.  As someone with a
10    difficult last name, myself, I completely
11    understand.
12        How were Georgia and Karen selected?
13 A   Greg recommended them to us as the second choice.
14 Q   Who was the first choice?
15 A   I don't remember his name.
16 Q   And do you know Greg's last name, by any chance?
17 A   I don't.  I think it begins with a G.
18 Q   Is he from the same firm as the attorney who is with
19    you today?
20 A   I -- I don't know.
21 Q   Did Georgia and Karen confirm that Mr. Langston lied
22    on his resume?
23 A   They did not -- they did not use those words.  They
24    just simply said if someone had turned in a resume
25    of this caliber once we did our check, he would have

Page 85

1     been -- he would have been terminated and not hired.
2  Q   They didn't actually conclude whether or not it was
3     wrong or false information, they just said had it
4     been false information as is being claimed, that
5     justifies a termination.
6  A   That's correct.
7        MS. BERKERY:  I'm gonna place an objection
8     on the record because you have the report, and the
9     report speaks for itself.  If you want to ask him
10    his recollection of what's in the report, that's
11    fine.
12        MR. VLAHOPOLOUS:  Ms. Berkery, I'm going
13    to ask you to not coach the witness about this.
14        MS. BERKERY:  I'm not coaching the
15    witness.
16        MR. VLAHOPOLOUS:  Your objection is noted
17    for the record.
18 BY MR. VLAHOPOLOUS:
19 Q   Mr. Hogwood, you've discussed with Karen and Georgia
20    about their investigation.  Right?
21 A   Okay.  Ask that question again.
22 Q   Sure.
23        You've had personal discussions with
24    Georgia and Karen about their investigation.  Right?
25 A   Yes.

Page 86

1  Q   Okay.
2  A   Yes.  All the members of the board did.
3  Q   And so you have personal knowledge as to how they
4      went about their investigation.  Right?
5  A   No.
6  Q   Do you have personal knowledge --
7  A   I do not know what -- I'm sorry.  Go ahead.
8  Q   I was just gonna ask:  Do you have personal
9      knowledge as to the conclusions that were reached
10     and presented to the board?
11 A   Oh, yes.
12 Q   Okay.
13 A   Of the conclusions, yes, sir.
14 Q   Okay.  And so my question was, if we can go back,
15     that Georgia and Karen, they did not conclude that
16     Mr. Langston lied on the resume.  They merely
17     concluded that should he have lied on the resume,
18     that would justify a termination.
19 A   Yes.
20 Q   Is that correct?
21 A   Yes.
22 Q   Okay.  Dale also writes to you in this email:
23         "I very much appreciate the
24      observations of all those who spoke,
25      except that Randy's comments seemed to

Page 87

1      substantiate my belief that he was
2      sidestepping the search committee and
3      was probably a key player in Terry's
4      dismissal."
5          Do you agree that Mr. Treacher was a key
6      player in Terry's dismissal?
7          MS. BERKERY:  Foundation.
8  BY MR. VLAHOPOLOUS:
9  Q   You can answer.
10 A   I -- I -- I -- I don't know.  Randy -- the only
11     thing Randy ever said to me was that Terry was not
12     qualified for the job.  That's the only thing he
13     ever said to me.  He never elaborated or anything.
14 Q   Now, I know that's what he's told you.  But we
15     looked at his -- we looked at his behavior that has
16     been recorded in the meeting minutes.  We know that
17     he received a text from someone about the
18     discrepancies on Terry's resume.
19         I understand what Randy has told you.
20     Okay?  But my question is whether you think he was a
21     player in Terry's dismissal given all the facts that
22     you know now and based off of what has occurred.
23         MS. BERKERY:  Asked and answered.
24         THE WITNESS:  I -- I don't think he was a
25     player.

Page 88

1  BY MR. VLAHOPOLOUS:
2  Q   Okay.  Now, Dale says that:
3         "... he" -- meaning Randy --
4      "told us that it was his reporting to
5      the staff that led to Teri Steele's
6      dismissal."
7          Do you know anything about that?
8  A   I have hearsay information regarding it.
9  Q   Tell me what you know about Teri Steele's dismissal.
10 A   I know that Teri and Randy were close.  I know that
11     Teri felt that she could talk to Randy about
12     anything in confidence.
13         She mentioned to Randy that one or two of
14     the board members really got on her nerves.  And
15     that was communicated via a text message.
16         And Randy sent a text message to Sara,
17     who in turn terminated her because she wasn't
18     supposed to be talking to board members.  And it
19     was inappropriate of what she was saying about
20     them.
21 Q   Was it possible that Ms. Steele was complaining to
22     Randy about how Sara was treating her?
23         MS. BERKERY:  Foundation.
24         THE WITNESS:  I have no idea concerning
25     that.

Page 89

1  BY MR. VLAHOPOLOUS:
2  Q   Understood.
3         It says here in this message:
4      "The fact that Philip was not
5      allowed to interview staff is a huge
6      red flag."
7          Who is Philip?
8  A   Philip.  Philip.
9  Q   Do you see that, Mr. Hogwood?
10 A   Yes.  I don't -- I don't know who Philip is.
11 Q   Okay.  Now, Dale says:
12     "It will also show that he" --
13     referring to Terry -- "did not delete
14     material from his computer as
15     I understand he was accused of having
16     done."
17         Mr. Hogwood, was Terry ever accused of
18     deleting things -- or materials off of his computer
19     and cell phone?
20         MS. BERKERY:  Foundation.
21         THE WITNESS:  I -- I have -- I have no --
22     well, no.  I do -- I know that Sara -- because --
23     she said because an employee quits, they get someone
24     from IT to go in and see if there's any other
25     messages that are necessary to the Center, and then

Page 90

1    send them to her.  And then I guess they wipe the
2    computer clean.
3         That's all I know concerning that.
4  BY MR. VLAHOPOLOUS:
5  Q   So, again, I saw the recording of your discussion
6      with Kyle Hammond.  Kyle Hammond works in IT.
7      Right?
8  A   Okay.
9  Q   Do you agree?
10 A   That -- that he works in IT?
11 Q   Yeah.
12 A   I'm sure he does, yeah.
13 Q   And so how did that conversation with Kyle come
14     about?  Was it that someone accused Terry of
15     deleting things off of his computer and cell phone?
16 A   I don't -- I don't know, sir.  I don't know.
17 Q   I don't mean to argue with you, Mr. Hogwood.  All
18     I simply want to know is what led to Kyle and you
19     having that conversation with Jessica Embury present
20     and Dale, as well.  What led to that?
21 A   I -- I don't remember.  I -- I don't remember.  I'm
22     sure that maybe Kyle just started bringing it --
23     bringing it up upon himself.  I don't remember.
24 Q   Did Sara tell you that Terry deleted things off of
25     his phone and computer?

Page 91

1  A   Sara told me that she went to Terry's computer.
2      That's what she does.  I don't know what she got off
3      of it.  But it was basically standard procedure.
4  Q   Did you ever learn whether or not Mr. Langston did
5      delete things off of his computer and cell phone?
6  A   No, I'm not aware of that.
7  Q   So just to clarify, you don't know whether he did or
8      did not delete things?
9  A   That's correct.
10 Q   Okay.  Mr. Hogwood, I'm showing you what has been
11     marked as Bates-stamped Defendant 897 through 898.
12         Same as last time.  Please review and let
13     me know if you'd like me to scroll and when you're
14     ready to discuss.
15 A   Okay.  You can scroll up a little.  Okay.  Okay.
16     You can scroll up.  Okay.  Okay.
17 Q   All right.  Mr. Hogwood, this first email at the
18     top, it's from Jessica Embury on Wednesday,
19     June 1st, 2022.  Correct?
20 A   Yes, sir.
21 Q   And that is to Colleen Rogers.  Right?
22 A   Yes, sir.
23 Q   Who is Ms. Rogers?
24 A   I believe that she was part of the search firm.
25 Q   With Campbell & Company then.  Right?

Page 92

1  A   I believe so.  I never met her.
2  Q   Okay.  And you're copied on this message.  Right?
3  A   Yes.
4  Q   Okay.  Now, in this email discussion there's some
5      talk of the possibility of Terry becoming the
6      interim CEO.
7          Was that ever an option that the Center
8      considered -- or that the board of directors,
9      rather, considered to make Terry the interim CEO?
10 A   The board of direction -- the board of directors is
11     the one that recommended that.
12 Q   Okay.  So collectively the board said, even
13     following the cancelation of the search process with
14     Campbell & Company, that Terry should become the
15     interim CEO.  Right?
16 A   Yes, that -- that is correct.  A motion was made and
17     it was seconded and it was voted upon.
18 Q   Who made the motion?
19 A   Dale Moretz.
20 Q   Who seconded it, if you remember?
21 A   I do not remember.
22 Q   That's okay.
23         Did you support the motion?
24 A   I -- I supported it.  I don't know if anyone counted
25     anything or not on the ballots.  I don't -- so

Page 93

1      I don't know if it was unanimous, but I think it
2      was.  I don't remember that.
3  Q   Understood.
4          So if a motion was passed, why didn't that
5      happen?
6  A   You know, I think it didn't happen because we wanted
7      to have more information before we made our final
8      decision.  And that is when we got Greg involved.
9  Q   More information with respect to just Terry's
10     termination, in general, or --
11 A   Yes, yes, yes.
12 Q   Mr. Hogwood, I'm showing you what has been marked
13     Bates-stamped TL236 through 237.  Take your time to
14     review this.  Same procedure as last time.  Okay?
15 A   Who -- who -- who wrote this?
16 Q   At the bottom you'll see that this is from Jessica
17     to you.
18 A   Okay.  You can move it up.  Okay.  Okay.  Move it
19     up.  Okay.  I have a good gist of it.
20 Q   Mr. Hogwood, have you seen this email before?
21 A   I'm sure I have.
22 Q   Okay.  But you're reviewing it again now since then,
23     I presume.  Right?  So this is the second time,
24     perhaps, that you've seen this document?
25 A   Yes.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
94..97

Page 94

1   Q   Okay.  So Jessica sends you an email stating that --
2       the very first sentence:
3           "I could not sleep last night
4       thinking about the way in which both the
5       attorney, Sara and Rebecca are playing
6       this out.  I continued to be
7       significantly concerned about the legal
8       ramifications of the chaos created by
9       Sara and Rebecca, and how they are now
10      characterizing Terry's work with the
11      Center.  The deletion of computer files
12      is a serious matter, and we should not
13      make those allegations lightly.  I would
14      like us to do the following as time is
15      slipping away for us to right the wrong
16      that is being done at the Center both
17      with respect to Terry Langston and Teri
18      Sue Steele."
19          So reading that, when it says "both the
20      attorney, Sara and Rebecca," which attorney are they
21      referring to -- is Jessica referring to?
22  A   Sara has an attorney that supports her.  So I'm
23      assuming she's right here.
24  Q   That would be Ms. Berkery --
25  A   Yes.

Page 95

1   Q   -- who you pointed to.  Right?
2   A   Yes.
3   Q   And did Ms. Berkery, Sara, and Rebecca represent
4       that Terry Langston deleted computer files?
5   A   Well, what she stated to us is that this is not the
6       job of the board, because we only have one employee.
7       And that employee is Sara.  That was the major gist
8       out of the conversation.
9   Q   I hear you, Mr. Hogwood, but that's not quite what
10      I'm asking.
11          For instance, if you look at the sentence
12      right below that, it says:
13          "I do not believe Sara, Rebecca, or
14      the attorney when they say that Terry
15      has destroyed property of the Center
16      (deletion of his files from the CHF
17      issued computers) ..."
18          So, again, my question is, Mr. Hogwood:
19      Did Ms. Berkery, Sara, and Rebecca report to you and
20      the board that Mr. Langston deleted materials off of
21      his computer?
22  A   No.
23  Q   Then why would Jessica say that?
24          MS. BERKERY:  Foundation.
25          THE WITNESS:  I don't know.

Page 96

1   BY MR. VLAHOPOLOUS:
2   Q   It prompted, though, that conversation with Kyle
3       Hammond.  Right?
4   A   I believe it did, yes.
5   Q   And Kyle said, in fact, that Terry Langston had not
6       deleted anything from his computer.  Right?
7   A   If that's what he said, yes.
8   Q   Do you recall asking Mr. Hammond, quote, "What is
9       the opinion of the staff having all white female
10      executives"?
11  A   I don't -- I don't believe I asked that question.
12  Q   Okay.  Would the response that Mr. Hammond gave you
13      referring to them, the female executives, as a club,
14      does that sound familiar?
15  A   No, it doesn't.
16  Q   Have you ever heard of individuals referring to the
17      executive leadership team as "The Girls' Club"?
18  A   "The Ghost Club"?
19  Q   "The Girls' Club."
20  A   "The Girls' Club"?
21  Q   Yeah.
22  A   I've never heard that.
23  Q   Okay.  Is it possible that you just don't remember
24      Kyle saying that to you?
25  A   It's -- it's possible, surely.

Page 97

1   Q   Okay.  But it's also possible that Kyle and other
2       employees have said that to you before.  Right?
3   A   Sure.  Yes.
4   Q   And you just don't remember it.
5   A   Right.
6   Q   Okay.  Jessica says:
7           "So, I am requesting that we send
8       an email to Sara, Rebecca, cc'ed the
9       attorney for them to provide evidence by
10      Thursday of this week that Terry in fact
11      deleted all the files from his
12      computer."
13          Was any evidence ever presented to you
14      that Terry, in fact, deleted all files from his
15      computer?
16  A   No.
17  Q   We talked a little earlier about Georgia Fojtasek
18      and Karen Chaprnka.
19          I'm going to show you what is marked as
20      Defendant 1423 through 1425.
21          Mr. Hogwood, can you see my screen?
22  A   Yes, sir.
23  Q   So it's three pages.  And I'll give you the time to
24      review it, but have you seen this before, these
25      notes that Georgia took on her conversation with you

Page 98

1      from June 27, 2022?
2  A   I've never seen these notes.
3  Q   Okay.  Then allow me to just point you in a few
4      directions as to what she wrote from her
5      conversation with you.  Okay?
6  A   Okay.
7  Q   And my reason for this is just so that you can
8      explain to me your -- give me more context to these
9      notes.  Okay?
10 A   Okay.
11 Q         "In midst received an email from
12         Jessica and Ted that wanted RT removed."
13             Is "RT" Randy Treacher?
14 A   Yes, sir.
15 Q   Okay.  And so you told Georgia that you received an
16     email from Jessica and Ted that they wanted Randy
17     Treacher removed from the search committee.  Right?
18 A   Yes.
19 Q   And Randy was adamant that Terry Langston was not
20     qualified.  Correct?
21 A   Yes.
22 Q   And like you told me earlier, you said that you were
23     not going to remove Randy Treacher.  Correct?
24 A   Correct.
25 Q   Then it says:

Page 99

1           "Sara called to say
2           "Not qualified to run $30 million
3      business.
4           "Doctors said were not right fit.
5           "One working in Michigan but living
6      elsewhere.
7           "TL outright lies.  (Lying on
8      resume:  They called Molly).  Rebecca
9      stepped in somewhat aggressively that
10     if done anywhere else, would fire
11     immediately."
12          So did Sara and Rebecca bring concerns
13     about other candidates to you?
14 A   They did not bring any other candidates to me.  The
15     only candidate they talked to me about was Terry
16     Langston.
17 Q   Okay.  And Rebecca seems to be the aggressive one
18     here saying that if it was done anywhere else, they
19     would be fired immediately.  Right?
20 A   Yeah.  Sara did not talk much, at all.  90 percent
21     of the talking to me was from Rebecca.
22 Q   Mr. Hogwood, do you find it strange that -- again,
23     the only two internal candidates who applied were
24     Ms. Snow and Terry.  Is that right?
25 A   Yes.

Page 100

1  Q   And now Rebecca did not make it as far as Terry did.
2      Correct?
3  A   That's correct.
4  Q   But then Rebecca is the one, as these notes put it,
5      aggressively pushing for his termination?  Is that
6      right?
7  A   Yes, that's true.  She -- she spoke to me and told
8      me.  She was adamant in her vocabulary regarding it.
9  Q   What kind of vocabulary did she use?
10 A   Well, when I say "vocabulary," I'm talking about her
11     words, her passion, her beliefs that this is wrong
12     and we need to fix it and we're gonna fix it now.
13 Q   Did she curse --
14 A   She was aggressive in her conversation.
15 Q   Did she curse or use any profanity?
16 A   No.
17 Q   Okay.  But she was just passionate, as you put it.
18 A   She was passionate about the fact that she's looking
19     at a piece of paper.  In her opinion, it was -- it
20     was a lot of untruths and a lot of embellishments.
21     It's like she'd never seen that before.  And we need
22     to fix it and we need to fix it now.  She was
23     aggressive.
24 Q   Regardless of whether or not those discrepancies in
25     the resume are actually true.  Right?

Page 101

1  A   That's how it was presented to me.
2  Q   You say here -- or you don't say it.  Apologies.
3      The notes say:
4           "Picked apart by Jessica and
5           others.  Didn't have right to do
6           unilaterally.  A puppet."
7               What does that mean, if you know?
8  A   I don't know.
9  Q   That's okay.
10              Was anyone a puppet?
11 A   I don't -- I don't know.  I don't know what I'm
12     saying here.
13 Q   That's okay.
14              To be fair then, you don't know why
15     Georgia might have wrote down "A puppet."  Right?
16 A   Yeah.  I don't know why.
17 Q   You don't think she's referring to you as a puppet,
18     do you?
19          MS. BERKERY:  Foundation.
20          THE WITNESS:  I don't -- I don't know.
21     I don't know.
22 BY MR. VLAHOPOLOUS:
23 Q   Do you feel like -- strike that.
24 A   Okay.
25 Q   Down here you're discussing -- or there's notes

Page 102

1    discussing what you think of Mr. Langston, and
2    says -- I'll quote it directly:
3         "TL: nice guy.  Answers questions.
4    Did good ... with politicians.  Good rep
5    in community.  Asks him to give, he
6    writes check.  Nice good employee.
7    Did complain to Steven several times:
8    in Molly's meetings Rebecca puts him
9    down and doesn't answer questions.
10    Start look for another job."
11        So did Mr. Langston tell you that Rebecca
12   puts him down in meetings?
13 A   Yes.
14 Q   When did he tell you that?
15 A   Well, again, I don't have exact dates.  It had to be
16   several years ago.  And it was just a little
17   conversation that we would have and he would talk to
18   me about how he was talked to in meetings.  And that
19   he would not receive any support from Molly in those
20   meetings.  And that Rebecca and Sara would always
21   say something condescending towards him or belittle
22   him or criticize any type of recommendation or
23   proposal that he presented.
24 Q   And how did you respond to him?
25 A   I listened.  About all I could do is listen.

Page 103

1 Q   I understand.
2        Did you believe Mr. Langston?
3 A   Yes, I believed him.
4 Q   It also says down here:
5        "Jennifer ripped him apart."
6        Who is "him"?  Did Jennifer -- let's back
7    up.
8        Is this referring to Jennifer White?  Do
9    you see here?
10 A   Yes.  I --
11 Q   And it says --
12 A   Oh, I'm sorry.  Go ahead.
13 Q   I was just gonna ask:  Who is "him" when it says
14   "Jennifer ripped him apart"?  Who is that referring
15   to?
16 A   I -- I -- I don't know.  It could have been
17   referring to me.
18 Q   Okay.
19 A   Because I made the decision to cancel the search
20   committee.  And I did not talk to anyone about it.
21   And I had a long conversation with Jennifer.  And
22   she -- she let it be known to me, as well as others,
23   that I shouldn't have done that.
24        That's the only thing I can think of.
25 Q   What did -- it says:

Page 104

1        "Racism to hilt."
2        Did Jennifer present this to you, her
3    concerns, as this being racially motivated?
4 A   She -- she -- she -- she did.  She did.
5 Q   It says:
6        "All orchestrated to get rid of
7    TL," Terry Langston.
8 A   Yes.  That's what it says, yeah.
9 Q   So in your knowledge, do other board members believe
10   that this was racially motivated?
11        MS. BERKERY:  Foundation.
12        THE WITNESS:  The only one that I've heard
13   that from is Jessica and Jennifer.
14 BY MR. VLAHOPOLOUS:
15 Q   Do members of the board, to your knowledge, believe
16   that Mr. Langston was terminated because he's a man?
17 A   No.
18 Q   Do you, Mr. Hogwood, believe that racism is involved
19   in this?
20 A   Yes, I do.
21 Q   Can you explain it to me, please.
22        I'm sorry, Mr. Hogwood.  Did you hear my
23   question?
24 A   Oh, no, no.  I'm sorry, go ahead.
25 Q   That's okay.  You can be seated.

Page 105

1        I just asked if you could please explain
2    why you think racism might be involved.
3 A   Well, I just -- I just think it's obvious.  It's
4    just obvious.
5        I picked up the phone and I called --
6    I called Philip.  Now, again, I'm sorry, I don't
7    remember his name, but he -- but he works for, you
8    know, one of the health centers.  And I called him
9    needing some type of information or clarity
10   regarding this.
11        And I said, "I can't believe this is going
12   on; that they're terminating a man that's worked
13   with the company, you know, for over seven or eight
14   years.  And they're terminating him because of some
15   embellishment on a resume."  And I said, "It doesn't
16   make any sense."
17        And I said, "Would you have terminated
18   him?"
19        And he says, "No, Steven, I wouldn't
20   have."  He said, "If it was that bad, I just would
21   have had a conversation with him."
22        And as long as I've been on the board,
23   it's -- it seems that, you know, men don't last and
24   a black man didn't last.  It's just apparent.  It's
25   in your face.  And I don't know why.

Page 106

1  Q   Did you ever suspect that Mr. Langston was going to
2      bring a lawsuit against the Center?
3  A   Say that again.
4  Q   Sure.
5          Did you ever suspect that Mr. Langston
6      might bring a lawsuit against the Center?
7  A   No, I never thought he would.  But he did.
8  Q   Yeah.
9          Was anyone else on the board ever
10     concerned that Mr. Langston might bring a lawsuit?
11 A   Well, after the situation, I'm sure everybody
12     thought he was gonna bring one.
13 Q   Have any board members stepped down since
14     Mr. Langston's termination?
15 A   No.
16 Q   Okay.  Correct me if I'm wrong, Mr. Hogwood, did
17     Ms. Embury ever step away from the board or was she
18     suspended from the board?  What happened there?
19 A   Jessica was suspended from the board.
20 Q   Why was she suspended?
21 A   She was suspended from the board because she had --
22     she had -- she had a business relationship with
23     Terry.  And she showed Terry some of these documents
24     that had information regarding who was being
25     selected and not selected regarding to the CEO

Page 107

1      position.
2  Q   So was it that she had just forwarded emails to
3      Mr. Langston about what was going on?
4  A   I was told that she did.  And she admitted it.
5  Q   Did --
6  A   And she apologized.
7  Q   Was this after Mr. Langston's termination?
8  A   I think it was before.
9  Q   Okay.
10 A   I think it was before.
11 Q   After Mr. Langston is terminated.
12         So now this next question:  After
13     Mr. Langston is gone from the Center, did you ever
14     give any sort of documents to Terry as to an
15     investigation or did you give him any sort of
16     evidence -- or not evidence, but did you give him
17     any documents to review?
18 A   No.  I never gave Terry any documents, at all.
19     I don't keep documents.
20 Q   Fair enough.
21 A   Terry -- not Terry.  But Jessica was the secretary,
22     and she handled everything.
23 Q   Is it possible that she might have told Jessica to
24     give something to Terry?
25 A   No, no.

Page 108

1  Q   Now, Mr. Hogwood, I understand you don't keep the
2      records yourself.  Were you aware that you had an
3      obligation to save all communications and documents
4      with respect to Mr. Langston's termination?
5  A   I'm not aware that I was supposed to save all these
6      various memos.  But it appears that someone did.
7  Q   Did Ms. Berkery ever advise the board or yourself to
8      preserve any of these documents?
9  A   Not to my knowledge.
10 Q   Okay.  Mr. Hogwood, we're almost done.  I'm just
11     gonna show you a few more documents.  Okay?
12 A   Okay.
13         THE WITNESS:  Can I say something?
14         MS. BERKERY:  No.  Wait for the question.
15         THE WITNESS:  I can't say anything?  Oh,
16     okay.  I was gonna say something.
17 BY MR. VLAHOPOLOUS:
18 Q   Sorry, is your attorney advising you of anything,
19     Mr. Hogwood, currently?
20         MS. BERKERY:  He asked me if he could
21     ask -- make a statement, and I told him no.  Wait
22     for your question.
23         THE WITNESS:  Okay.
24 BY MR. VLAHOPOLOUS:
25 Q   Which question did you want to make a statement on,

Page 109

1      Mr. Hogwood?
2  A   I wanted to make a statement on the documents.
3  Q   Go ahead.  Go ahead.
4  A   Anytime I wanted something written and maintained,
5      I would call the secretary and they did it for me.
6  Q   I understand.
7  A   That's -- that's all I wanted to say.
8  Q   I completely understand.
9          Who would be the secretary?
10 A   Well, Stephanie or I would just call Sara and
11     I would say, "Do it for me."
12 Q   Okay.
13 A   I mean, even Zoe.  To this day, I'd say, "Write a
14     letter for me and send it out and I'll approve it
15     and move on."
16 Q   Were you involved in producing any documents in this
17     case?  Did you have any involvement, at all?
18 A   No.
19 Q   Understood.
20         Okay.  Mr. Hogwood, can you see my screen?
21 A   Yes.
22 Q   Okay.  So these are documents that have been created
23     over the course of litigation.  Okay?  And what
24     these are, are our, plaintiff's, Mr. Langston's,
25     interrogatories to the Center.

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
110..113

---

Page 110

1   And an interrogatory, think of it as just
2   a question.  Okay?
3       The first question that we asked the
4   Center was to identify the individuals who are
5   responding to our interrogatories.
6       And they listed Sara Benedetto and
7   Michelle Lutz, as well as Nilda Ward.
8       So we've talked a lot about Sara, but we
9   haven't talked about Michelle Lutz.  Who is she?
10  A  I have no idea.
11  Q  Okay.  Do you know who Nilda Ward is?
12  A  I have no idea.
13  Q  Were you ever consulted about these interrogatories?
14  A  No.
15  Q  Okay.  Then allow me to show you Interrogatory
16  Number 13, which asked the Center to please identify
17  every individual that had input into Mr. Langston's
18  termination.
19      And they list Sara Benedetto, Rose
20  Johnson, Katie Thornton, Kim Hinkle, Michelle Lutz,
21  Rebecca Snow, and then at the very end, Steven
22  Hogwood.
23      Do you see that, Mr. Hogwood?
24  A  Yes, I do.
25  Q  Do you agree with that, that you had input into

---

Page 111

1   Mr. Langston's termination?
2   A  I will agree to the fact that I disagreed with it.
3   That's the input that I had.
4   Q  Okay.  Tell me -- if you would, tell me what you
5   vocalized in disagreement with Mr. Langston's
6   termination.
7   A  Okay.  Say that again.
8   Q  Of course.
9       Tell me, if you can remember, what you
10  vocalized in disagreement with Mr. Langston's
11  termination.
12  A  What I told Sara and I told Rebecca, I said, "You
13  are making a bad decision."  I said, "There's no
14  reason to do this, at all."  And I said, "You are
15  going to hurt the Center."
16      And then I was simply told, "Well, thank
17  you, but that's not your job."
18  Q  Do you know what input Rose Johnson had --
19  Dr. Johnson had in Mr. Langston's termination?
20  A  I didn't even know she had input on it.  So, no,
21  I don't know.
22  Q  What about Dr. Thornton?  I believe she's the dental
23  director.  Did you know that she had any input?
24  A  This is what I do know.  I do know that they -- that
25  they received copies of the resumes.  And supposedly

---

Page 112

1   they were all offended by what they saw on Terry's
2   resume.
3   Q  I see.
4   A  But I did not know that they had any -- that they
5   had any influence in his termination.
6   Q  And so --
7   A  I just thought --
8   Q  I'm sorry.  Go ahead, Mr. Hogwood.
9   A  I just thought it was a decision of Sara and
10  Rebecca.
11  Q  Understood.
12      All the individuals, with the exception of
13  yourself, listed here, they're all members of the
14  leadership team.  Right?  This executive team?
15  A  Well, like I say, I don't -- I don't know a lot of
16  their names, but I can only say yes, you know.
17  Because I don't -- I don't know the HR lady, the
18  Michelle.  I don't know her.
19  Q  If you've heard other employees refer to members of
20  the executive team as a "club," would these be the
21  individuals that they're referring to?
22      MS. BERKERY:  Foundation.
23      THE WITNESS:  If that's the case, yes.
24  BY MR. VLAHOPOLOUS:
25  Q  Okay.  Mr. Hogwood, can you see my screen?

---

Page 113

1   A  Yes, sir.
2   Q  So these are document requests that we asked the
3   Center over the course of discovery.  Similar to the
4   interrogatories, these asked the Center to produce
5   documents that we believe are relevant to
6   Mr. Langston's case.
7       Now, I want to point your attention to
8   Request No. 22, which asked to (as read):
9       "Please produce all communications,
10      documents, video recordings and
11      electronically stored information,
12      which includes emails and text messages,
13      from October 1st, 2021 to November 1st,
14      2022, between Mr. Steven Hogwood" --
15      yourself -- "and board members that
16      relate to the search process."
17      Now, the first response that we received
18  was that board members do not have Center for Family
19  Health email or phone.
20      Do you see that?
21  A  Yes, sir.
22  Q  Now, we looked earlier at a document that contained
23  the contact information for board members.  Right?
24  A  Yes, sir.
25  Q  Would you say that board members use those emails

---

Page 114

1     and phone numbers listed in that contact spreadsheet
2     for business purposes with the Center?
3  A   Well, yes. Yes.
4  Q   Of course. Right?
5  A   Yes.
6  Q   And they probably also communicated about the search
7     process through those.
8  A   Yes.
9  Q   Okay. And then you'll see here, the second
10    supplemental response, that the Center claims you
11    did not save any emails or text messages responsive
12    to this request.
13       Do you see that?
14  A   Yes, sir.
15  Q   Now, my first question is: Were you ever asked to
16    produce documents like this that are requested in
17    Document Request No. 22?
18  A   Yes, I was asked if I had --
19  Q   When were you asked?
20  A   I was asked if I had any documents, emails, text
21    message, or anything of that nature.
22  Q   When were you asked?
23  A   A couple of weeks ago, I guess. And I said I didn't
24    have any.
25  Q   Give me one second, Mr. Hogwood.

Page 115

1  A   Okay.
2  Q   Do you know if that was after May 1st, 2023, the
3    beginning of this month?
4  A   It was this month I was asked.
5  Q   For the first time?
6  A   I believe so.
7  Q   Mr. Hogwood, do you know when those emails and text
8    messages might have been deleted -- or when you
9    deleted those messages?
10  A   I don't keep a lot of text -- I don't keep any text
11    messages. When I respond, I delete. So I don't --
12  Q   Okay.
13  A   Even on the personal side, I don't --
14  Q   I understand.
15  A   Any type of written communication for the Center is
16    always written by someone else.
17  Q   I understand.
18       And it's because no one told you to
19    preserve those. Right?
20  A   No one -- no one did, no.
21  Q   Yeah. No, I understand.
22      MR. VLAHOPOLOUS: Let's go off the record.
23    (Recess taken from 12:30 p.m. to 12:34 p.m.)
24      MR. VLAHOPOLOUS: Back on the record.
25      Mr. Hogwood, I appreciate your time today

Page 116

1    in answering these questions. I have no further
2    questions.
3      MS. BERKERY: I have a couple of follow-up
4    questions.
5      EXAMINATION
6 BY MS. BERKERY:
7  Q   Mr. Hogwood, do you remember me leaving you a voice
8    message, before May, about whether or not you had
9    any documents, text messages, or emails regarding
10    the Langston matter?
11  A   Yes, I remember that.
12  Q   And then you -- do you remember that you called me
13    back? We never spoke. You left me a message.
14  A   Yes, that's true.
15  Q   And you told me you didn't have anything.
16  A   That's correct.
17  Q   Okay. Mr. Langston testified that you told him that
18    he was fired because he's a black man.
19       Did you tell him that?
20  A   No, I didn't.
21  Q   He also testified that you told him to sue the
22    Center for Family Health, and that you hope he gets
23    millions of dollars.
24       Did you say that?
25  A   No, I didn't.

Page 117

1      MS. BERKERY: I have no other questions.
2      MR. VLAHOPOLOUS: I just have a few more,
3    Mr. Hogwood.
4      FURTHER EXAMINATION
5 BY MR. VLAHOPOLOUS:
6  Q   This voicemail, when was this voicemail left?
7  A   It was in April, I believe.
8  Q   So just the month prior, in April. Is that April of
9    2023, Mr. Hogwood?
10  A   Yes.
11  Q   Do you still have that voicemail?
12  A   No, I don't.
13  Q   That's okay.
14       Because you were never told to, you know,
15    preserve anything from this case. Right?
16      MS. BERKERY: Well, he would never
17    preserve --
18      MR. VLAHOPOLOUS: Ms. Berkery, this isn't
19    your question.
20      MS. BERKERY: -- or produce an email from
21    me -- or a voicemail from me.
22      MR. VLAHOPOLOUS: Ms. Berkery,
23    I understand, but this is not your question. This
24    is Mr. Hogwood's question.
25  \

TERRY LANGSTON vs CENTER FOR FAMILY HEALTH
HOGWOOD, STEVEN 05/22/2023

Job 23439
118..120

Page 118

1    BY MR. VLAHOPOLOUS:
2    Q    My question is:  Were you told to preserve anything
3         from this case, Mr. Hogwood?
4    A    I was asked a question: If I had any emails, please
5         let her know.
6    Q    And that was in April of --
7    A    Emails, communications, things of that nature.
8    Q    And that was in April of 2023.  Correct?
9    A    And I responded back to her via email -- voicemail.
10        I called her.  I called her office.
11   Q    Now, you were asked some questions about
12        Mr. Langston's testimony.
13             Is it possible that Mr. Langston believed
14        you supported his lawsuit?
15   A    It's -- it's possible, yes.
16   Q    Okay.  And is it also possible that he believed you
17        thought this might be, as you've testified today,
18        for racial reasons?
19   A    Yes, it's possible.
20             MR. VLAHOPOLOUS:  Okay.  I have no further
21        questions.
22             MS. BERKERY:  No questions.  Thank you.
23             MR. VLAHOPOLOUS:  Ms. Thomas, I would like
24        to order an E-Trans, please.
25             THE COURT REPORTER:  Ms. Berkery, did you

Page 119

1    need a copy?
2             MS. BERKERY:  Yes, please.
3             THE COURT REPORTER:  E-Trans?
4             MS. BERKERY:  E-Trans.
5             THE COURT REPORTER:  Okay.  Thank you.
6         (Deposition concluded at 12:37 p.m.)
7    \
8    \
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1                    CERTIFICATE
2    STATE OF MICHIGAN    )
                          ) ss
3    COUNTY OF OTTAWA     )
4             I, CYNTHIA M. THOMAS, Certified Shorthand
5         Reporter and Notary Public, do hereby certify that the
6         foregoing deposition was taken before me at the time
7         and place hereinbefore set forth, and that said witness
8         was duly sworn by me to tell the truth, the whole
9         truth, and nothing but the truth, and was examined and
10        testified in the foregoing deposition as appears:
11             I FURTHER CERTIFY that the deposition was
12        taken in shorthand and thereafter transcribed by means
13        of computer-aided transcription by me and under my
14        direction and supervision, and that it is a true and
15        accurate transcript of my original shorthand notes.
16             I FURTHER CERTIFY that I am not a relative or
17        employee or attorney or counsel of any of the parties,
18        or financially interested directly or indirectly in
19        this action.
20             IN WITNESS WHEREOF, I have hereunto set my
21        hand this 31st day of May, 2023, at Grand Rapids,
22        Michigan.
23                    _Cynthia M. Thomas_
                      CYNTHIA M. THOMAS
24                    Certified Shorthand Reporter No. 3836
                      Notary Public, Ottawa County, Michigan
25                    My Commission Expires:  11-09-28

Ex. A

3 FEB 2022   PM 1   L

FOREVER / USA

Theodore Hilleary
4738 Pin Oak Trl
Jackson, Mi 49201

49201-820338

What the most important skillset for a new CEO?

Trust. If the survey response is small, please don't justify why with historic trends, and
other excuses.   No one believes the survey is confidential.

Trust eroded when Rebecca pushed her Theory X management style into daily
operations at CFH.  She brought a culture of suspicion and a negative view of
employees. Good employees are called out for bogus incidents that inflate into
accusations as they rise up the bureaucratic ranks to her desk.  She can't see past her
own biases and is incapable or unwilling to accept truth when it is told to her if it doesn't
fit her preconceptions or expected outcomes. She's in the wrong position now and will
be in the wrong position as CEO.

DEF000156

Ex. B

**TL 000783**

Timeline leading up to the Termination Action –

<u>Monday, May 9, 2022</u> – Email from Colleen Rogers, Senior Consultant, Executive Search, Campbell & Company, Included CVs for three candidates

<u>Tuesday, May 10, 2022</u> – Reviewed email and CVs and noticed discrepancies in all three CVs.

Sara Benedetto phone conversation with Steven Hogwood, regarding discrepancies in CVs. Steven said to move forward and debunk the discrepancies during interviews.

Email from Terry Langston to Sara Benedetto responding to a request for Information on sponsorships of the awards dinner to thank them for their contribution.

<u>Wednesday, May 11, 2022 -</u> Sara Benedetto, Dr. Johnson, Dr. Thornton, Kim Hinkle and Rebecca Snow met to prepare for interviews with candidates scheduled for 5/12 and 5/13. Decision was made not to participate due to concerns over optics of senior leadership disputing CVs and questioning candidates especially in front of two search committee members.   Vetting CVs should be the role of the search firm.

Sara Benedetto contacted one of the alleged sponsors, Molina. Result was that contact person provided by Terry Langston and the supervisor of the contact person were not aware of any donation.  A search of the records by the supervisor showed no evidence of a donation to the Center.

<u>Thursday, May 12,2022</u> – Sara Benedetto became aware of issue with billboard and Terry Langston lying about discussing it with Dr. Rizwan.

Michelle Lutz and Sara Benedetto discussed the next steps in preparation for the Employee Discussion Summary and level of discipline.

Michelle Lutz disclosed to Sara Benedetto the issue with the employee and the donation that was taken after the expiration of her pledge.

<u>Friday, May 13, 2022</u> - Sara Benedetto spoke with Molly Kaser to verify discrepancies in Terry Langston's CV.  Resulted in final discrepancies verified.

Sara and Michelle Lutz discussed the termination of Terry Langston with Karen Berkery.  Karen discussed document and process.  Plan was to move forward on May 16th.

<u>Monday, May 16, 2022</u> – Terry Langston called in sick using FMLA.

<u>Tuesday, May 17, 2022 </u> - Termination Meeting took place with Sara Benedetto, Michelle Lutz and Terry Langston.

**TL 000783**

Ex. C

Attachment 4

**May 13, 2022**

Center for Family Health Board,

I am sending this letter to inform you of an important update regarding the search process. As you are aware our board search committee has been working with the search firm, we contracted with to recruit a new CEO for the center.

Today, I made the decision after discussion with the officers, to discontinue the current search process and our contract with the search firm.  This decision was made based on serious concerns about the search firm's performance.   I recognize many of you may be curious as to my decision, but I am not at liberty to discuss the details at this time. If and when the timing warrants, full disclosure may occur.

As for the money that has already been expended, it is sometimes necessary to understand that the right decisions may cost temporarily but will be valuable in the long term.  All of us recognize that this is the most important decision a board can make for the health and wellbeing of the Center.  Please rest assured, I did not make this decision lightly.

Over the next few days and weeks, we will be developing a new search process.  Please remember that confidentiality is expected for all Board members to ensure candid conversations during this process. As part of this expectation, please refrain from contacting staff regarding this matter.

DEF001328